UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                    :

ISACCO JACKY SAADA,          :

             Petitioner,     :

                    :

                    :   **MEMORANDUM AND ORDER**

       - against -        :   18-CV-5292 (AMD) (LB)

                    :

NARKIS ALIZA GOLAN,      :

             Respondent.  :

---------------------------------------------------------- X

**ANN M. DONNELLY,** District Judge.

       The petitioner, Isacco Jacky Saada, brings this case against the respondent, Narkis Aliza Golan, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. Mr. Saada, an Italian citizen, seeks the immediate return of his two and a half year old son, B.A.S., to Italy. He alleges that in August of 2018 Ms. Golan, the child's mother and an American citizen, wrongfully kept B.A.S. in the United States.

       Mr. Saada filed this petition on September 19, 2018.[1] (ECF No. 1.) A nine day bench trial began on January 7, 2019, during which Mr. Saada called 11 witnesses, including four experts. Ms. Golan called six witnesses, including three experts.

       Based on my review of the entire record, the parties' submissions and arguments, and my observations of the witnesses at trial, I conclude that the petition should be granted, subject to certain conditions to ensure the child's safety.

---

[1] At the Court's direction, Ms. Golan surrendered her passport, as well as B.A.S.'s passport for the pendency of the proceedings. The parties negotiated supervised visitation during the adjudication of the petition.

I do not come to this conclusion lightly. The record is clear that Mr. Saada's abuse of Ms. Golan and the parties' volatile relationship is harmful to B.A.S. But I do not act as a family court. My task is not to determine the best interests of B.A.S. or Ms. Golan, or to impose custody arrangements. Under the Hague Convention, I must determine whether B.A.S. should be returned to Italy for custody proceedings. I must first decide whether B.A.S.'s habitual residence is Italy, and if it is, whether he would be subject to grave risk of harm upon repatriation, and whether there are any measures that can ameliorate that risk. For the reasons set forth below, I find that B.A.S.'s habitual residence is Italy, that he would be subject to grave risk of harm upon repatriation, and that there are measures that can be taken to ameliorate the risk.

## FINDINGS OF FACT

The 31 year old petitioner, an Italian citizen, was born and currently resides in Milan, Italy. (ECF No. 39 ¶ 1; Tr. 820:3-8.) He has worked at his father's fashion and garment manufacturing company since he was 17 years old. (Tr. 52:4-6, 820:12-20; *see also* Tr. 1053:16-19.) The 28 year old respondent, an American citizen, was born in Brooklyn, New York, and currently resides in New York. (ECF No. 39 ¶ 2.) Mr. Saada and Ms. Golan have one child, two and a half year old B.A.S., who was born in Italy and has dual Italian and American citizenship. (*Id.* ¶ 3; R-8 at 1; R-12.)

The evidence established that the parties' relationship was turbulent from its inception, characterized by loud arguments and violence, most of which was perpetrated by Mr. Saada. At trial, neither Mr. Saada nor Ms. Golan was entirely credible. Mr. Saada admitted that he was violent toward Ms. Golan, but downplayed the frequency and severity of the abuse, and at points in his testimony, excused his behavior as justified by Ms. Golan's "provocation." For her part, Ms. Golan exaggerated at

points in her testimony. She was sometimes evasive and feigned confusion or failure of memory when confronted with evidence that she perceived to be unhelpful to her position.[2]

In the context of this case, however, the parties' credibility deficits were less significant because of the independent evidence—in the form of text messages, photographs, and Ms. Golan's contemporaneous recordings—of Mr. Saada's violence toward Ms. Golan, often in front of the young child who is the subject of this proceeding.

## I. Habitual Residence

The parties met at a wedding in Milan, Italy, on June 13, 2014. (Tr. 23:21-22, 821:17-19.) They started a relationship, and on August 25, 2014, Ms. Golan moved to Milan. (Tr. 27:14-18, 195:10-15, 822:25-823:6.) At first, she stayed with Mr. Saada at one of his family's apartments, in the same building where his family lived, at Via Luigi Soderini 35, Milan, Italy.[3] (Tr. 27:19-29:3, 820:23-821:9; ECF No. 39 ¶ 4.)

The couple broke up in October of 2014, and Ms. Golan returned to New York. (Tr. 832:21-25, 835:18-20.) They reconciled about two months later, in December, and Mr. Saada came to New York to see Ms. Golan. (Tr. 835:21-836:5.) They were engaged on February 18, 2015, and lived together in Milan in an apartment away from Mr. Saada's family until September of 2015. (Tr. 44:13-19, 847:22-

---

[2] Following the trial, the petitioner's attorney alerted the Court to Ms. Golan's postings on social media. Although the Court took steps to protect B.A.S.'s identity, given the highly personal and sensitive evidence about B.A.S. and his parents, Ms. Golan posted photographs of herself and B.A.S. on Instagram and encouraged her more than 200 followers to "follow" the trial. (ECF No. 54-1.) She included various hashtags: #judgeanndonnelly, #ellendegeneres, #michelleobama, #oprahwinfrey, #donttakemybaby, and #domesticviolencesurvivor. (*Id.* at 1-3.) One of the captions stated, "I am currently awaiting a court response by #judgeanndonnelly who is to decide whether my abuser gets to take my son back to his habitual place of birth or perhaps we've been through enough and can stay here, in my country where I know I'm safe and protected. Follow my story on google (saada vs. Golan)." (*Id.* at 1.) In another post, she stated, "I've remained quiet for 2 years of your life because daddy and his family have lots of money and power. Something mommy didn't have." (*Id.* at 2.)
[3] Mr. Saada's grandparents lived in an apartment on the second floor, his parents and two brothers lived in an apartment on the third floor, and his sister, her husband, and their three children lived in an apartment on the fifth floor. (Tr. 821:3-13.)

848:15, 856:9-15.) They were married in a religious ceremony[4] on August 18, 2015, in Tel Aviv, Israel.[5] (Tr. 24:11-18, 986:23-987:6.)

The parties lived in Italy after the marriage. (Tr. 59:17-20.) Although Ms. Golan did not want to live with Mr. Saada's family, the couple moved to an apartment in the building where Mr. Saada's family lived. (Tr. 59:23-60:18, 62:2-4; *see also* Tr. 856:23-857:20.) Ms. Golan got pregnant around September of 2015. (Tr. 281:2-8.) During a 2016 trip to New York, she explored the possibility of having the baby at Coney Island Hospital, but subsequently returned to Milan. (Tr. 77:10-78:2.)

B.A.S. was born in Milan in June of 2016. (Tr. 861:22-862:1; P-59.) Mr. Saada and Ms. Golan filled out and signed various documents for B.A.S.; they got him an Italian passport, medical coverage, identification cards, and a certificate of residence.[6] (Tr. 865:1-20, 1015:5-9; P-35; P-58; P-60.) They continued to live in the same apartment, and B.A.S. received all of his medical care in Italy.[7] (Tr. 237:8-11, 1015:22-24.) In March of 2017, Ms. Golan registered B.A.S.'s birth abroad with the United States consulate in Italy without telling Mr. Saada. (Tr. 227:11-15, 231:7-17, 890:2-4; R-12.)

Before July of 2018, B.A.S. had left Italy only three times: twice to Israel, and once, with both parents, to the United States in the summer of 2017. (Tr. 96:21-97:1, 137:23-138:8, 209:15-25, 872:24-873:6, 886:17-18.)

On July 28, 2017, while she and Mr. Saada were in the United States, Ms. Golan applied for a Social Security card for B.A.S., but did not tell Mr. Saada. (Tr. 141:14-16, 889:24-890:1; R-11.) On

---

[4] They never registered the marriage in any country; as a result, Ms. Golan could not work legally in Italy. (Tr. 24:17-18, 157:22-158:6, 914:17-21; R-8 at 1; R-9 at 1.)
[5] In papers opposing the petition, Ms. Golan described her marriage as "arranged" by her family. (ECF No. 20 ¶ 6.) She testified that she meant that her aunt and cousin introduced her to Mr. Saada, and she "felt a little bit pressured to get married." (Tr. 258:10-259:15.)
[6] Ms. Golan testified that Mr. Saada drove her to these places right after B.A.S. was born, and that she did not understand the paperwork that she signed. (Tr. 86:19-87:9.)
[7] Mr. Saada's sister, Jenny Saada, who lived in the family building, testified that B.A.S. had a close relationship with her three children, ages five, three, and one. (Tr. 1255:12-1256:9.)

August 15, 2017, Ms. Golan filed a custody petition in New York Family Court, Kings County seeking full custody of B.A.S. (Tr. 142:17-143:3; R-14.) The Kings County Family Court dismissed the case for lack of jurisdiction.[8] (Tr. 1425:14-21.) In any event, Ms. Golan returned to Italy, because Mr. Saada promised to change, "work on" their marriage and go to counseling. (Tr. 143:22-144:8.) Around this time, the parties enrolled B.A.S. in Scuola del Merkos, a school and daycare, in Milan. (P-88; Tr. 205:1-11.)

