UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
**ISACCO JACKY SAADA**,

                        Petitioner,

        – against –                    **MEMORANDUM DECISION AND ORDER**
                                                       1:18-CV-5292 (AMD) (SMG)

**NARKIS ALIZA GOLAN**,

                        Respondent.
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

On September 20, 2018, the petitioner, Isacco Jacky Saada, brought this case against the respondent, Narkis Aliza Golan, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011.  Mr. Saada, an Italian citizen, alleged that in August of 2018, Ms. Golan, an American citizen, wrongfully kept their minor son, B.A.S., in the United States.

In a March 22, 2019 decision, I found that B.A.S. was a habitual resident of Italy, and that while he would be subject to grave risk of harm upon repatriation, there were sufficient measures that would ameliorate the risk.  (ECF No. 64 (*Saada I*) at 35.)  The Second Circuit affirmed the decision in part and vacated it in part.  *Saada v. Golan* (*Saada II*), 930 F.3d 533, 537 (2d Cir. 2009).  The Court agreed that Italy is B.A.S.'s "habitual residence" under the Hague Convention, but determined that certain measures could not be enforced before B.A.S. was repatriated to Italy.  *Id.* at 542-43.  Accordingly, the Second Circuit remanded the case with instructions to ensure that the measures necessary for B.A.S.'s safe repatriation could be "enforce[d] by the District Court or supported by other sufficient guarantees of performance." *Id.* at 543.

Over the past nine months, I undertook an extensive examination of the measures available to ensure B.A.S.'s safe return to Italy. With the assistance of the United States Department of State, I contacted the Honorable Peter J. Messitte, Senior Judge of the United States District Court for the District of Maryland and the Representative of the United States Federal Judiciary for the International Judicial Network under the Hague Convention. With Judge Messitte's assistance, I corresponded with the Italian Central Authority and the Italian Ministry of Justice on matters concerning B.A.S., the petitioner and the respondent. (*See, e.g.*, ECF Nos. 73, 74, 77, 78, 85, 87, 88.) The parties appeared for multiple conferences and submitted status reports and briefs on the status of the case in Italy and the sufficiency of various ameliorative measures. (ECF Nos. 100, 103, 106.)

As I explained in my earlier decision, these determinations are difficult, and are certain to bring heartache to one side. Nor am I unmindful of the inevitable upheaval that necessarily follows decisions of this kind.[1] Nevertheless, based on the record before me at the trial and upon remand from the Second Circuit, I am confident that the Italian courts are willing and able to resolve the parties' multiple disputes, address the family's history and ensure B.A.S.'s safety and well-being. I find that B.A.S. must be returned to Italy.

## DISCUSSION[2]

The Hague Convention seeks to protect children from the harmful effects of wrongful removal, and establishes procedures to ensure their prompt return to the state of their habitual residence. *See Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (explaining purpose of the Convention). The general rule is that a wrongfully retained child "must be returned" to his country of habitual

---

[1] "The ordinary disruptions necessarily accompanying a move [do] not by themselves constitute a" grave risk of harm. *Blondin v. Dubois* (*Blondin IV*), 238 F.3d 153, 164 (2d Cir. 2001).

[2] Familiarity with the facts is assumed.

residence. *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) (citing *Blondin v. Dubois* (*Blondin II*), 189 F.3d 240, 245 (2d Cir. 1999)). The rule is not absolute, though; a child will not be returned if repatriation would cause "grave risk" of "physical or psychological harm" to the child, or "otherwise place [him] in an intolerable situation." Hague Convention, art. 13(b); *see also* 22 U.S.C. § 9003(e)(2)(A) (exception must be proven by "clear and convincing evidence"). In such a case, the child should not be repatriated absent ameliorative measures that protect him from the "grave risk" of harm. *See Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011, at *23 (E.D.N.Y. Oct. 15, 2019) ("[A] grave risk finding would . . . be fatal to a petition" absent sufficient ameliorative measures.).

A thorough consideration of all potential ameliorative measures safeguards not only the child, but "the important treaty commitment" articulated in the Hague Convention "to allow custodial determinations to be made—if at all possible—by the court of the child's home country." *Blondin II*, 189 F.3d at 248. "[T]he whole structure of the Convention depend[s] on the institutions of the abducted-to state generally deferring to the forum of the child's home state." *Id.* (citation and internal quotation marks omitted).

