```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
```
**ISACCO JACKY SAADA**,

                           Petitioner,

     – against –                           **MEMORANDUM DECISION AND ORDER**
                                                    18-CV-5292 (AMD) (RML)

**NARKIS ALIZA GOLAN**,

                           Respondent.
```
---------------------------------------------------------------X
```
**ANN M. DONNELLY**, United States District Judge:

On September 20, 2018, the petitioner, Isacco Jacky Saada, brought this case against the respondent, Narkis Aliza Golan, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011. On January 21, 2021, the Court of Appeals affirmed my May 5, 2020 decision granting the petition and directing the respondent to return the couple's son, B.A.S., to Italy. (ECF No. 116.) Now before the Court is the respondent's motion to set aside the judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, or in the alternative, to stay the action pending her petition for writ of certiorari to the United States Supreme Court. (ECF No. 118.) For the reasons discussed below, the respondent's motion is denied.

## BACKGROUND

The petitioner, an Italian citizen, alleged that in August of 2018, the respondent, an American citizen, wrongfully kept their minor son, B.A.S., in the United States. On October 13, 2018, the petitioner filed an order to show cause requesting that he be allowed to visit with his son while the petition was pending. At a conference on October 16, 2018, I directed the parties to arrange for the petitioner to have supervised visitations with B.A.S. (ECF No. 118-2, Oct. 16,

Case 1:18-cv-05292-AMD-RML   Document 130   Filed 03/29/21   Page 2 of 16 PageID #: 2108

2018 Hearing Transcript ("Oct. 16, 2018 Hr'g Tr.") 4:7-20.)  The respondent expressed concern that the petitioner would use the supervised visits as a means to discover where she was living. (*Id*. at 4:21-25.)  In the context of that discussion, I commented, "I don't think – let's just be clear here, so I wouldn't think I would have to say this but obviously there's not going to be any effort to try to determine where [the respondent] is; you're not going to do that, are you?" (*Id*. at 5:1-5.)  The petitioner's counsel responded that they would not try to locate the respondent, and that the supervised visitation would take place at a neutral location, so that the petitioner would not be able to follow the supervisor to the respondent's apartment.  (*Id*. at 5:6-9.)  Although the parties discussed formalizing their visitation agreement and submitting it to the court for approval (*see id*. at 14:9-15:1), they did not do so.  Nor did the respondent seek a protective order from this Court.

In January of 2019, I held a nine-day bench trial during which the petitioner, the respondent, and numerous experts testified.  In a March 22, 2019 decision, I found that B.A.S. was a habitual resident of Italy, and that while he would be subject to grave risk of harm upon repatriation, there were sufficient measures available in Italy that would ameliorate the risk to B.A.S. upon his return.  (ECF No. 64 at 35.)[1]

The Second Circuit affirmed the decision in part and vacated it in part.  *Saada v. Golan*, 930 F.3d 533, 537 (2d Cir. 2009) (*Saada I*).  The Court agreed that Italy is B.A.S.'s "habitual residence" under the Hague Convention, but determined that certain ameliorative measures could not be enforced before B.A.S. was repatriated to Italy.  *Id.* at 542-43.  Accordingly, the Second Circuit remanded the case with instructions to ensure that the measures necessary for B.A.S.'s

---

[1] I based the grave risk determination not on the petitioner's violence to B.A.S., but because of B.A.S.'s exposure to violence between the petitioner and the respondent.

safe repatriation could be "enforce[d] by the District Court or supported by other sufficient guarantees of performance." *Id.* at 543.

On May 5, 2020, after additional briefing and an extensive examination of the ameliorative measures available in Italy, I found that "the Italian courts are willing and able to resolve the parties' multiple disputes, address the family's history and ensure B.A.S.'s safety and well-being." (ECF No. 108.) Indeed, both the petitioner and the respondent have legal counsel in Italy, and in December of 2019, the Italian court issued an order to help facilitate B.A.S.'s repatriation that included a protective order against the petitioner and an order requiring Italian social services to oversee his parenting classes and behavioral and psychoeducational therapy. (*Id*. at 6.) Moreover, the petitioner agreed to give the respondent a sum of money to allow her to live independently of the petitioner and his family upon her return. (*Id*. at 11.)[2] Accordingly, I granted the petition and ordered that B.A.S. be returned to Italy. (*Id*. at 13.) On January 21, 2021, the Court of Appeals affirmed that decision in its entirety. *Saada v. Golan*, 833 F. App'x 829, 831 (2d Cir. 2020) (*Saada II*).