In January of 2018, Mr. Saada came to New York after a fight with his brother over the family business. (Tr. 918:14-22; *see also* Tr. 163:10-16, 371:14-372:2, 918:14-23; R-29.) He considered getting an apartment for himself, Ms. Golan, and B.A.S. (Tr. 374:6-18.) He also looked at boutique storefront locations, met with business contacts, and talked to Ms. Golan's brother, Eldar Golan, about going into business. (Tr. 161:22-162:15, 371:14-22, 374:6-13.) Ultimately, he decided not to move to New York because his father agreed to give him an increased share of the family business. (Tr. 163:24-164:6, 374:24-375:4, 918:18-25.)

On July 18, 2018, Ms. Golan and B.A.S. flew to the United States, with Mr. Saada's consent, to attend Eldar Golan's wedding. (ECF No. 39 ¶ 5; Tr. 172:8-13.) Although they were scheduled to return to Italy on August 15, 2018, Ms. Golan stayed in New York, and moved to a confidential domestic violence shelter.[9] (ECF No. 39 ¶¶ 5-6; *see also* Tr. 172:19-24, 176:9-16, 901:25-902:6; P-46.)

Ms. Golan claimed that she never agreed to live permanently in Italy or to have B.A.S. live there. (Tr. 142:14-16; *see also* Tr. 917:14-918:13.) And Mr. Saada testified that Ms. Golan "would just try all these years just to make me, make me fight with my family, take me away . . . bring me to America. That was all her plan from day one." (Tr. 967:20-23.) She "always told [him] she want[ed] to move to

---

[8] At some point, Ms. Golan gave Mr. Saada a copy of the custody petition, which he apparently ripped up. (Tr. 143:10-14.)

[9] Ms. Golan reported that she could not stay with her mother, who lives in Brooklyn. (R-296 at 27.)

the U.S.," she asked him "constantly" to "move to the U.S.," and her "often-expressed desire to move to the United States" was a "point of contention" in their relationship, causing frequent arguments. (Tr. 917:14-918:13; *see also* ECF No. 31 ¶ 6.) But Mr. Saada never agreed to move to the United States. (*See* Tr. 917:14-918:25.)

Ms. Golan left Milan without Mr. Saada both before and after B.A.S. was born, but until July 2018, always returned to Milan. She claimed that she returned only because Mr. Saada and his family promised that he would not assault her and that he would seek help. (*See* Tr. 41:7-13, 44:3-14, 58:23-59:18, 78:1-12, 143:22-144:10, 214:25-215:18.)

On September 19, 2018, Mr. Saada filed a criminal complaint in Milan, accusing Ms. Golan of kidnapping B.A.S. (R-8 at 3.) He initiated this action the next day. (ECF No. 1.) He also commenced civil proceedings in Italy. (R-9 at 9-32.) Mr. Saada subsequently filed for sole custody of B.A.S. in Italy.[10] (Trib. Di Milano-Sezione IX Civile, 8 Novembre 2018, RG n. 51492/2018.)

## II. Violence and Abuse

The evidence established that Mr. Saada and Ms. Golan fought frequently, and that Mr. Saada physically, psychologically, emotionally and verbally abused Ms. Golan. He admitted that he slapped, pushed, and grabbed Ms. Golan. (Tr. 842:25-843:16, 956:16-25; *see also* R-313 at 12-13.) He estimated that he slapped Ms. Golan five or six times, pulled her hair three or four times, pushed her four or five times, threw a glass bottle during an argument, yelled, swore, and called her names.[11] (Tr. 842:25-844:15.) He also told Ms. Golan's family that he would kill her, although he said he made the

---

[10] Mr. Saada states in his post-trial brief that the "custody action in Milan is scheduled for April 9th." (ECF No. 59 at 37 n.23.)

[11] Mr. Saada frequently insulted Ms. Golan in front of other people, including family, friends, and at least one time, police officers. (*See, e.g.*, R-17; R-17A; R-18; R-18A; Tr. 602:20-603:3; *see also* R-20; R-20A.) He called her "animal," "bitch," "a cancer," "crazy," "dirt," "disgusting," an "escort," "fucking asshole," "garbage," "*hadia* [shit]," "lowlife," "*merda* [shit]," "piece of shit," "poison," "psychopath," "stupid," "tramp," and "whore." (*See, e.g.*, Tr. 107:9-19, 926:5-7; R-5 at 4; R-17; R-17A at 1, 12, 14; R-18; R-18A at 2; R-19; R-19A at 2; R-21; R-21A at 1; R-24; R-24A at 5.)

6

threat only out of anger. (Tr. 844:18-21.) Mr. Saada admitted that he tried to restrain Ms. Golan, got

"violent," was "impulsive," "los[t] control" when he got "angry," and hit Ms. Golan "to shut her up."

(Tr. 956:19-25, 967:7-12, 991:23-992:4, 1003:16-20.) He summarized their relationship this way:

> I knew when I met Narkis that she came from a broken home and she really come with the best
> intention the first time to Milano. I know I did a lot of mistakes, too. I'm a cheater, I get violent,
> I say things that I shouldn't say, maybe sometime I, in a stupid way, I took advantage—not
> advantage, but not—I felt comfortable doing certain things because she didn't know to, maybe
> to protect herself. I mean, I did a lot of bad things to Narkis . . . .

(Tr. 967:10-12.)

Mr. Saada and Ms. Golan fought "on a daily basis." (Tr. 966:6-7.) The fights often resulted in

one of them leaving the house. (Tr. 966:11-15.) Mr. Saada was "sure" that B.A.S. heard "screaming

and fighting and yelling." (Tr. 969:4-10.)

Although Mr. Saada was far and away the more violent, there were times when Ms. Golan

fought with and yelled at him. She conceded that she scratched and kicked Mr. Saada, and verbally

abused him. (Tr. 106:6-15, 223:7-25; R-5 at 5.) According to Mr. Saada, Ms. Golan slapped him a few

times, scratched him about ten times, bit him about five or six times, spit in his face, kicked him, and

often yelled at him. (Tr. 844:22-25, 845:3-25, 846:21-847:1.) She called him names, insulted his

family, and at one point said that she wished his family would die. (Tr. 847:2-7, 847:12-13.)

There is no significant evidence that Mr. Saada was intentionally violent to B.A.S. Eldar Golan

described one time that Mr. Saada put B.A.S. on his shoulder when B.A.S. was crying, and "hit him

really hard on his behind." (Tr. 370:21-371:2.) Ms. Golan claimed that Mr. Saada, while dragging her

out of the apartment, also pushed B.A.S. (Tr. 156:10-21.) However, Ms. Golan frequently left B.A.S.

with Mr. Saada while she ran errands, or went out with friends. (*See* Tr. 536:6-18, 618:7-15, 1036:21-

1037:19, 1042:13-18.) She also testified that she wants B.A.S. and Mr. Saada to have a relationship.[12] (Tr. 302:17-22.)

## A. Incidents

### i. Before B.A.S.'s Birth (December of 2014 to May of 2016)

The parties' relationship was violent and contentious almost from the beginning. During a December 2014 trip to New York, Mr. Saada slapped Ms. Golan; he admitted in a subsequent text message exchange that he had "smash[ed]"[13] Ms. Golan on two other occasions—once at a hotel and once at "[M]icol['s] wedding."[14] (Tr. 34:14-35:7, 39:8-40:20; R-39.) Ms. Golan testified that Mr. Saada slapped her while they were in Israel planning their wedding, an accusation that Mr. Saada denied. (Tr. 45:14-22, 849:19-23.)

On another occasion, after Mr. Saada argued with his mother about Ms. Golan's refusal to attend Shabbat dinner, Mr. Saada screamed at Ms. Golan, "You are poison. Look what you caused me to be. . . . You ruined me . . . . What are you, an animal?" (Tr. 46:1-14, 850:20-22; R-21; R-21A.) He threw a glass bottle, which shattered against a wall behind Ms. Golan. (Tr. 46:1-14, 850:20-22; R-21; R-21A.) Ms. Golan testified that he aimed for her; Mr. Saada admitted that he threw the bottle, but said that he threw it at the wall opposite Ms. Golan.[15] (Tr. 46:1-14, 850:22-24.)

Mr. Saada also admitted that he slapped Ms. Golan in June of 2015 after she threw water in his face. (Tr. 944:17-25.) In a text message to Ms. Golan's mother, Mr. Saada said he "smash[ed] [Ms. Golan's] face without thinking as [a] reaction." (R-40 at 6.)

---

[12] Similarly, Mr. Saada believed that Ms. Golan was a good mother, and that she was "an able and loving parent." (Tr. 999:25-1000:4.)
[13] Mr. Saada, whose first language is Italian, testified that when he wrote "smash," he actually meant "slap." (Tr. 838:3-6.)
[14] Mr. Saada admitted the New York incident, but claimed not to recall anything at a hotel or Micol's wedding. (Tr. 938:3-939:25.)
[15] Ms. Golan made an audio recording of this incident. (R-21; R-21A.)

During the parties' honeymoon in Florida, Ms. Golan looked at Mr. Saada's iPad, and discovered that before their wedding he had sex with a prostitute in London.[16] (Tr. 49:22-51:25, 851:21-852:7.) Ms. Golan left at one point, and stayed with her grandmother in New York. (Tr. 52:15-25.) According to Ms. Golan, Mr. Saada came to the house, slapped her, pulled her hair, and punched her in the face. (Tr. 56:6-20.) Eldar Golan said that the parties were "yelling and screaming" at each other, and that Mr. Saada punched Ms. Golan in the face "several times." (Tr. 366:11-22.) Mr. Saada denied the violence; he said that Ms. Golan put her hands over her ears when he tried to apologize, so he tried to remove her hands from her ears. (Tr. 852:3-854:1, 956:10-957:19.)