**I.    Ameliorative Measures**

To ensure a child's safe repatriation, the ameliorative measures must "reduce whatever risk might otherwise be associated with the child's" return. *Id.* at 248. The court should "examine the full range of options," *Blondin IV*, 238 F.3d at 163 n.11, including measures undertaken "by the authorities of the state having jurisdiction over the question of custody[,]" and measures undertaken "by the parents[.]" *Blondin II*, 189 F.3d at 248. The analysis includes, for example, the capability and willingness of the court in the country of habitual residence "to give the child adequate protection," *Souratgar*, 720 F.3d at 103 (citing

162), as well as measures undertaken *before* the child's repatriation, *Saada II*, 930 F.3d at 542. The measures must be "enforceable by the [d]istrict [c]ourt or supported by other sufficient guarantees of performance." *Id.* at 543.

It is not clear in this Circuit whether it is the petitioner's or respondent's burden to establish the "appropriateness and efficacy of any proposed undertakings." *Valles Rubio*, 2019 WL 41890111, at *23 (citations omitted). While "[l]ogically . . . the burden would appear to fall on the petitioner" to rebut a finding of grave risk of harm,[3] the Second Circuit has previously "impl[ied]" that the burden is part of the respondent's grave risk claim—that is, "to prove grave risk, the respondent must also prove" the absence of adequate ameliorative measures. *Id.* (characterizing language in *Blondin IV*). In any event, the focus is on measures that "make possible the safe return of [the] child to the home country." *Blondin IV*, 238 F.3d at 153 n.11.

## II. Application

The grave risk of harm to B.A.S. is exposure to violence between the petitioner and the respondent. The record is clear that "Mr. Saada was violent—physically, psychologically, emotionally, and verbally—to Ms. Golan," and "that B.A.S. was present for much of it." (ECF No. 64 at 32.) While B.A.S. was not the target of abuse himself, "a child who is exposed to domestic violence . . . could face a grave risk of harm." (*Id.*) That risk is greatly reduced when the parties are not together.

The respondent has made it clear that she intends to return to Italy with B.A.S. if the Court orders his repatriation. Because the respondent is B.A.S.'s primary caretaker, her safety is a factor in the Court's decision. *See, e.g.*, *In re Krishna v. Krishna,* No. C 97-0021, 1997 WL

---

[3] The First Circuit and Sixth Circuit explicitly assign the burden to the petitioner. *See Simcox v. Simcox*, 511 F.3d 594, 611 (6th Cir. 2007) ("[T]he petitioner proffering the undertakings bears the burden of proof.") and *Danaipour v. McLarey*, 286 F.3d 1, 21 (1st Cir. 2002) ("[T]he proponent of the undertaking bore the burden of showing" its adequacy.).

195439, at *3-4 (N.D. Cal. Apr. 11, 1997) (courts may deny petition where the respondent would be forced to rely on abusive spouse in new country). However, it is B.A.S.'s safety and well-being that is paramount—not the respondent's. *See Davies v. Davies*, 717 F. App'x 43, 48 (2d Cir. 2017) (The grave risk "inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm."). [4] "[A] respondent should not be rewarded for declining to ameliorate the risk" to her child, *Valles Rubio*, 2019 WL 5189011, at *31, and harm that is "a consequence of choices made by [the] respondent" should not affect the Court's repatriation decision. *In re Koc*, 181 F. Supp. 2d 136, 156 (E.D.N.Y. 2001), *report and recommendation adopted* (Apr. 3, 2001).

The respondent maintains "that no set of ameliorative measures is appropriate" because the petitioner is "unwilling" and "unable" to comply with court orders. (ECF No. 103 at 4.) The petitioner disagrees, and says that in any case, the proposed measures do not require the Court "to rely on any promises" by him. (ECF No. 100 at 8.) For the reasons that follow, I find that the proposed measures are sufficient to ameliorate the grave risk of harm to B.A.S. upon his return to Italy.

### A. Undertakings by the Italian Courts

The Italian courts are willing and able to enforce the conditions necessary to protect B.A.S. in Italy. It is undisputed that both parties have obtained legal counsel and are active

---

[4] There is no evidence in the record that the petitioner was abusive to B.A.S. or that B.A.S. would be unsafe with the petitioner. In fact, the respondent frequently left B.A.S. with the petitioner when she lived in Italy. (*See* Tr. 536:18, 618:7-15, 1036:21-1037:19, 1042:13-18.) Accordingly, B.A.S.'s return to Italy is not necessarily contingent on the respondent also living there.