On January 25, 2021, shortly after the Court of Appeals issued its mandate in *Saada II*, the respondent filed the instant motion seeking to vacate the May 5, 2020 order pursuant to Rule 60(b)(2), based on "newly discovered evidence." (ECF No. 118.) Describing my remarks at the October 16, 2018 proceeding as a "court order," the respondent says that the petitioner "hired an investigator who surveilled B.A.S. and the respondent and took pictures of them in their apartment," in "blatant violation" of the October 16, 2018 court order. (*Id*. at 1.) According to the respondent, the surveillance shows that the petitioner will not comply with my orders, which in turn demonstrates that he will not follow the Italian court's protective orders. (*Id*. at 2.) In

---

[2] The petitioner agreed to give the respondent between $30,000 and $60,000. (*Compare* ECF No. 94 at 3 *with* ECF No. 102 at 2.) I ordered that he give her $150,000. (ECF No. 108 at 11.)

3

short, the respondent argues that this "new" evidence establishes that B.A.S. will face a "grave risk of harm" that cannot be ameliorated, and therefore, the petition should be denied.[3]

To support her allegation of secret surveillance, the respondent submitted the transcript of a November 2020 conversation between the petitioner, his father, and a rabbi who was working with the respondent to help her secure a *get*. (ECF No. 118-1.)[4] Unbeknownst to the petitioner, the respondent was listening in, and the call was being secretly recorded. (ECF No. 123-1, Feb. 2, 2021 Conference Transcript ("Feb. 2, 2021 Conf. Tr.") 3:15-19.)[5] At one point, the petitioner opined that the respondent was not a good mother because "she, I know from information – I cannot tell you how, with investigators, that people told me – she bring[s] men[] to her place to have sex with her, different men[]. I have picture[s] of my son with different men." (ECF No. 118-1 at 13.) When the rabbi asked how the petitioner knew what the respondent did in her apartment, the petitioner said, "Don't worry. I cannot tell you how I know, but I have proofs. . . . The lawyers who [inaudible] investigators . . . so I know." (*Id*. at 14.)

In opposing the motions to set aside the judgment and to stay, the petitioner represents that Kfir Hazan, an acquaintance of the respondent, contacted him in November of 2019 and offered to collect "damaging" evidence against the respondent in exchange for money. (ECF No.

---

[3] The respondent's counsel describes the petitioner's actions as "a shocking intrusion into B.A.S.'s and Ms. Golan's private lives and evidence a significant threat to their safety and wellbeing." (ECF No. 118 at 2.) Although the respondent's counsel learned about the investigation in November of 2020, and despite their concern about the respondent's safety and wellbeing, they did not file this motion until January 25, 2021.

[4] "A *Get* is a divorce document under Jewish law that is given by a husband to his wife, without which a Jewish woman cannot remarry." (ECF No. 118 at 2 n.3.)

[5] It is not clear that this recording is admissible evidence. Although the respondent's counsel represented that the rabbi recorded the call, they did not submit an affidavit from the rabbi attesting to this fact or authenticating the transcript of the recording. If the respondent recorded the conversation without either the petitioner's or the rabbi's consent, she would have violated New York law. *See* N.Y. Penal Law §§ 250.00, 250.05. Nevertheless, further inquiry into the admissibility of this conversation is unnecessary because its contents do not merit reconsideration of my May 5, 2020 order.

4

121 at 1-2.) Mr. Hazan sent photographs and videos of himself with B.A.S., presumably taken inside the respondent's New York apartment, and said that the respondent was doing drugs and engaging in "inappropriate" and "high-risk" behavior around B.A.S. (*Id*. at 2.)

The petitioner told his attorneys what Mr. Hazan had alleged, and his attorneys decided to investigate the claims to determine whether B.A.S. was in any imminent danger. (*Id*. at 2.) The attorneys hired an investigator who took limited measures to ensure that B.A.S. was safe; the investigation lasted less than a week, and the investigator did not disclose the respondent's address to the petitioner or his attorneys. (ECF No. 122 at 2.) The petitioner's attorneys determined that Mr. Hazan's allegations were not credible, and that he was just seeking to extort the petitioner. (Feb. 2, 2021 Conf. Tr. 14:13-16.) Accordingly, they took no further action. (*Id*.) Another person contacted the petitioner via Facebook in January of 2020, also offering to collect evidence against the respondent in exchange for money. (ECF No. 121 at 2.) The petitioner's attorneys did not believe that this person was credible and took no further action to investigate or report his claims. (Feb. 2, 2021 Conf. Tr. 14:17-22.)