Ms. Golan became pregnant with B.A.S. in September of 2015. (Tr. 281:2-8.) She testified that Mr. Saada attacked her several times while she was pregnant. On one occasion, when she and Mr. Saada were in a car, she told him that she could not continue their relationship and wanted to go back to New York. (Tr. 63:1-12.) Mr. Saada became angry and said, "You want to leave me? You think you're going to leave me? Huh?" (Tr. 63:143-64:3.) He grabbed her by the hair, and "bash[ed] [her] face against the dashboard," causing her sunglasses to cut her face. (Tr. 64:4-12; *see also* Tr. 607:13-608:4.) Mr. Saada denied that this happened. (Tr. 858:1-6.)

Another time, Mr. Saada hit Ms. Golan because she missed Passover dinner with his family. (Tr. 79:19-80:20.)

Ms. Golan described an incident of "sexual violence" during her pregnancy. While she and Mr. Saada were having consensual sex, she felt pain and asked him to stop, but he refused. (Tr. 66:13-67:6.) Ms. Golan started bleeding, and thought she was having a miscarriage. (Tr. 67:21-68:3.) She told Mr. Saada that she wanted to go to the hospital; he told her to ask his parents for permission, because they were having Shabbat dinner. (Tr. 68:4-9.) Mr. Saada's mother, Caroline Darwich, dismissed Ms.

---

[16] Mr. Saada admitted that he slept with other women, including prostitutes and "models." (R-313 at 14 n.4; Tr. 926:8-25.)

Golan's concerns: "[A]s long as you don't have chunks coming out the size of lemons, you have nothing to worry about."[17] (Tr. 68:18-20.)

Mr. Saada eventually took Ms. Golan to the hospital where a doctor diagnosed her with "ripped tissue," and released her about an hour after she arrived. (Tr. 69:2-5, 70:4-6; R-305.) As they were leaving the hospital, Mr. Saada grabbed her by her hair, pushed her down, and dragged her, something Mr. Saada admitted in a text message to Ms. Golan's mother: "When we go out of hospital [I] was d[i]stressing and [I] pull her hair . . . and then [I] pull her from her jacket . . I[']m not say[i]ng was [right] to pull her hair but [it] was an accumulation of stress that she keep put[t]ing me [through]."[18] (Tr. 70:8-71:11; R-44 at 1-2.)

Mr. Saada agreed that Ms. Golan was bleeding, but denied that she complained of pain during sex or asked him to stop. (Tr. 859:4-13, 959:11-960:10.) He claimed that he asked her repeatedly if she wanted to go to the hospital, and she said she wanted to wait. (Tr. 859:10-15.) It was not until the next day at Shabbat dinner that Ms. Golan said for the first time she wanted to go to the hospital. (Tr. 859:15-20.) Mr. Saada took her to the hospital, and was "upset" that she could not wait one more hour until dinner was over, since she "wait[ed] all day" to say she wanted to go to the hospital. (Tr. 859:18-23.) Mr. Saada was "annoyed or angry" with Ms. Golan for forcing him to take her to the hospital and missing the family dinner; she could "never let [him] enjoy any moment." (Tr. 963:5-15.) Mr. Saada admitted that he pulled Ms. Golan's hair, but said that she threw herself on the ground and screamed.

---

[17] Ms. Golan claimed that Mr. Saada's family was also verbally abusive toward her. Ms. Darwich screamed and swore at her, and even told Mr. Saada to hit her. (*See, e.g.*, R-15; R-15A; R-23; R-23A; Tr. 80:1-20, 104:15-18.) Once, after Ms. Golan missed a family dinner, Ms. Darwich told Mr. Saada to "put some sense into this madwoman you married." (R-15; R-15A at 2.) Some of these incidents were recorded on audio and video. (*See, e.g.*, R-15; R-15A; R-23; R-23A.)

[18] Ms. Golan claimed two security guards watched Mr. Saada assault her, but did nothing, something Ms. Golan attributed to Mr. Saada's "family influence" over them. (Tr. 71:5-11, 283:20-25, 285:9-14.) Ms. Golan made a similar claim about "family influence" over the Italian authorities in her response to the petition, but no such evidence was introduced at the trial. (ECF No. 20 ¶ 69.)

(Tr. 860:11-16, 963:14-25; *see also* R-44 at 1-2.) He tried to pull her up, and told her to take a cab. (Tr. 964:1-3.) In the end, she went home with him. (Tr. 964:3-5.)

Another time during Ms. Golan's pregnancy, Mr. Saada became angry with Ms. Golan and "hipped" her while they were walking down the stairs, causing her to lose her balance and fall down a few stairs. (Tr. 64:21-63:12.) Mr. Saada said that he did not push her "down the step," but pushed her toward the wall. (Tr. 860:6-10, 861:16-18.)

### ii. After B.A.S.'s Birth (June of 2016 to July of 2018)

Shortly after B.A.S. was born,[19] Mr. Saada got angry during a Monopoly game, and while B.A.S. was in the room, hit Ms. Golan's leg with a candle, causing a bruise. (Tr. 101:19-102:19; R-27.) Mr. Saada admitted that he was angry, but denied that he hit Ms. Golan. (Tr. 843:11-12, 871:9-11.)

Ms. Golan claimed that during a religious ceremony called "pidyon haben" at their apartment, Mr. Saada pulled her into their bedroom, and slapped her in the face with both hands. (Tr. 88:3-89:13.) B.A.S., who was about a month old, was in the room in his basinet. (Tr. 88:23-24.) Mr. Saada denied that this incident occurred.[20] (Tr. 867:14-19.)

About a month later, the couple took B.A.S. to Israel for a vacation. (Tr. 96:21-97:1.) Ms. Golan claimed that Mr. Saada slapped and punched her while she was breastfeeding B.A.S., and that he made contact with B.A.S. (Tr. 97:2-98:15; *see also* Tr. 606:24-607:12.) According to Ms. Golan, the baby refused to eat for some time after the incident; she also developed a condition in her breast. (Tr. 98:16-25.) Mr. Saada denied the accusation. (Tr. 870:6-11.)

---

[19] Ms. Golan claimed that Mr. Saada forced her to leave the hospital before she was ready. (Tr. 86:1-18.)
[20] Ms. Golan's brother, Eldar Golan, visited the couple at least once in Milan, and also saw them on their trips to New York. He communicated with both, and socialized with Mr. Saada. Eldar was in Milan for B.A.S.'s bris in June of 2016, and stayed with Ms. Golan and Mr. Saada. (Tr. 367:17-368:1.) At one point, B.A.S. was crying; Mr. Saada put him on his shoulder, and "began to hit him really hard on his behind," and explained that he was "teaching [him] how to be a man." (Tr. 370:19-371:2.) Mr. Saada denied that he ever hit, spanked, or pushed B.A.S. (Tr. 897:4-898:5.)

Ms. Golan also testified about an argument with Ms. Darwich, Mr. Saada's mother. Ms. Darwich wanted her to celebrate an upcoming holiday, but Ms. Golan told her that she had already made plans for that day, "asked her to respect me," and left the building. (Tr. 105:1-5.) When she returned, Mr. Saada was waiting outside. (Tr. 105:6-9.) He angrily demanded that she apologize to Ms. Darwich. (Tr. 105:9-20.) He then grabbed Ms. Golan by the hair, pushed her down, dragged her, and punched and kicked her while Ms. Darwich watched from her apartment balcony. (Tr. 105:2-106:5; *see also* Tr. 871:12-872:21.) Mr. Saada admitted that he was angry because Ms. Golan was not sufficiently respectful to his mother. (Tr. 969:24-970:5.) After initially claiming that Ms. Golan "thr[e]w herself in the ground," and "scream[ed] like crazy," he admitted that he pushed Ms. Golan, and "maybe" pulled her hair. (Tr. 871:12-872:21.)

Ms. Golan claimed generally that Mr. Saada forced her to have sex "a lot," and that there were times when she asked him to stop, and he refused; on at least one occasion, B.A.S. was in the bed with them. (Tr. 66:9-67:6, 92:18-93:5, 107:20-111:18.) On one occasion Mr. Saada threw her on the bed, grabbed her crotch, and demanded, "Who owns you, huh? Who owns you?" (Tr. 108:18-109:16.) He pressed his thumbs on her throat until she blacked out, and raped her.[21] (Tr. 109:19-111-1.) Mr. Saada denied this accusation, and insisted that he never raped or sexually assaulted Ms. Golan. (Tr. 868:17-19.)

Ms. Golan took B.A.S. to visit her father in Israel in the spring of 2017; Mr. Saada stayed in Milan because his grandfather was very sick. (Tr. 209:13-210:8, 212:15-213:13, 872:24-873:11.) At one point, Mr. Saada asked Ms. Golan to come back to Italy so he could be with B.A.S. while his grandfather was dying. (Tr. 874:15-21.) Ms. Golan told Mr. Saada she was not coming back. (Tr. 227:5-10, 874:22-875:8.) Mr. Saada wrote to Ms. Golan, "I wish u fucking die." (R-304 at 7.) In a

---

[21] Ms. Golan described another incident of forcible sex, right after B.A.S. was born, that caused her internal stitches to rip. (Tr. 92:2-93:5; *see also* Tr. 609:11-13.)

later text message attempting to explain his behavior, he said he was "desperate" and "treat[ing] everyone like shit." (*Id.* at 24.) He also wrote, "I don't want to abuse u." (*Id.* at 13.)