litigants in an ongoing custody dispute in Italy.[5] On December 12, 2019, the Italian court overseeing the custody dispute issued a comprehensive order imposing various measures to facilitate B.A.S.'s Italian repatriation. (ECF No. 96-1.) The order included, among other directives, a protective order against the petitioner and an order directing Italian social services to oversee his parenting classes and behavioral and psychoeducational therapy. (*Id*. at 11-13.) The order also noted the extensive case documentation in this Court's proceedings, as well as the Court's finding that the petitioner was physically and psychologically violent toward the respondent, sometimes in the presence of B.A.S. (*Id*. at 7-8.) Separately, on January 31, 2020, an Italian criminal court dismissed charges that the petitioner initiated against the respondent in connection with B.A.S.'s removal from Italy. (ECF No. 99-1.) The petitioner also signed a statement agreeing not to pursue future criminal or civil actions against the respondent and submitted it to the Italian court. (ECF No. 94-1 at 31.) In short, the Italian justice system is actively involved with the parties and their disputes, including most significantly, B.A.S.'s welfare.

The respondent challenges the scope of the Italian order of protection, and argues that it should extend to the petitioner's parents. (ECF No. 103 at 19.) Next, she takes issue with the details of the Italian court's order that the petitioner undergo therapy; she says that the order must specify the duration and frequency of the petitioner's treatment (*id.* at 20), and that in any event, the petitioner cannot be trusted to follow any court order. (*Id.* at 12.) Finally, the respondent challenges the adequacy of the Italian courts generally, suggesting that the judges do not appreciate the significance of the proceedings in this court and are somehow incapable of

---

[5] Indeed, the respondent apparently secured counsel as early as August 2018 (ECF No. 102-2 at 35); at the time of the trial, that lawyer was representing the respondent *pro bono*, which is apparently still the case.

6

"expeditiously translating key materials" from this proceeding.[6] (*Id.* at 24.) None of these arguments are persuasive.

There is insufficient evidence on the record before me to require an order of protection against the petitioner's parents before B.A.S. can be returned safely to Italy.[7] While there is evidence that the petitioner's parents took his side against the respondent, including when he was physically and verbally abusive to her (*see, e.g.*, Tr. 80:1-20), there is no evidence that their behavior constitutes a grave risk to B.A.S., or that they were violent or abusive to B.A.S. *See Blondin II*, 189 F.3d at 246 ("As the federal statute implementing the Convention makes clear, these four exceptions are meant to be 'narrow.'"). I am also not persuaded by the respondent's claims that the petitioner's father poses a danger to B.A.S. There was no mention at trial of two of the accusations—that he "threw B.A.S. into a swimming pool without flotation devices," and "kicked a soccer ball hard at [him]." (ECF No. 45 at 18.) In any case, even if true, neither constitutes a grave risk of harm.[8] "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by

---

[6] The respondent says that the Italian court must have the entire record of this Court's proceedings translated to Italian before B.A.S. can be returned to Italy. (ECF No. 103 at 23-24.) This is unnecessary; the Italian court already has multiple documents in Italian, has acknowledged the comprehensive proceedings before this Court, and has recognized the findings of violence. The Italian court is more than capable of deciding which parts of the record should be translated.

[7] When the respondent cited her in-laws' animosity as a basis for requiring an order of protection against them, I made the following observation in a footnote of a previous order: "To the extent that the respondent believes that an order of protection against the petitioner's family is necessary, the petitioner should submit that request to the Italian court for adjudication." (ECF No. 89.) The respondent seems to have interpreted this as an expression of my agreement that such an order is a condition precedent to B.A.S.'s repatriation. (ECF No. 95 at 1-2.) It is not. The scope of any orders of protection beyond what is necessary for B.A.S.'s safe return is best left to the court overseeing the custody dispute and enforcing the order of protection.

[8] The respondent's claim that she did not include these incidents in her trial testimony because "[t]he parties had limited time on the Court's calendar" (ECF No. 103 at 20 n.10) is perplexing. I heard testimony from multiple witnesses over the course of nine days, including the respondent, who testified for two days.

7

the child, have not been found to constitute a grave risk." *Souratgar,* 720 F.3d at 104 (collecting cases). The respondent also testified that the grandfather took B.A.S. from the petitioner and respondent's first floor apartment to the grandparents' third floor apartment one time, while the respondent and petitioner were out for the evening and the child was with a babysitter. (Tr. 268:2-269:1.) This incident does not warrant a finding that B.A.S.'s grandparents pose a grave risk of harm to him.