The petitioner's attorneys maintain that they never attempted to "discover" the respondent's address. (*Id*. at 24:21.) At one point, in April of 2020, the respondent sent the petitioner two New York addresses via WhatsApp so that he could send gifts to B.A.S. (*Id*. at 24:22-25; ECF No. 121-1 at 3-4.) When the petitioner submitted B.A.S.'s application for a United States Passport, the State Department confirmed that one of those two addresses was B.A.S.'s home address. (Feb. 2, 2021 Conf. Tr. 25:1-9.)

The respondent challenges the petitioner's credibility, and argues that his attorneys should have brought Mr. Hazan's allegations to the attention of the Court in November of 2019, before hiring a private investigator. (*Id*. at 11:17-12:18.) According to the respondent, the

decision by petitioner's counsel to investigate Mr. Hazan's claims—even if the petitioner was not directly involved—violated my order directing the petitioner not to try to locate the respondent during the 2018 trial, and is grounds for reconsideration of the order to return B.A.S. to Italy. (*Id.* at 12:19-13:1.)

## DISCUSSION

### I. Motion to Set Aside the Judgment

Rule 60(b) outlines the grounds for relief from a final judgment, order or proceeding, including "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)[.]" Fed. R. Civ. P. 60(b)(2). A Rule 60(b)(2) motion must be made "no more than a year after the entry of the judgment or order or the date of the proceeding," Fed. R. Civ. P. 60(c)(1), and may not be used "simply to relitigate matters settled by the original judgment." *MAVL Capital, Inc. v. Marine Transp. Logistics, Inc.*, 771 F. App'x 56, 57 (2d Cir. 2019) (summary order) (quoting *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 60 (2d Cir. 1984)). The decision to grant a motion for relief under Rule 60(b) is left to the discretion of the court. *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012).

To prevail on a motion for relief from a judgment on the grounds of newly discovered evidence, a party must establish that:

> (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 146-47 (2d Cir. 2020) (quoting *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001)). "The burden of proof is on the party seeking relief from judgment." *Toppin v. Cty. of Nassau*, 828 F. App'x 19,

22 (2d Cir. 2020) (summary order) (quoting *Int'l Bhd. of Teamsters*, 247 F.3d at 391). Rule 60(b) is "a mechanism for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances." *See Pelczar v. Pelczar*, 833 F. App'x 872, 876 (2d Cir. 2020) (summary order) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)) (internal quotations omitted). The respondent has not established that she is entitled to relief from the judgment ordering B.A.S.'s return to Italy.

There is a threshhold question as to whether the respondent's motion was timely under Rule 60(c)(1). *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 466 F.3d 97, 100 (2d Cir. 2006) ("The one-year limitation period for Rule 60(b) motions is absolute." (internal quotations omitted)). Generally, courts in this circuit have held that an appeal does not toll the one-year limitations period for bringing a motion for reconsideration based on newly discovered evidence. *See Pryor v. Berryhill*, 286 F. Supp. 3d 471, 474 (E.D.N.Y. 2017) (collecting cases); *see also King v. First Am. Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir. 2002) ("Such tolling is unnecessary because a Rule 60(b) motion 'can be made even though an appeal has been taken and is pending.'" (quoting *Transit Casualty Co. v. Security Trust Co.*, 441 F.2d 788, 791 (5th Cir. 1971))). However, if the Second Circuit's ruling substantively changes the party's legal position from that established by the judgment of the district court, the one-year clock does not begin to run until after the judgment of the district court on remand. *See Martha Graham Sch. & Dance Found.*, 466 F.3d at 101.

The Second Circuit substantively changed the respondent's legal position by vacating the March 22, 2019 judgment in part with instructions to "consider whether there exist alternative ameliorative measures that are either enforceable by the District Court or supported by other sufficient guarantees of performance." *Saada I*, 930 F.3d at 543. The respondent filed her Rule

7

60(b) motion within one year of my May 5, 2020 order, which modified the judgment on remand; therefore, her motion is timely.

It also appears that the respondent has met the first prong of the Rule 60(b)(2) test; the "newly discovered facts"—the investigation in November of 2019—existed at the time that I was considering the May 5, 2020 order.