Mr. Saada's grandfather died on April 22, 2017, while Ms. Golan and B.A.S. were still in Israel. (Tr. 874:6-12.) They returned to Italy four days later. (Tr. 214:11-20, 875:9-12.) Ms. Golan claimed that she returned because Mr. Saada and his family promised that Mr. Saada would change. (Tr. 214:21-215:2.)

On April 29, 2017, Mr. Saada's family hosted family and friends for the last day of Shiva. (Tr. 876:11-17, 877:4-8.) At one point, Mr. Saada's father said something that upset Ms. Golan, and she left with B.A.S. (Tr. 876:20-877:3.) Later that day Mr. Saada and Ms. Golan had an argument about keys, and Ms. Golan called the police.[22] (Tr. 877:9-878:17.) She also threatened to call her mother, and Mr. Saada twisted her arm. (Tr. 112:5-11.) Ms. Darwich arrived at some point, and directed Mr. Saada to record Ms. Golan as she called the police.[23] (Tr. 878:11-17.)

Ms. Darwich then called her best friend, and asked her to send her attorney husband, Paolo Siniscalchi, because "[i]t's already the third time she called the police on us." (Tr. 878:2-7.) The police arrived and interviewed the parties separately. (Tr. 881:15-20.) Mr. Siniscalchi also arrived, directed everyone to calm down, and told them, "[T]his is not a game." (Tr. 881:21-24.) Mr. Saada asked the police not to involve Social Services; one of the officers responded that it was his responsibility to do so. (Tr. 882:15-20.)

---

[22] This was not the first time that Ms. Golan called the Milan police to the Saada residence. She was out one night while her son was with a babysitter; she learned that Mr. Saada's father had taken B.A.S., who was asleep, up to his apartment on the third floor. (Tr. 268:2-269:1.) Ms. Golan said that she could not reach Mr. Saada's parents by phone, so she called the police instead; she wanted the police to tell the parents "to notify [her] before taking the child" because she was "afraid of them." (Tr. 268:9-13, 269:22-24.)

[23] Because Ms. Golan frequently recorded Mr. Saada, Ms. Darwich told him "Do the same. Now she's saying that you're beating her up, take the phone and record her." (Tr. 878:11-17.)

Ms. Golan recorded a portion of the parties' interaction with the police, and Mr. Siniscalchi translated some of the conversation between Ms. Golan and the officers. (*See* R-17; R-17A.) At one point, Ms. Golan told the police that Mr. Saada did not hit her that day, but assaulted her when she was pregnant with B.A.S. (R-17; R-17A at 15-16.) The police asked if Ms. Golan wanted to go to a hotel. (R-17; R-17A at 17.) She initially said that she "want[ed] to take [her] son and . . . go to a hotel," but later said, "We can work something out," and "I don't want to take my son away from [Mr. Saada] and I don't want him to take my son away from me." (R-17; R-17A at 16-18.) Ms. Golan did not want the police to arrest Mr. Saada; she wanted them to tell him not to hit her and to "warn him not to do it again." (Tr. 233:8-10.) The police ultimately referred the case to Milan Social Services. (*See* R-5.)

Social Services began an investigation in the fall of 2017, and representatives interviewed Mr. Saada and Ms. Golan separately about five or six times and together about ten times. (Tr. 884:2-25.) In a December 20, 2017 report, Social Services noted "highly concerning issues . . . which are connected to the dynamics of the conflict existing between the two parents, and which also culminate in reciprocal acts of violence, both physical and psychological, as also recognized by both" Mr. Saada and Ms. Golan. (R-5 at 7.) The report cites Mr. Saada's "scarce awareness of the consequences of said conflicts on his family unit," and his tendency to "blame Ms. Golan entirely;" "even when recounting serious events, he minimizes the effects that they have on himself and the family relationships." (*Id.*) Moreover, Mr. Saada was "not very capable to comprehend that his behavior, even if not directed at the child, has a negative consequence on [the child's] development." (*Id.* at 4.)

The report also specified that social workers offered to place Ms. Golan in a safe house, but that she "declared she was feeling capable of keeping under control anything that might happen and manifested her difficulties in trying to concretely modify the status quo."[24] (R-5 at 7.) Social Services

---

[24] Ms. Golan claimed that she declined the safe house because she did not know if she could take B.A.S. with her. (Tr. 319:15-20.)

noted the "significant role . . . played by the presence and proximity of Mr. Saada's extended family, which appears not to represent a resource in terms of marital conflict mediation but rather a reason for further discord." (*Id.*)

The report also commented on the financial aspects of the couple's relationship. "The financial issue seems to be a decisive factor in [Ms. Golan's] choices . . . ." (*Id.* at 5.) Ms. Golan stated that she "would leave [Mr. Saada] only if [she] was sure that [B.A.S.] could maintain the same lifestyle." (*Id.*) Ms. Golan had "neither a valid Permit to Stay nor financial autonomy," and therefore "could not be free, unrestricted from her husband and his family," and Mr. Saada kept her from gaining financial and legal independence. (*See, e.g.*, R-5 at 5; R-306.3; R-306.3A at 8; Tr. 157:22-158:8, 382:8-13.)

In the final session with Social Services, "both husband and wife said they had recently found a balance in their relationship, due to mutual commitment and also probably due to the involvement of a third party (Social Services and Judicial Authority)." (R-5 at 7.) Nevertheless, Social Services concluded that "the family situation entails a developmental danger for the [child]," and requested that the Judicial Authority "issue an order for the protection" of the child requiring psycho-diagnostic analysis of the parties, educational intervention, and "couple psychotherapy."[25] (*Id.* at 8.)

In May of 2017, Ms. Golan recorded Mr. Saada screaming at her to "get out of the fucking car" while she and B.A.S. were in the back seat. (Tr. 136:3-137:22; R-24; R-24A at 4-5.) At trial, Mr. Saada admitted that he screamed and cursed at Ms. Golan. (Tr. 989:5-15.)

In the middle of August 2017, during their trip to the United States, Ms. Golan and Mr. Saada were in Central Park with B.A.S. (Tr. 137:23-138:19, 889:7-16.) Ms. Golan told Mr. Saada that she could not find B.A.S.'s Italian passport, and asked him to sign a form so that B.A.S. could get a United States passport. (Tr. 138:13-21, 228:22-229:9, 887:5-888:25; R-13 at 2.) According to Ms. Golan, Mr.

---

[25] Ms. Golan testified that she went to Social Services with Elena Gemelli, a translator, and asked about the status of her case, but that "[t]hey brushed [her] off." (Tr. 153:24-154:19.)

Saada refused to sign the application, twisted her arm, and threatened to "destroy" her if she called the police.[26] (Tr. 138:13-139:2; 140:23-141:3; R-13 at 2.)

Ms. Golan did go to a police precinct in Brooklyn the next day, August 13, 2017, and told an officer that Mr. Saada threatened to "destroy" her, and reminded her that he "ha[d] money," that she "ha[d] nothing," and that his father could "buy the police." (Tr. 139:9-16; R-13 at 2.) Ms. Golan did not report any physical attack. (*See* R-13.) She completed a form with pre-printed questions, and checked "Yes" to questions that asked whether Mr. Saada had threatened to kill her or her child, strangled or choked her, and beaten her while pregnant. (*Id.* at 2.) She checked "No" for the question "Is there reasonable cause to suspect a child may be the victim of abuse, neglect, maltreatment or endangerment?" (*Id.*) According to Ms. Golan, the officer said that Mr. Saada would be arrested if he hit her while they were in New York.[27] (Tr. 233:22-23.)

Mr. Saada agreed that he and Ms. Golan argued in Central Park about the passport application, but said that Ms. Golan left the park. (Tr. 889:7-8, 889:13-14.) Ms. Golan called him a few hours later, and threatened to report him for kidnapping B.A.S. unless he brought B.A.S. to the hotel. (Tr. 889:15-21.) Mr. Saada said that he did not twist her arm.[28] (*See* Tr. 889:7-21.)

In addition to filing the police report, Ms. Golan filed a custody petition in New York Family Court in August of 2017. (Tr. 142:17-143:3; R-14.) She also sent two recordings to her best friend, Mario Kravchenko—one was the audio recording of Mr. Saada throwing the glass bottle against a wall, and the other was the video recording, taken in a car, of Mr. Saada yelling at Ms. Golan while B.A.S. was in the back seat. (R-25; R-26; Tr. 624:5-8.)

---

[26] B.A.S. never got a United States passport. (Tr. 140:23-141:3, 888:24-25.) Ms. Golan found his Italian passport before they returned to Italy. (Tr. 229:13-23.)

[27] The police did not question or arrest Mr. Saada. (Tr. 233:16-234:9.)

[28] Mr. Saada, Ms. Golan, and B.A.S. were scheduled to go to Jamaica with Ms. Golan's mother. (Tr. 229:10-12.) Ms. Golan decided to stay in the United States with B.A.S., and Mr. Saada went on the trip with Ms. Golan's mother. (Tr. 230:9-16, 337:23-338:6.)