The grave risk of danger to B.A.S. is his exposure to domestic violence, almost all of it perpetuated by the petitioner against the respondent. The order of protection put in place by the Italian court prohibits the petitioner from going near the respondent or B.A.S.[9] (ECF No. 96-1 at 11.) This is sufficient to ameliorate the grave risk of harm resulting from his parents' violent relationship.

I also reject the respondent's claims about the efficacy of the Italian court's directives on the subject of the petitioner's therapy. Although there was no evidence that the petitioner was violent to B.A.S., I directed him to obtain therapeutic treatment because of the expert testimony about his lack of insight into his behavior and its effect on B.A.S. In the months following my decision, the petitioner provided evidence that he sought and obtained treatment. Moreover, the Italian court has directed Italian Social Services to investigate both parties and B.A.S. in order to assess parental suitability and B.A.S.'s needs. (ECF No. 96-1 at 12 ¶ 4.) The Italian court has also directed that any visitation be supervised. (*Id*. at 10.) Finally, the Italian judge warned the petitioner that failure to comply with Italian Social Services could be held against him in the custody proceedings. (*Id*. at 13 ¶ 10.) This order provides a sufficient guarantee that the petitioner will undergo appropriate treatment, and that B.A.S. will be safe in Italy.

---

[9] The order of protection lasts one year beginning when the respondent and B.A.S. return to Italy, and can be renewed. (*Id*.)

The respondent also asserts that the petitioner will not follow the orders of the Italian court because he is untrustworthy. The record before me does not support the respondent's claim. The petitioner cooperated with the 2017 Italian Social Services investigation that was prompted by one of the respondent's calls to the Italian police. There is no evidence that he obstructed or refused to participate in the investigation; rather, the record shows that the petitioner participated in multiple interviews by himself and with the respondent. (Tr. 884:2-25.) Moreover, since the start of proceedings in this Court, the petitioner has traveled to the United States for the trial and other hearings. He has abided by all conditions of the supervised visits with B.A.S., despite the absence of any court order. Finally, of course, the petitioner will suffer significant consequences if he disregards court orders. The Italian court, like any court, expects litigants to comply with its directives and is fully capable of imposing sanctions on litigants who flout its orders. If the petitioner is foolish enough to disobey court orders, he will risk losing not only custody of B.A.S., but any rights of visitation or access. (ECF No. 96-1 at 13 ¶ 10.) Given the severe consequences of noncompliance with the Italian court orders, as well as the record before me, I am confident that the Italian legal system is able to enforce its orders.[10]

"[T]he exercise of comity that is at the heart of the [Hague] Convention requires [the Court] to place [its] trust in th[ose] court[s]" of Italy to do what is necessary to protect B.A.S. *Saada II*, 930 F.3d at 539-40 (citing *Blondin II*, 189 F.3d at 248-49). Based on the expert testimony presented at trial, I concluded that the Italian legal system is capable of handling domestic violence cases involving children. (ECF No. 64 at 24.) My interactions with the Italian courts over the past nine months have confirmed that conclusion, as well as established specifically that the Italian court will protect B.A.S. The Italian court has issued a

---

[10] The petitioner's alleged refusal to grant the respondent a "get"—a religious divorce—was not a subject of the trial, and in any event is not a factor that affects B.A.S.'s well-being.

9

comprehensive order that demonstrates an understanding and respect for this Court's findings, and has imposed measures consistent with B.A.S.'s safe return.

### B. Undertakings by the Parents

In addition to the conditions that the Italian court will enforce, the Court has considered additional measures to ameliorate the risk of harm to B.A.S. The respondent's well-being is a factor in my decision because B.A.S. will be under her care pending resolution of the custody dispute in Italy, *see, e.g.*, *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1061 (E.D. Wash. 2001) (declining to return child where the respondent had "no resources which would enable her to live in Greece"), but as explained above, the respondent's well-being is not the main focus of this proceeding. The Court should focus on ameliorative measures during the pendency of the child custody proceeding in the country of habitual residence. *See Walsh v. Walsh*, 221 F.3d 204, 219 (1st Cir. 2000) ("The undertakings [should] preserve the child's safety while the courts of th[e home] country have the opportunity to determine custody of the child[] within the physical boundaries of their jurisdiction."). "Typical undertakings concern support, housing and the child's care pending resolution of the custody contest." *Blondin IV*, 238 F.3d at 159 n.8 (citation omitted).