It is not clear when the respondent first learned about the November 2019 investigation. She maintains that she only learned of it during the recorded conversation with the rabbi a year later in November of 2020. (ECF No. 123 at 4.) The evidence of the respondent's conversations with the petitioner seem quite clear that she knew about the investigation when it happened, or at least by April 26, 2020, when she told the petitioner, "You hired a private investigator, I know. I know. . . . It's okay. I hired one, too. It's fine." (ECF No. 126 at 4; ECF No. 126-1 at 14.)[6] In any event, even if the respondent was "justifiably ignorant" of the surveillance as of May 5, 2020, despite "due diligence," her motion must be denied because the evidence is not "of such importance that it probably would have changed the outcome" of the May 5, 2020 order. *See Int'l Bhd. of Teamsters*, 247 F.3d at 392.

The respondent asks this Court to undo months of intercession and the implementation of protections by the Italian courts, as well as undertakings between the parties, based on vague

---

[6] The respondent objects to the admission of two May 6, 2020 telephone conversations. (ECF No. 127 at 1-2; *see* ECF Nos. 126-4, 126-5.) She argues that these conversations primarily concerned settlement negotiations between the parties and are therefore inadmissible under Rule 408 of the Federal Rules of Evidence. (*Id*. at 2.) In addition, the parties agreed in January of 2020 not to record their settlement conversations; the respondent argues that the petitioner breached this agreement by recording these conversations. (*Id*.) I need not consider the admissibility of these conversations as neither is relevant to the issues currently before me. Nor will I mediate a disagreement over the propriety of "secret recordings"—which seems to be the standard mode of operation between the parties—particularly when I am being asked to consider another set of secret recordings as the basis for this motion. In any event, the April 26, 2020 conversation appears to be a routine phone call between Mr. Saada, Ms. Golan, and B.A.S, not a settlement negotiation. (*See* ECF No. 126-3.) Therefore, I will consider statements made during that call, to the extent they are relevant.

statements that the petitioner made during a divorce negotiation involving a third-party—that he had "information" about the respondent which he learned from "lawyers who [inaudible] investigators." (ECF No. 118-1 at 13.) She submits no other evidence to support her claim that the petitioner tried to find out where she lived during the pendency of the petition, or that he hired someone to take pictures of her and B.A.S. inside her apartment. She does not claim that she ever saw him at or near her home, or that he sent people to harass her at that location. Nor did she produce pictures allegedly taken by the petitioner or an investigator, to support her claim that they were surveilling her inside of her apartment. Moreover, she has acknowledged that she knows Mr. Hazan, and that they are friends. (Feb. 2, 2021 Conf. Tr. 19:13-16.)

The evidence also undercuts the respondent's claim that she did not want the petitioner to know where she lived. Indeed, the parties' relationship during the past eighteen months appears to have been commendably civil given their turbulent history. In April of 2020, the respondent sent the petitioner her address so that he could send things to B.A.S. (ECF No. 121-1 at 3-4.) Even if the petitioner had "discover[ed]" her address before she volunteered it, there is no evidence that he did anything to cause physical or psychological harm to either the respondent or B.A.S.

Although I did not find the petitioner to be an entirely credible witness at trial, I have no reason to doubt the credibility of his attorneys. They corroborated that strangers contacted the petitioner, made serious accusations against the respondent and offered to collect evidence against her in exchange for money; one of them sent photographs and videos of himself with B.A.S., and alleged that the respondent was engaging in behavior that put B.A.S. at risk. (ECF No. 121 at 1-2.) The petitioner did not take any action himself. Rather, he turned to his lawyers for help. They hired an investigator to ensure that B.A.S. was safe. (Feb. 2, 2021 Conf. Tr.

9

13:23-14:4.) Counsel explained that they did not want to raise the allegations with the Court or the Administration for Children's Services (ACS) unless they had determined that they were credible. (*Id*. at 14:5-16.) Having determined that the allegations were not credible and that B.A.S. was safe, the petitioner's attorneys ended the investigation and took no further action.[7] Given the contentiousness of the litigation, the petitioner's attorneys made a decision that they believed was in the best interest of both parties and B.A.S. (*Id*. at 16:17-25; 18:1-9.)

Moreover, the investigation did not violate my October 16, 2018 directive that the petitioner should not try to find out where the respondent lived.[8] As noted, the petitioner did not personally take any actions; he contacted his attorneys. The petitioner's counsel represented that they did not learn where the respondent lived, nor did they give the petitioner, who has been in Italy for at least the past year, any information about the respondent's whereabouts. (*Id*. at 25:9-12.)[9] The respondent has offered nothing that contradicts counsel's representations, and I have no reason to doubt their credibility as officers of the Court.