Ms. Golan testified that on September 6, 2017, Mr. Saada twisted her arm and head-butted her. (Tr. 146:24-147:15.) She went to the emergency room, and got an X-ray and CAT scan for the lump that had formed on her forehead. (Tr. 145:25-146:15, 146:24-147:16; R-37 at 3.) In a message to a friend, Ms. Golan said that she was "scared," but could not tell medical personnel that she was afraid to go home because they would "send social services." (R-48 at 12.) Mr. Saada denied head-butting her or twisting her arm. (Tr. 885:18-23.)

According to Ms. Golan, after Milan Social Services completed its investigation at the end of 2017, she and Mr. Saada continued to argue, and Mr. Saada continued to be violent. Ms. Golan testified that during an argument after a Shabbat dinner Mr. Saada tried to drag her out of their apartment while B.A.S. was holding her leg. (Tr. 156:6-13.) Mr. Saada pushed B.A.S. with one hand while he dragged Ms. Golan with the other, and B.A.S. fell. (Tr. 156:10-21.) Mr. Saada denied this accusation. (Tr. 897:22-898:3.)

In early 2018, Mr. Saada and Ms. Golan went to a wedding. (Tr. 167:3-7, 898:6-12; ECF No. 20 ¶ 77.) According to Ms. Golan, Mr. Saada dragged her into a bathroom, locked the door, and slammed her head against a wall after she became upset with him for "flirting and dancing and touching other girls inappropriately." (Tr. 167:8-24; see also Tr. 608:5-11.) He told her that her jealousy meant that she did not "understand" how much he "fucking love[d]" her. (Tr. 167:11-168:2.) Mr. Saada agreed that they attended the wedding, but denied any violence; he said that he and Ms. Golan shared a romantic kiss next to a bathroom. (Tr. 898:13-23.)

At some point in 2018, Ms. Golan sought legal help from an Italian lawyer. (Tr. 171:21-172:5.) In July of 2018, Mr. Saada found a letter from the lawyer, and confronted Ms. Golan about it while they were driving on a highway with B.A.S. in the back seat.[29] (Tr. 170:14-171:3; see also Tr. 840:1-2.) Ms.

---

[29] Ms. Golan testified that Mr. Saada was also angry about missing a tennis lesson. (Tr. 170:23-24.)

Golan claimed that Mr. Saada, driving at a high speed, grabbed and twisted her crotch area, and said, "Who owns you? Who owns you?" (Tr. 170:14-171:6; *accord* Tr. 608:17-18.) Ms. Golan bit his hand, and he punched her in the face. (Tr. 171:7-12.)

Mr. Saada agreed that they were arguing in the car, but said that it was Ms. Golan who initiated the attack on him; she scratched, hit and slapped him. (Tr. 840:1-5, 992:16-17.) In an effort to defend himself, he pushed her away; he did not "know where [his] hand was going." (Tr. 840:6-7, 841:7-17, 990:1-13.) He admitted that he "slapped her to shut her up," and that he hit her "more than once," but did so only because she was scratching him and biting his arm while he was driving. (Tr. 991:24-992:21.) According to Mr. Saada, the incident was "very dangerous," and could have "ma[d]e an accident and my son die, too." (Tr. 991:24-993:7; R-19; R-19A at 3.)

Ms. Golan brought B.A.S. to the United States in July of 2018 so that she could attend the wedding of her brother, Eldar Golan. (Tr. 172:8-13, 1005:14-18.) During that time, she and Mr. Saada, who was still in Milan, communicated only sporadically.[30] (Tr. 173:1-5.) But Mr. Saada was in regular contact with Ms. Golan's brother. (*See* Tr. 174:9-11, 381:10-19.) In one call to Eldar, Mr. Saada said that if Ms. Golan came back to Italy, she would "be leaving in a pine box" or he would "drive her into a mental ward."[31] (Tr. 386:9-11; *see also* Tr. 386:25-387:1.) Eldar Golan recorded one conversation, in which Mr. Saada said the following:

> So, what she tells you, she come to you, and tell you that I beat her up, yea, maybe I beat her up. I apply the . . . pressure that I can but she put you in the situation where you have to defend yourself. She is a psychopath, and you can laugh here, and you can think that I'm lying but this is the truth. . . . I smash her means not that I beat her up, I kill her. I smash her to shut her fucking ugly mouth, the – the curse, and the things she do. And then she come to you, and cry like she is a – like she is a small dog abandoned, but it's not like this. She, uh, behaves like an evil. She say the worst thing in the world that make the person crazy . . . . So it's not that I beat up because I am violent, it's not that I beat up every day. . . . I think if you were in my position, you was beating her up a hundred time more . . . .

---

[30] According to Ms. Golan, Mr. Saada blocked her from contacting him on his phone. (Tr. 173:1-5.)
[31] Ms. Golan testified that Mr. Saada had previously threatened that "the only way out of this marriage is in a coffin." (Tr. 353:22-354:4.)

(R-19; R-19A at 2-3.)

In another call that Eldar Golan recorded, Mr. Saada threatened that he would make sure Ms. Golan had no money if she returned to Milan. (R-20; R-20A at 2-5.) He refused to help her get legal status or find a place to live in Italy, saying, "[I]f she make a request, they going to give her an apartment, a crappy one, and . . . full of Arabs and all the N—ers." (R-20; R-20A at 4.)

Days later, Ms. Darwich left a voice message for Ms. Golan admitting that Mr. Saada had "a problem—a lot of problem." (R-306.2; R-306.2A at 2.) Ms. Golan left her a voice message:

> [Y]ou're the only person that can help me – help us. You know, Jacky listens to you . . . . So please help me. Because I'm standing here, and I'm afraid to come back. And this is always like this. It's always been like this. Every time I come here, he fights with me.

(R-306.3; R-306.3A at 10.)

Ms. Darwich responded in a voice message that it was Ms. Golan who "must change," that she "must be *Eishet Chayil* [a woman of valor] and take the situation and make him happy. If not, I don't think there is another solution. I'm sorry to say . . . ." (R-306.5; R-306.5A at 2.)

### B. Diane Hessemann's Testimony

During the adjudication of this petition, licensed social worker Diane Hessemann supervised visits between Mr. Saada and B.A.S. Ms. Hessemann testified that B.A.S. and Mr. Saada seemed happy together, that their relationship appeared to be loving, and that B.A.S. did not seem to be at all afraid of Mr. Saada.[32] (Tr. 1106:12-16, 1110:21-23, 1112:14-15.)

---

[32] Ms. Hessemann also saw Ms. Golan when she dropped B.A.S. off. At one point, Ms. Golan accused Ms. Hessemann of accepting dresses from Mr. Saada as a form of bribery. (Tr. 1126:11-1128:20.)

## C. Expert Testimony and Submissions

### i.  Risk of Harm

The parties called four experts in the area of domestic abuse and its effects on children.

Dr. Alberto Yohananoff, a psychologist with 25 years of experience and training in forensic evaluation, testified for Mr. Saada, as did Dr. Peter Favaro, a licensed psychologist with over 30 years of experience, who reviewed the reports submitted by Ms. Golan's experts.  Dr. Yohananoff conducted four clinical interviews with Mr. Saada for a total of 11 hours, and two hours of observation of interactions between Mr. Saada and B.A.S.  (R-313 at 3.)  Dr. Favaro did not evaluate the parties or B.A.S.  (Tr. 1360:21-1361:2.)

Dr. Stephanie Brandt, an adult and child psychiatrist with over 30 years of experience who has testified in other Hague Convention cases, testified for Ms. Golan, as did Dr. Edward Tronick, a developmental and licensed clinical psychologist who has done research and written articles and books, including on the organization of adult-infant interactions and the risk factors for infants and parents.  Dr. Brandt conducted four clinical interviews with Ms. Golan for a total of seven and a half hours, and two additional clinical interviews with Ms. Golan and B.A.S. together.  (R-296 at 2.)  Dr. Tronick did not evaluate the parties or B.A.S.  (Tr. 650:2-651:4.)

Each expert had impressive credentials, and all were essentially credible.  They agreed that domestic violence can have a significant effect on a child, even if the child is not the target of the violence.  Dr. Tronick testified that exposure to domestic violence has immediate effects on young children's cognitive, social, and emotional development and their ability to "regulate stress."  (Tr. 631:6-11.)  It also has physiologic effects and both immediate and long-term effects on the brain structure and organization.  (Tr. 631:12-15.)  In Dr. Tronick's view, exposure to domestic violence could have particularly severe effects on a child as young as B.A.S. because of the stage of brain development at

that age. (*See* Tr. 631:3-15.)  Continued exposure or re-exposure to domestic violence, whether directed at the child or witnessed by the child, has a cumulative effect on the child and increases the likelihood of later effects. (Tr. 631:19-23.)  According to Dr. Brandt, exposure to domestic violence can result in "a known high risk for the development of serious long-term mental and even medical consequences," and she described the "toxic and pathogenic effect" on children and their brains. (R-296 at 4.)  Drs. Yohananoff and Favaro agreed that domestic violence has an effect on young children. (Tr. 1197:14-15, 1362:8-11.)