The respondent asserts that she "has supported her son without child support from [the petitioner] for the past year and a half" (ECF No. 103 at 22 n.13), but that she is vulnerable in Italy because she is not an Italian citizen, and because she lacks financial resources, which she claims puts B.A.S. at risk. There are obvious and significant expenses associated with an international move, including housing, utilities, food, travel and child care. (*See* ECF No. 102 at 3-5.) These expenses will be higher in the first few months of B.A.S.'s return to Italy as the respondent settles him into a new routine, secures her own employment and manages their

relocation. Based on the parties' submissions (*see, e.g.*, ECF No. 102), $150,000.00 will ensure B.A.S.'s safe and comfortable return to Italy, as well as the respondent's financial independence from the petitioner and his family.[11] The petitioner must make this payment before the respondent's return to Italy to ensure performance.

The money should alleviate the respondent's asserted concerns about her vulnerability as a non-citizen with limited Italian language skills (ECF No. 103 at 10), which are in any event somewhat overblown. The respondent, with the assistance of an attorney, has navigated the Italian legal system for the past two years. While she lived in Italy, she ran errands, went out with friends, traveled independently, and regularly sought assistance from the Italian police and Social Services. (*See* Tr. 536:6-18, 618:7-15, 1036:21-1037:19, 1042:13-18, 884:2-25.) A payment of $150,000.00 for a year of expenses will ensure the respondent's interim stability pending the Italian custody proceeding.[12]

### C. B.A.S.'s Special Needs

After the trial, a representative of the New York City Department of Education and a psychologist that the respondent hired evaluated B.A.S., who is now three years old, for special needs. (See ECF Nos. 68, 91.) The most recent diagnosis was "mild Autism Spectrum Disorder" and "clinically significant difficulties in executive functioning skills" with "average non-verbal cognitive capabilities." (*See, e.g.*, ECF No. 91 at 22.) According to the respondent, B.A.S. should receive treatment in the United States because Italy cannot provide him with sufficient services. (ECF No. 103 at 26.)

---

[11] The respondent also can use this money to pay her lawyer to the extent she is not getting free representation.

[12] Moreover, the tools for obtaining legal status and a work permit are in the respondent's hands. At the Court's direction, the respondent has already contacted the Italian Embassy in the United States about her move to Italy. (ECF No. 95 at 3.)

A grave risk of harm exists when repatriation would cause the child "real risk of being hurt, physically or psychologically." *Blondin IV*, 238 F.3d at 162. The risk of harm "must be severe," and there must be a "probability that the harm will materialize." *Souratgar,* 720 F.3d at 103. A "grave risk" of harm does not exist when repatriation "might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences." *Blondin IV,* 238 F.3d at 162. It is the respondent's burden to show grave risk of harm by clear and convincing evidence. *Id.* at 157.

There is insufficient evidence that repatriation would cause B.A.S. grave psychological harm in light of the recent diagnoses. Based on the evidence provided by the respondent, B.A.S.'s conditions are mild, and while he has made "noticeabl[e]" progress receiving care in the United States, his continued participation in programs here is "strongly recommended" only to "maximize" his improvements. (ECF No. 103 at 25; *see also* ECF No. 91 at 22.) There is no evidence that repatriation would result in "significant regression" or marked "deterioration in [his] cognition, social skills, and self-care." *See Ermini v. Vittori*, 758 F.3d 153, 159-60 (2d Cir. 2014) (affirming grave risk of harm finding for child with severe autism whose "hope for an independent and productive life rested on his continued participation" in a specific treatment program) (internal quotation marks omitted). Moreover, the petitioner agrees that B.A.S. should be evaluated in Italy and that he will cover any costs associated with his treatment. (ECF No. 100 at 9-10.)

The Italian court overseeing the custody dispute has already directed Italian Social Services to evaluate B.A.S. to determine the extent of his psychological or educational needs. (ECF No. 96-1 at 9.) Absent evidence that B.A.S.'s repatriation would cause him grave risk of harm, the court in his country of habitual residence is best suited to decide the scope of his future

treatment. The respondent has not shown by clear and convincing evidence that B.A.S.'s special needs put him at grave risk of harm in Italy.

## CONCLUSION

Accordingly, the petition is granted and B.A.S. must be returned to Italy. The Clerk of Court is respectfully directed to enter judgment in favor of the petitioner. The parties are to meet and confer regarding B.A.S.'s return to Italy and the ameliorative measures outlined in this order, including the petitioner's payment to the respondent. This order is stayed for thirty days to allow the parties time to resolve the method of B.A.S.'s return, and for the respondent to seek and obtain a decision on an expedited appeal.

**SO ORDERED.**

      s/Ann M. Donnelly

Ann M. Donnelly  
United States District Judge

Dated: Brooklyn, New York  
      May 5, 2020