In short, there is no evidence that the petitioner or his attorneys tried to find out where the respondent lived, certainly not during the trial or anytime thereafter. Knowledge of the limited investigation that did take place would not have changed the outcome of my May 5, 2020 order, because it does not establish that the petitioner has violated an order of this Court or that the

---

[7] Reporting the allegations to the Court or to ACS would have almost certainly led to an investigation of some kind.

[8] I am assuming for the sake of argument that the October 16, 2018 directive was the protective order that the respondent's arguments assume. I made the directive in the context of supervised visitations, and it could be interpreted simply as a directive not to use supervised visitation as a means of discovering where the respondent lived. (Oct. 16, 2018 Hr'g Tr. 5:1-5.)

[9] The respondent is correct that the petitioner's attorneys are his "agents" and that their behavior is imputed to him. *See Tufamerica, Inc. v. Hammond*, No. 99-CV-10369, 2002 WL 1058059, at *9 (S.D.N.Y. May 23, 2002) ("parties are bound by the acts of their freely-chosen attorneys" (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962))). Because I do not find that the petitioner's attorneys violated a court order, there is no liability to impute to the petitioner.

protections put in place in Italy will be insufficient to protect B.A.S. from a grave risk of harm. The evidence is not sufficient grounds to reverse the judgment; therefore, the respondent's motion to set aside the judgment is denied.

## II.     Motion for Stay

At the February 2, 2021 conference, I told the parties that I intended to grant the respondent's request for a stay pending her petition for a writ of certiorari to the U.S. Supreme Court. (Feb. 2, 2021 Conf. Tr. 32:6.) At that time, it was my understanding that B.A.S. was not able to travel because he had not yet received his United States passport. (*Id.* at 31:15-16.) Moreover, while the petitioner paid to have the passport expedited, it was not clear if B.A.S. was eligible for an expedited passport or how long it would take to secure. (ECF No. 120 at 1.) In fact, as the petitioner's counsel advised on March 12, 2021, the State Department issued B.A.S.'s passport on January 27, 2021, and the respondent received it shortly thereafter. (ECF No. 129.) While I am somewhat puzzled that this was not brought to my attention during the February 2, 2021 conference or in any of the subsequent briefing, it is clear that no practical barrier currently exists to B.A.S.'s return. Accordingly, I must reassess my decision to stay the action pending the petition to the Supreme Court to ensure that I give proper consideration to the concerns of both parties.

In deciding whether to stay a return order in a Hague Convention case, courts must balance the "importance of the prompt return of children wrongfully removed or retained" with the concern that "shuttling children back and forth between parents and across international borders may be detrimental to those children." *Chafin v. Chafin*, 568 U.S. 165, 178 (2013). "Staying the return of a child in an action under the Convention should hardly be a matter of course." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996).

11

Courts considering whether to stay a return order must apply the four traditional stay factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Chafin*, 568 U.S. at 179 (quoting *Nken v. Holder,* 556 U.S. 418, 434 (2009)). A decision to stay the return should include an "appropriate consideration of the child's best interests." *Id.*

### a. Likelihood of Success

Given the small percentage of cases that the Supreme Court accepts each term, it is not likely that the respondent's petition for certiorari will be successful.[10] This case does present an interesting legal question, which appears to be a matter of first impression before the Court. The Second Circuit requires the district court to determine whether there are ameliorative measures or undertakings in the country of habitual residence that can protect the child before it denies a Hague Convention petition based on the grave risk of harm exception. *See Blondin v. Dubois*, 238 F.3d 153, 163 (2d Cir. 2001) ("before a court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine the full range of options that might make possible the safe return of a child to the home country"). However, other circuits have declined to impose this requirement and leave the decision to seek ameliorative measures or undertakings to the discretion of the district court. *See Baran v. Beaty*, 526 F.3d 1340, 1347 (11th Cir. 2008); *see also Cuellar v. Joyce*, 596 F.3d 505, 510 (9th Cir. 2010) (questioning the requirement that the court should consider whether the home country can protect the child from

---

[10] The Supreme Court "accepts 100-150 of the more than 7,000 cases that it is asked to review each year." *Supreme Court Procedures*, U.S. Courts, https://www.uscourts.gov/about-federal-courts/educational-resources/about-educational-outreach/activity-resources/supreme-1 (last visited Mar. 28, 2021).