The experts also agreed that exposure to Mr. Saada's undisputed violence toward Ms. Golan— including verbal, emotional, psychological, and physical abuse—posed a significant risk of harm to B.A.S. (*See* Tr. 1210:4-8, 1213:3-11, 1220:14-19, 1235:20-1236:14; R-313 at 22; *accord* Tr. 575:17-20; R-296 at 4-10.)  Dr. Yohananoff testified that Mr. Saada could not control his anger or his behavior, or take responsibility for its effect on B.A.S. (Tr. 1197:23-25, 1219:10-1220:19.)  Dr. Yohananoff believed Mr. Saada was "motivated in the evaluation to vindicate himself," was not "completely honest," and was "likely underreporting" his abuse of Ms. Golan; Mr. Saada's "impulsive behavior, emotional reactivity, poor tolerance frustration, difficulties thinking through the consequences of his behavior, questionable judgment and a potential for explosive anger when confronted with stressful situations" could have an adverse effect on B.A.S. (Tr. 1213:12-1214:24; R.313 at 7, 22.)  Dr. Yohananoff acknowledged that Mr. Saada's trial admissions of behavior that he denied in pre-trial interviews meant that his reliability was "down the tube." (Tr. 1215:8-17.)

Drs. Yohananoff and Brandt parted company on the question of ameliorative measures should B.A.S. return to Italy.[33]  Dr. Brandt took the position that there were no measures that could protect

_____

[33] Dr. Brandt believed that B.A.S. was an "at risk" child who was less resilient or adaptive and thus particularly susceptible to stress due to his exposure to domestic violence. (Tr. 423:3-23.)  She diagnosed B.A.S. with a severe developmental delay in his speech and language development, but acknowledged that the cause was not necessarily the child's exposure to domestic violence. (R-296 at 12-13; Tr. 579:22-580:1.)

B.A.S. given Mr. Saada's history of violence not to B.A.S., but to Ms. Golan. (Tr. 593:10-594:12.) Dr. Yohananoff, on the other hand, thought that any risk would be mitigated if Mr. Saada's visits with B.A.S. were supervised, and if Mr. Saada got parental coaching and psychoeducational training. (Tr. 1202:8-1204:2, 1245:12-19.)[34]

In my view, it was Dr. Yohananoff who provided the clearest and most objective evaluation of the parties' relationship, and the potential risks to B.A.S. As part of his evaluation, he not only interviewed Mr. Saada, he consulted collateral sources and made use of psychological testing. Dr. Brandt relied only on her interviews of Ms. Golan and her observations of B.A.S., and on Ms. Golan's account of her experience. She was also more of an advocate for Ms. Golan than an objective evaluator. She appeared to accept everything Ms. Golan said at face value, without consulting any independent sources.[35] Dr. Yohananoff was far more detached in his evaluation of Mr. Saada; he did not hesitate to point out areas of concern nor was he defensive when confronted with Mr. Saada's testimony, which varied from the statements he made when Dr. Yohananoff interviewed him.

### ii. Italian Legal System

Two experts testified about the Italian legal system's approach and capacity to handle cases of domestic violence.

---

[34] Dr. Brandt diagnosed Ms. Golan with post-traumatic stress disorder as a result of Mr. Saada's abuse. (R-296 at 10-11.) Dr. Yohananoff did not think Dr. Brandt could conclusively find that Mr. Saada caused Ms. Golan's PTSD, since Ms. Golan experienced "significant trauma" as a child. (Tr. 1199:20-1200:15.) Drs. Brandt and Yohananoff also disagreed about whether there was sufficient data to conclude that Mr. Saada engaged in a persistent pattern of severe abuse. Dr. Brandt characterized Mr. Saada's violence as a "very long-standing pattern" of intimidation and control, while Dr. Yohananoff did not think there was enough information "to firmly establish a persistent pattern of domestic abuse." (Tr. 440:19-441:6, 1187:13-15, 1196:21-1197:4.)

[35] For example, Dr. Brandt believed that Ms. Golan's behavior that seemed misleading or manipulative was not actually intentionally misleading or manipulative, but rather the result of childhood trauma; she noted that Ms. Golan was aware that her "vague, out-of-sequence, or . . . incomplete narrative[s]" can appear manipulative. (R-296 at 11-12, 40.)

Mr. Saada called Cinzia Calabrese, an Italian civil lawyer specializing in family law who has practiced for 34 years in Milan and is president of the AIAF Lombardia "Milena Pini," an Italian organization of lawyers specializing in family and minor issues. Ms. Calabrese described the structural protections in place for domestic violence victims, which include criminal and civil court orders of protection, orders of supervised visitation during the pendency of custody proceedings, and appointments of expert psychologists and psychiatrists to evaluate parent-child relationships and domestic violence allegations in custody proceedings. (Tr. 1284:5-25, 1287:14-1289:18, 1291:5-21.) Ms. Calabrese also discussed the free legal services available at a specialized department for victims of family and sexual violence in Milan's public prosecutor's office. (Tr. 1285:12-18, 1286:8-15; *accord* Tr. 804:11-805:2.)

Ms. Golan called Elena Biaggioni, a criminal lawyer who chairs a network of domestic violence organizations in Italy and is Vice President of the Center for the Elimination of Violence Against Women in Trento, Italy. Ms. Biaggioni represents victims of domestic violence in criminal proceedings; her civil matters, which account for about five percent of her work, are limited to juvenile courts. (*See* Tr. 676:20-677:9, 775:21-25.) Ms. Biaggioni spoke in generalities about the flaws in the Italian legal system and its ability to protect domestic violence victims. (*See, e.g.*, Tr. 686:25-687:18, 692:22-694:9, 714:4-716:12; R-295 ¶¶ 58-59.) She acknowledged, however, that other countries, including the United States, also had some of these shortcomings. (*See* Tr. 720:13-721:9, 774:19-775:20, 807:13-808:4; *see also* Tr. 761:5-10.) According to Ms. Biaggioni, Italian courts are dismissive of a victim's custody petitions, and courts often award custody to abusive fathers, sometimes at the expense of children's safety or without sufficient protections surrounding visitation. (R-295 ¶¶ 94-95; *see also* Tr. 713:15-19.) She noted that the European Court of Human Rights, the Council of Europe, and the United Nations have criticized Italian courts and prosecutors for "systemic failures" to protect victims of domestic

violence. (*See, e.g.*, R-295 at 392-400, 478, 482-83, 613-32; *see also* R-295 at 52-120; Tr. 711:23-712:7; *accord* Tr. 1299:10-14.)

In my view, Dr. Calabrese provided a clearer picture of the structure of the Italian legal system and the tools available to domestic violence victims in Italy. Although Dr. Biaggioni credibly testified about certain shortcomings in the Italian legal system, she spoke in broad terms, citing anecdotal evidence, but few specifics. She acknowledged that other countries also had flaws in their systems, including the United States. In any event, both experts agreed that orders of protection are available to domestic violence victims, and I credit Dr. Calabrese's testimony about the Italian legal system's ability to handle domestic violence cases involving children.

### iii. Domestic Violence Services in Milan

Elena Antonucci, an obstetrician and gynecologist, testified about a specialized hospital for domestic violence victims in Milan. The hospital center has psychologists, social workers, doctors, and lawyers to assist victims of domestic violence, and provide free legal advice. (Tr. 1018:23-1019:6.) The center also trains health professionals and law enforcement. (Tr. 1019:11-13.) Ms. Golan's expert, Ms. Biaggioni, acknowledged that these services "go beyond the traditional and necessary medical assistance," and include psychological and social counseling for victims of domestic abuse. (Tr. 798:16-799:4.)

## CONCLUSIONS OF LAW

The Hague Convention is intended to "'protect children internationally from the harmful effects of their wrongful removal by establishing procedures to ensure their prompt return to the State of their habitual residence,' so that the 'rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Souratgar v. Lee*, 720 F.3d 96, 101-02 (2d Cir. 2013) (quoting *Abbott v. Abbott*, 560 U.S. 1, 32 n.6 (2010) and *Chafin v. Chafin*, 133 S. Ct. 1017,

1021 (2013)). The Convention is particularly focused on instances of "unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (citation omitted). The Convention's remedy is repatriation, which "is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court." *Souratgar*, 720 F.3d at 102 (internal quotations omitted). Both the United States and Italy are contracting states to the Convention. *Ermini v. Vittori*, 758 F.3d 153, 156 (2d Cir. 2014).

When a child is wrongfully removed from his or her country of habitual residence by one parent, the other parent may commence a proceeding to repatriate the child to the country of habitual residence. *Souratgar*, 720 F.3d at 102. "The decision concerning repatriation shall 'not be taken to be a determination on the merits of any custody issue.'" *Id.* (quoting *Blondin v. Dubois ("Blondin I")*, 189 F.3d 240, 245 (2d Cir. 1999)); *see also Mota v. Castillo,* 692 F.3d 108, 112 (2d Cir. 2012) ("[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings.").

A petitioner bringing a Hague Convention action for the wrongful retention of a child must show that (1) the child was "habitually resident" in one contracting state and was retained in another contracting state; (2) the retention breached the petitioner's custody rights under the law of the contracting state of habitual residence; and (3) the petitioner was exercising those rights at the time of retention or would have been exercising those rights but for the retention. *Gitter*, 396 F.3d at 130-31; *Hofmann v. Sender*, 716 F.3d 282, 291 (2d Cir. 2013). The petitioner must prove these elements by a

preponderance of the evidence. *Gitter*, 396 F.3d at 131 (citing 42 U.S.C. § 11603(e)(1)(A), now codified at 22 U.S.C. § 9003(e)(1)(A)).