12

grave risk); *Van De Sande v. Van De Sande*, 431 F.3d 567, 571 (7th Cir. 2005) ("to define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian's country has good laws or even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute"). Overall, this factor does not weigh strongly for or against a stay.

      b.      *Irreparable Damage to the Respondent and B.A.S.*

I am not persuaded that the respondent will be irreparably injured absent a stay. The Italian court has put many protections in place to ensure the respondent's safety in Italy, and she will have money to provide for herself and B.A.S. when they return. B.A.S.'s return would not moot the respondent's claims or prevent her from continuing to litigate this action. *See Chafin*, 568 U.S. at 180. If the return order is reversed, there are currently no substantial barriers that would prevent the respondent's return to the United States with B.A.S. The respondent is a United States citizen and will retain sole custody of B.A.S. in Italy, at least until the custody dispute is resolved in the Italian courts; she should be able to return to the United States if the Court ultimately decides in her favor.

The potential harm to B.A.S. from being "shuttled back and forth" is more pronounced. He is now four years-old, attends school, and has been diagnosed with mild autistic spectrum disorder, a condition that may make it more difficult for him to adapt to changes in his environment. (ECF No. 91 at 2, 22.) Although there is no evidence that B.A.S.'s needs will not be met in Italy (*see* ECF No. 96-1 at 9-10), the possibility that he may be uprooted again in a few months or a few years is concerning.

On the other hand, if I stay the action and the return order is affirmed, he will have lost "precious months when [he] could have been readjusting to life in [his] country of habitual

13

residence." *Chafin*, 568 U.S. at 178. Moreover, "[a] removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the [Hague] Convention, it is the abduction that causes the pangs of subsequent return." *Lukic v. Elezovic*, No. 20-CV-3110, 2021 WL 804384, at *3 (E.D.N.Y. Mar. 3, 2021) (quoting *Friedrich*, 78 F.3d at 1068). I would encourage the parties to consider B.A.S.'s interests in deciding the timing of his return, but I cannot find that this factor weighs in favor of a stay.

        c.     *Prejudice to the Petitioner*

This factor weighs against a stay. The Court ordered B.A.S.'s return to Italy almost two years ago, but he still resides in New York. Due to COVID-19, the petitioner has not been able to travel to see his son in over a year. (ECF No. 121 at 5.) I cannot ignore the fact that he is losing precious opportunities to be with his son during this formative time in the child's development. The balance of harms weighs in the petitioner's favor.

        d.     *Public Interest*

"[T]he public interest, as relevant to a Hague Convention dispute, is primarily defined by the treaty itself, the express purpose of which is 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" *Hofmann v. Sender*, No. 12-CV-8104, 2012 WL 8466673, at *1 (S.D.N.Y. Dec. 20, 2012) (quoting Hague Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1980). "The aim of the Convention is to secure prompt return of the child to the correct jurisdiction, and any unnecessary delay renders the subsequent return more difficult for the child, and subsequent adjudication more difficult for the foreign court." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 211 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) (quoting *Friedrich*, 78 F.3d at 1063).

14

Public interest cautions against further delay of my return order. This case has been pending for over two years, and the litigation could continue for several more years depending on the Supreme Court's determination. Continued delay, where there is no clear risk of irreparable harm, does not further the goals of the Hague Convention. *See Chafin*, 568 U.S. at 179 ("If losing parents were effectively guaranteed a stay, it seems likely that more would appeal, a scenario that would undermine the goal of prompt return and the best interests of children who should in fact be returned."). Therefore, this factor weighs against a stay.

Weighing all the factors, I find a stay that would delay B.A.S.'s return indefinitely no longer serves either B.A.S.'s best interests or the important considerations of the Hague Convention. I therefore decline to stay the case pending the outcome of the respondent's petition to the Supreme Court. I will stay the judgment an additional 60 days from the date of this order to allow the parties to make travel arrangements and to provide adequate transition time for B.A.S. The parties are encouraged to work together for B.A.S.'s benefit during this transition period. Further extension of this stay, without the consent of both parties, is unlikely.

## CONCLUSION

The respondent's motion to vacate the judgment is denied. Accordingly, the petition is granted and B.A.S. must be returned to Italy. The Clerk of Court is respectfully directed to enter judgment in favor of the petitioner. The Court will stay the judgment for 60 days to allow the parties to finalize travel arrangements to Italy. The parties are directed to submit a joint status report 30 days from the date of this order updating the Court on the progress of their arrangements.

**SO ORDERED.**

                                                        s/Ann M. Donnelly
                                                        ANN M. DONNELLY
                                                        United States District Judge

Dated: Brooklyn, New York
       March 29, 2021