If the petitioner establishes that the child's retention was wrongful, "the child *must be returned*" unless the respondent can establish one of the four defenses to a Hague Convention petition. *Souratgar*, 720 F.3d at 102 (emphasis in original) (quoting *Blondin I*, 189 F.3d at 245); *see also* 22 U.S.C. § 9001(a)(4). Of particular relevance to this case is the defense of grave risk of harm; the respondent raising this defense must show by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). "Subsidiary facts may be proven by a preponderance of the evidence." *Souratgar*, 720 F.3d at 103.

District courts have "considerable discretion" under the Hague Convention. *Id.* (quoting *Blondin I*, 189 F.3d at 246 n. 4.). Indeed, even if the respondent establishes one of the "narrow" defenses, "the district court is not necessarily bound to allow the child to remain with the abducting parent.'" *Id.*

## I. Habitual Residence

The parties agree that Ms. Golan removed B.A.S. from Italy with Mr. Saada's consent, that she retained him in the United States without Mr. Saada's consent, in breach of Mr. Saada's "rights of custody," as defined in Article 5(a) of the Hague Convention, under Italian law, and that Mr. Saada was exercising those rights when Ms. Golan kept B.A.S. in the United States. (ECF No. 39 ¶¶ 5, 8.) Mr. Saada must prove that Italy was the child's habitual residence at the time Ms. Golan kept him in the United States.

Mr. Saada argues that B.A.S. spent his entire life in Italy, making Italy his habitual residence at the time Ms. Golan refused to bring him back to Italy. (ECF No. 59 at 20, 26.) Ms. Golan counters that

B.A.S. never had a habitual residence on the theory that his parents did not share a settled intent that the child would be raised in Italy. (ECF No. 58 ¶ 8.)

In most Hague Convention cases, "determining the child's country of habitual residence is a threshold issue," because the laws of the country of habitual residence "determine the custody rights recognized by the Convention." *Guzzo v. Cristofano*, 719 F.3d 100, 108 (2d Cir. 2013) (citing Convention, art. 3). The Convention does not define "habitually resident," but the Second Circuit instructs courts to make the following inquiries:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134. "In the easy case," the parents agree on the child's habitual residence; in most Hague Convention cases, the parents do not agree on the issue. *Id.* at 133. "It then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared," which "is a question of fact in which the findings of the district court are entitled to deference." *Id.* The habitual residence inquiry requires consideration of "the unique circumstances of each case." *Holder v. Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004).

I conclude that Italy was B.A.S.'s habitual residence at the time Ms. Golan kept him in the United States. B.A.S. was born in Italy and lived there until the summer of 2018 when Ms. Golan brought him to the United States. The parties' only shared residence was in Italy, where they lived for more than a year before B.A.S. was born, and it became B.A.S.'s home as well. He went to pre-school in Italy, his doctors were there, as was his extended family. Before Ms. Golan brought him to the United States, B.A.S. had left Italy only three times, for short trips. *See Holder*, 392 F.3d at 1020 ("[I]f

27

a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country.").

Ms. Golan asks me to find that B.A.S. had no habitual residence; she argues that she and Mr. Saada never shared a settled intent that Italy would be B.A.S.'s habitual residence, that she conditioned her own residence in Milan on Mr. Saada's promise to change, a promise he did not keep, and that she and B.A.S. lived in Italy only because Mr. Saada exercised coercive control over her.

Ms. Golan cites her longstanding wish to return to the United States as evidence that she and Mr. Saada had no shared intent regarding B.A.S.'s habitual residence. The record shows that she expressed a desire to return to the United States from the beginning of her marriage, well before B.A.S. was born. However, in determining the question of shared intent, "the court should look, as always in determining intent, at actions as well as declarations." *Gitter*, 396 F.3d at 134. Ms. Golan's actions show that she intended that Italy be B.A.S.'s habitual residence. She established a home with Mr. Saada in Milan, and continued to live there with him after B.A.S. was born. Ms. Golan participated in decisions about B.A.S.'s life in Milan. She and Mr. Saada enrolled him in school, got him a pediatrician, and secured various forms of Italian identification for him. *Cf. Guzzo*, 719 F.3d at 104-05 (parents agreed mother would have custody of child and child would attend school in New York, mother home-schooled the child in English, and child was insured through Medicaid and received primary medical treatment in the United States). While Ms. Golan might have hoped to move to the United States, her actions established B.A.S. as a habitual resident of Italy.

The record is equally clear that Mr. Saada never shared her wish to move to the United States. He took no action to get himself established in the United States, and did not agree to any of the steps that Ms. Golan wanted to take with respect to B.A.S.; he would not agree to get B.A.S. a United States passport, and did not know that Ms. Golan had tried to get B.A.S. a Social Security card, that she had

registered his birth with the United States Consulate, or that she had considered giving birth at Coney Island Hospital.

I do not agree that Mr. Saada's trip to New York in January of 2018 was an agreement to change B.A.S.'s habitual residence. The trip—which stemmed from a business dispute with his brother—was merely exploratory; Mr. Saada looked into possible business and living arrangements in New York, but never committed to moving, and never looked into schools or doctors for B.A.S. Within a couple of weeks, he had patched up his relationship with his brother, and decided to stay in Italy. He never agreed to move B.A.S. to the United States. *See Guzzo*, 719 F.3d at 104. Moreover, Mr. Saada did not deceive Ms. Golan into establishing Italy as B.A.S.'s residence. *See Gitter*, 396 F.3d at 135 (father secretly established residence in Israel while telling his wife that the move was only temporary).

I am not persuaded that Ms. Golan's agreement to live in Italy was solely conditioned on Mr. Saada's promise to change his behavior. There is no evidence that Mr. Saada agreed that Ms. Golan could move with B.A.S. if he did not meet this condition. *See Gitter*, 396 F.3d at 135 (parties agreed to move to Israel on a conditional basis).

I also reject Ms. Golan's claim that she and B.A.S. remained in Italy only because Mr. Saada exercised coercive control over her. Of course, "coerced residence is not habitual residence within the meaning of the Hague Convention." *Application of Ponath*, 829 F. Supp. 363, 368 (D. Utah 1993). Mr. Saada was without a doubt physically aggressive toward Ms. Golan; they fought on a daily basis, fights that often ended in violence, almost always perpetrated by Mr. Saada. The record does not, however, establish that Mr. Saada "so dominated decisions and controlled information" to the point where Ms. Golan did not know that he planned to keep B.A.S. in Italy. *See Tsarbopulos v. Tsarbopulos*, 176 F. Supp. 2d 1045, 1055 (E.D. Wash. 2001) (father hid his intent to move the family permanently to Greece from the United States, and mother did not share that intent). Nor did Mr. Saada keep Ms. Golan

prisoner in Italy. While she relied on him and his family for financial support, she had a degree of independence. She spent time with friends in Milan and travelled internationally by herself and with B.A.S. She sometimes refused to attend family gatherings, and made use of the legal system; she called the police about Mr. Saada and his family, and frequently recorded or otherwise memorialized Mr. Saada's attacks. Given this record, I do not agree that Ms. Golan's will was overborne so that she did not intend B.A.S. to be habitually resident in Italy.

In short, the parties' last shared intent was to have B.A.S. live in Italy. Thus, Italy was the child's habitual residence at the time Ms. Golan kept him in the United States.[36]

## II. Grave Risk of Physical or Psychological Harm

The next step in the analysis is to determine whether the respondent established one of the affirmative defenses to wrongful retention. Ms. Golan asserts one affirmative defense—"grave risk of harm." Specifically, she argues that returning B.A.S. to Italy would expose him to physical or psychological harm. I agree that Ms. Golan has met her burden in this regard.

### A. Grave Risk of Harm

Article 13(b) of the Convention provides that "a grave risk of harm" from repatriating the child to the country of habitual residence arises "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Souratgar*, 720 F.3d at 103 (internal quotations omitted). According to the Second Circuit, "[t]he potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." *Id.* (internal quotations omitted). The grave risk determination includes both "the magnitude of

---

[36] I do not address the second *Gitter* inquiry—whether "the child has acclimatized to the new location and thus has acquired a new habitual residence"—because the respondent does not assert, and the evidence does not support, that B.A.S.'s habitual residence changed to the United States.

the potential harm" and "the probability that the harm will materialize." *Id.* The grave risk exception "is to be interpreted narrowly, lest it swallow the rule." *Id.* The respondent must prove grave risk of harm "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

The Second Circuit instructs courts considering this question to take care to differentiate between "those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences," and "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation." *Blondin v. Dubois ("Blondin II")*, 238 F.3d 153, 162 (2d Cir. 2001). The former situations are not considered grave risks of harm; the latter are. *Id.*

The grave risk of harm need not take the form of direct physical abuse to the child. A history of spousal abuse "though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse." *Id.* (internal quotations and citations omitted); *see also Ermini*, 758 F.3d at 164–65 (spousal abuse can establish a grave risk of harm to the child in certain circumstances). "[A] sustained pattern of physical abuse and/or a propensity for violent abuse" that poses "an intolerably grave risk to the child" can establish the exception to the preference for repatriation. *Souratgar*, 720 F.3d at 104 (internal quotations omitted).

However, the history of domestic violence is relevant only "if it seriously endangers the child." *Souratgar*, 720 F.3d at 103-104. "The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Id.* at 104. "Sporadic or isolated incidents" of physically disciplining the child, "or some limited incidents aimed at persons other than the child, even if witnessed by the child" are generally not grave risks of harm. *Id.*

There is no dispute that Mr. Saada was violent—physically, psychologically, emotionally, and verbally—to Ms. Golan, or that B.A.S. was present for much of it. Mr. Saada admitted that he slapped Ms. Golan, pulled her hair, pushed her, and yelled at her. These were not "sporadic or isolated incidents" or "some limited instances," but happened repeatedly throughout the course of the parties' relationship. The pattern is corroborated by contemporaneous texts, in which Mr. Saada described what he did, and his attempts to explain it away, as well as audio and video recordings. There are particularly chilling recordings in which Mr. Saada is screaming and swearing at Ms. Golan, often while B.A.S. was there. And although he disputed Ms. Golan's account of how it started, Mr. Saada also admitted a physical altercation with Ms. Golan while B.A.S. was in the car and while Mr. Saada was driving at a high speed.[37]

Nor is there any dispute that a child who is exposed to domestic violence, even though not the target of abuse, could face a grave risk of harm. Dr. Tronick explained that domestic violence disrupts a child's cognitive and social-emotional development, and affects the structure and organization of the child's brain. Dr. Brandt described the "toxic and pathogenic effect" on children and their brains. Dr. Favaro testified that the presence of domestic violence has an effect on children, and Dr. Yohananoff testified that domestic violence—Mr. Saada's violence toward Ms. Golan—poses a risk to B.A.S. Similarly, Italian Social Services concluded that "the family situation entails a developmental danger" for B.A.S.

The evidence makes it equally clear that Mr. Saada has to date not demonstrated a capacity to change his behavior. During his testimony, Mr. Saada minimized or tried to excuse his violent conduct.

---

[37] I do not agree that B.A.S. was himself the target of violence. There were isolated incidents of possible abuse—the overly aggressive "spanking" that Eldar Golan described, Ms. Golan's claim that Mr. Saada inadvertently hit B.A.S. when he meant to hit Ms. Golan, and an episode in which Mr. Saada pushed B.A.S. *See Souratgar*, 720 F.3d at 104. It is significant that Ms. Golan did not see Mr. Saada as a threat to B.A.S.; she frequently left B.A.S. with Mr. Saada while she ran errands or socialized with friends. She also said that she wants Mr. Saada to have a relationship with B.A.S.

His own expert said that Mr. Saada had in all likelihood lied about the frequency and severity of his abuse, that his reliability was "down the tube," and that he could not control his anger or take responsibility for his behavior, which was also evidenced by the fact that he frequently abused Ms. Golan in front of other people—his family and even hospital employees.

Accordingly, Ms. Golan established by clear and convincing evidence that returning the child to Italy would subject the child to a grave risk of harm.

## III. Undertakings or Ameliorative Measures

Having found that repatriation poses a grave risk of harm to B.A.S., I must consider whether there are "any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with the child's repatriation." *Blondin I*, 189 F.3d at 248. In other words, I consider whether there are any measures that could protect B.A.S. "while still honoring the important treaty commitment to allow custodial determinations to be made—if at all possible—by the court of the child's home country." *Id.*

Thus, I consider "the range of remedies that might allow *both*" the child's return and his protection from harm pending a custody determination in the child's country of habitual residence. *Id.* at 249 (emphasis in original). "In cases of serious abuse, before a court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine the full range of options that might make possible the safe return of a child to the home country." *Blondin II*, 238 F.3d at 163, n.11. To that end, I directed the parties to propose ameliorative measures that could achieve this goal.

Ms. Golan takes the position that there are no steps that would protect B.A.S., and no way to ensure that Mr. Saada would comply with them.[38] (ECF No. 58 at 96-101.) I disagree. First, Ms. Golan and Mr. Saada will no longer be living together, and eliminating the element of proximity will

---

[38] Ms. Golan supplied a list of undertakings with the understanding that she was not forfeiting her claim that no undertakings could ensure B.A.S.'s safety.

reduce the occasions for violence.[39]  Second, Mr. Saada has agreed to take certain steps before B.A.S.

comes back to Italy.  In my judgment, those steps would ameliorate the grave risk to B.A.S. posed by

Mr. Saada's abusive behavior to Ms. Golan.

Mr. Saada testified that he would stay away from Ms. Golan if she were to return to Italy, and

give her money, before B.A.S. returns to Italy, for her own apartment and for expenses for her and

B.A.S. until the Italian courts address the custody issues.  (Tr. 909:11-910:3.)  In his post-trial

submission, Mr. Saada confirmed that he would agree to the following undertakings:  (1) give Ms.

Golan $30,000, before B.A.S. returns, for housing without restrictions on location in Italy, financial

support, and legal fees until the Italian courts address those issues; (2) mutual agreement to stay away

from Ms. Golan until the Italian courts address this issue;[40] (3) pursue dismissal of criminal charges

against Ms. Golan relating to her abduction of B.A.S.; (4) begin cognitive behavioral therapy in Italy;

and (5) waive any and all rights to legal fees or expenses under the Hague Convention and ICARA for

the prosecution of this action.  (ECF No. 59 at 39.)

Ms. Golan proposed similar undertakings:  that Mr. Saada drop and promise not to pursue any

criminal or civil actions against Ms. Golan in Italy based on the abduction of B.A.S.; that he pay for

relocation expenses, child support, housing, transportation, and legal expenses; that there be orders of

protection; that he give Ms. Golan full temporary custody of B.A.S. pending the custody determination

in Italy; therapeutic services for both Mr. Saada and Ms. Golan; agreements about the use of evidence in

---

[39] I reject Ms. Golan's claim that Mr. Saada and his family have some power over Italian law enforcement officials.  Ms. Golan cites the police response to her call in April of 2017, but in my view, the police response was appropriate.  It led to the Social Services investigation, and subsequent series of sessions that Social Services conducted with the parties.  Nothing in the record suggests that Mr. Saada ignored or violated any orders or directives.  The involvement of family friend and attorney Paulo Siniscalchi did not affect the way the police handled the investigation.  The police did not arrest Mr. Saada, but Ms. Golan admitted that she did not want him arrested; she wanted the police to warn him not to hit her again.

[40] Mr. Saada also acknowledged that he could "only exercise visitation with the child upon [Ms. Golan's] consent" "[u]ntil there is an order of the Italian courts stating otherwise, . . . although [he] ha[s] equal rights of custody."  (ECF No. 59 at 37 n.23.)

this case for the Italian custody proceeding; and a sworn statement setting forth the process for Ms. Golan to obtain legal status and working papers in Italy, including the measures Mr. Saada will take to ensure that Ms. Golan gets legal status and working papers in a timely manner.

The proposed undertakings sufficiently ameliorate the grave risk of harm to B.A.S. upon his repatriation to Italy. By giving Ms. Golan sufficient funds for housing and expenses for the duration of the custody proceedings and agreeing to mutual orders of protection, Mr. Saada has reduced the risk that B.A.S. would be subjected to harm upon his return to Italy. Ms. Golan can return to Italy with B.A.S. and have enough money for an apartment that she chooses, without Mr. Saada or his family knowing of its location, during the course of the Italian custody proceedings.

* * *

As one court has observed, "[t]hese cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome. [Courts] cannot alleviate the parties' emotional trauma, but at a minimum [courts] can hope to provide them and their child[] with a prompt resolution so that they can escape legal limbo." *Holder*, 392 F.3d at 1023. This case is no different.

## CONCLUSION

The Court concludes that B.A.S. was a habitual resident of Italy when Ms. Golan kept him in the United States, and that B.A.S. would be subject to grave risk of harm upon repatriation to Italy. Mr. Saada has agreed to the following undertakings: (1) he will give Ms. Golan $30,000 before B.A.S. is returned to Italy for housing accommodations without restriction on location in Italy, financial support, and legal fees; (2) he will stay away from Ms. Golan until the Italian courts address this issue; (3) he will pursue dismissal of criminal charges against Ms. Golan relating to her abduction of B.A.S.; (4) he will begin cognitive behavioral therapy in Italy; and (5) he waives any and all rights to legal fees or expenses under the Hague Convention and ICARA for the prosecution of this action. In addition,

Mr. Saada is to provide the full record of these proceedings, including trial transcripts, court filings, exhibits, undertakings, expert reports, and decisions of this Court to the Italian court presiding over the custody proceeding. Mr. Saada is to provide a sworn statement with the measures he will take to assist Ms. Golan in obtaining legal status and working papers in Italy. Mr. Saada must also drop any current civil actions against Ms. Golan in Italy based on the abduction of B.A.S., and must not pursue any future criminal or civil actions against her in Italy based on the abduction. Based on these undertakings and conditions, which the Court concludes sufficiently ameliorate the risk of harm to B.A.S. upon repatriation, the petition is granted.

The parties are directed to appear for a conference on Friday, March 29, 2019, at 10:30 a.m. in Courtroom 4G North to establish the timing and circumstances for B.A.S.'s return to Italy.

**SO ORDERED.**

s/Ann M. Donnelly

The Honorable Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
     March 22, 2019