# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

kking@maglaw.com; (212) 880-9403

SENIOR COUNSEL
PAUL R. GRAND

COUNSEL
JASMINE JUTEAU
CURTIS B. LEITNER

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

July 25, 2022

**By ECF**
The Honorable Ann M. Donnelly
United States District Judge, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

  Re: *Saada v. Golan*, No. 18-CV-5292 (AMD) (RML)

Dear Judge Donnelly:

  We represent Respondent Narkis Golan in the above-referenced proceeding, and submit this letter-brief pursuant to the Court's order dated July 12, 2022. We respectfully submit that the Court should deny Petitioner Jacky Saada's petition for return.

**I. Introduction**

  On June 15, 2022, the Supreme Court issued a unanimous decision in this case that overturned the Second Circuit's rule mandating consideration of ameliorative measures following a grave risk finding, clarified the appropriate process for the discretionary consideration of ameliorative measures, and provided substantive guidance on what is (and what is not) an appropriate measure. [ECF 151-1 ("Op.").] Importantly, the Court clarified that any consideration of ameliorative measures must "prioritize the child's physical and psychological safety"; must "not usurp" the role of the custody court; and must be expeditious. Op. 12-15. This Court's prior return order of May 5, 2020 [ECF 108] was therefore vacated and the case remanded to determine "whether the measures in question are adequate to order return in light of [this Court's] factual findings concerning the risk to B.A.S., **bearing in mind that the Convention sets as a primary goal the safety of the child**." Op. 16 (emphasis added).

  The answer to this question is no. The only undisturbed finding of this Court is its March 2019 determination, based on clear and convincing evidence and never appealed, that B.A.S. would, if returned to Italy, be exposed to grave risk of harm from Mr. Saada's pattern of domestic abuse and violent temper, often in front of the child. [ECF 64] The proceedings that followed the grave risk finding — including this Court's November 15, 2019 order compelling the parties to obtain an Italian court order, and its subsequent May 5, 2020 return order in reliance on that Italian order — were undertaken pursuant to an improper legal framework, and are inconsistent with the requirements of the Hague Convention and the Supreme Court's recent

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

decision. The May 2020 order violates each of the Supreme Court's requirements for considering ameliorative measures, and therefore cannot stand.

Given the source of the grave risk in this case, together with the Supreme Court's confirmation that the "primary goal" of a Hague proceeding is to ensure the "safety of the child," Op. 16, the only safe and expeditious resolution that is consistent with this Court's March 2019 findings, the Hague Convention's requirements, and the Supreme Court's guidance is denial of the petition. Critically, this Hague proceeding determines *only* the physical location of the child during subsequent custody proceedings. The goal is simply to keep the child safe during that process. The separate custody court can then work to address the difficult and complex family issues here, and determine the ultimate custody, visitation, and travel arrangements for this family. As the Supreme Court noted, "domestic violence in the home may . . . constitute an obvious grave risk to the child's safety that could not readily be ameliorated." Op. 13.

There is no justification for this Court to impose any risk to B.A.S., who has lived safely in New York for the last four years. The current circumstances of B.A.S., Mr. Saada, and Ms. Golan also are critical to any evaluation of risk, and there are complicated, serious issues here that require family law expertise as well as time and close attention that is not conducive to an expedited Hague process nor to ensuring the "safety of the child." Op. 16. Among other things, B.A.S. has been diagnosed with autism since a 2019 formal evaluation [ECF 91], has substantial developmental delays, receives specialized behavioral and speech therapy services multiple times per week to address those delays, has strong emotional ties to family and friends in New York, does not speak or understand Italian, and has had virtually no contact with Mr. Saada in the last two years (by Mr. Saada's choice). Ending B.A.S.'s therapy services here (with no evidence regarding if or when he could resume the same services in Italy) and returning him to Italy therefore would not only expose him to grave risk based on Mr. Saada's behavior, but would also severely destabilize him, and would further expose him to potential post-traumatic stress based on the dramatic change in his surroundings. Returning B.A.S. also would destabilize and re-traumatize Ms. Golan, the only parent and protector in his life. Under these circumstances, no ameliorative measures that have been ordered by this Court (or that could be ordered pursuant to the appropriate expedited process) can alleviate the grave risk of harm that return would have on B.A.S. And there is no reason to uproot him now and create this risk when a custody proceeding may ultimately determine that he should live in New York with his mother.

**II.     This Court Cannot Rely on May 2020 Order to Direct Return**

Because this Court's May 2020 order and the process it took to arrive at that order are fundamentally inconsistent with the requirements of the Hague Convention and with the Supreme Court's decision, this Court cannot — contrary to Mr. Saada's suggestion in his July 1 letter [ECF 151] — simply rely on that order to again direct return. Indeed, Mr. Saada advanced this argument before the Supreme Court in suggesting that the Court could affirm this Court's return order even if it found an error in the underlying legal framework, *see* Br. of Resp. Saada 42 (filed Feb. 18, 2022). But the Supreme Court, in declining to affirm and instead remanding for this Court's further consideration consistent with its opinion, rejected that argument.

The Supreme Court's decision contained two key holdings. *First*, the Court held that a district court is not categorically required to examine all possible ameliorative measures to facilitate return once it has found that return would expose the child to a grave risk of harm. The Court thus overturned the Second Circuit's contrary rule in *Blondin v. Dubois*, 189 F.3d 240, 248

2

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

(2d Cir. 1999), which "improperly elevated return above the Convention's other objectives," including the safety of the child. Op. 11-12.

*Second* — and critically for this case — the Court held that a district court's discretionary consideration of ameliorative measures must be guided by the Convention's requirements. Op. 11-12. The Court identified three such requirements:

1. Most importantly, "any consideration of ameliorative measures must **prioritize the child's physical and psychological safety**." Op. 12. That is because the "Convention does not pursue return exclusively or at all costs," but instead is "designed to **protect the interests of children and their parents**, and children's interests may point against return in some circumstances." Op. 12.

2. Any consideration of such measures must "**not usurp**" the role of the separate custody court. Op. 13.

3. Any consideration of such measures must be **expeditious**. Op. 13-14.

The Court made clear that a court need not consider measures that have **not been raised by the parties**, that do not **prioritize safety** or that otherwise are **unworkable**, that risk drawing the court into **custodial determinations**, or that risk **overly prolonging** Hague proceedings. Op. 15.

The May 2020 return order violated each of these requirements.

The Italian protective order was not a measure proposed by the parties. Instead, the idea originated with the Second Circuit, which suggested that this Court require the parties to obtain an Italian protective order pursuant to *Blondin*'s improper "return if at all possible" framework, while simultaneously urging that the process be as expeditious as possible. *See Saada v. Golan*, 930 F.3d 533, 542–43 (2d Cir. 2019). What resulted was a process and result that were both inconsistent with the Hague Convention: This Court spent nine months orchestrating an order from an Italian court that neither party requested, and in so doing, drew itself into in custodial issues — including physical custody, visitation, and social services — that are not appropriately part of the Hague process.

And, despite the time required to obtain the Italian order, the process provided little time to actually assess whether the order would be effective in ensuring B.A.S.'s safety. There was, for example, no examination of the effectiveness of protective orders in domestic violence cases. As amici curiae noted in briefing to the Supreme Court, there is ample research demonstrating that "abusers are highly prone to recidivism and are likely to ignore or defy . . . court orders[]," including because abusers "are very likely to seek to reestablish control once they regain access to their victims." Br. of Dom. Viol. Orgs. 7, 11 (filed Jan 26, 2022). Indeed, one study found that in every Hague case where return was ordered subject to measures prohibiting violence (including protective orders), abusers violated such measures in every case. *Id.* at 11-12.

In addition, protective orders rely on deterrence, which to be effective requires both consistent enforcement and the ability of an abuser to appreciate the consequences of his actions and a desire to avoid those consequences. There was no analysis in May 2020 of the Italian system's enforcement of protective orders in practice, nor was there any analysis of whether Mr. Saada's behavior had changed following the testimony *of his own expert* finding him impulsive, violent, and without the "capacity to change his behavior." [ECF 64, at 21, 32.] There is good reason to question the adequacy of the Italian system to deter abusers. Over eighty

3

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Italian organizations filed an amicus brief with the Supreme Court to make this point, and cited a recent report by a Council of Europe working group that found Italy's system to be "severely lacking in multiple critical respects," including in the enforcement of protective orders, the ability of first responders to assess risk of victims, the understanding and consideration of domestic violence by civil courts, and cultural biases against foreign women. Br. of Italian Orgs. 15-17 (filed Jan. 26, 2022). And Mr. Saada's actions over the last two years — cutting off contact with his son — cast substantial doubt on this Court's assumption in May 2020 that he would be deterred from violating the order because it would jeopardize his access and claims to B.A.S. in the custody proceeding. To the contrary, Mr. Saada's actions corroborate this Court's March 2019 findings that he is unreliable and unable to change his behavior.

In short, because the May 2020 order was procedurally and substantively flawed, it was vacated by the Supreme Court. This Court cannot simply direct return pursuant to that order.

### III. The Court Cannot Issue a Return Order That Ignores the Current Circumstances of the Parties

Separate from the legal flaws precluding the Court from relying on the May 2020 order, the Court also cannot issue a return order without understanding the current circumstances of B.A.S., Mr. Saada, and Ms. Golan. The findings made by the Court more than two years ago are necessarily stale. The safety of B.A.S. (and of Ms. Golan) cannot be guaranteed without understanding Mr. Saada's current circumstances, including, for example, his actions over the past two years and whether he has undertaken the therapy necessary to address the abusive behavior that underpinned the Court's March 2019 grave risk finding (and, if he has, whether it has had any effect). The Court also would have to take evidence concerning B.A.S.'s current circumstances, including his substantial social, psychological, and educational needs stemming from his autism, in order to understand the risk that returning him to Italy would pose.[1]

This expedited Hague proceeding is not the appropriate forum in which to consider these fact-intensive, complex, and dangerous circumstances, let alone to meaningfully address the grave risk to B.A.S. at issue in this case. Only the separate custody court, with its expertise in family law issues, is properly placed to address these numerous issues. The only safe and swift course for this Court is to deny the petition now and to allow the custody court to address those issues, rather than to try to fashion a solution to them or — even worse — to ignore them.

To preview some of these issues, B.A.S. has now lived in a stable, safe environment in New York for four years, under the care of Ms. Golan and surrounded by family and friends. He attends school, has just graduated from kindergarten, and is preparing for first grade at the same school in the fall. He also has significant special needs (including a detailed Individualized Education Plan), and has been diagnosed with autism spectrum disorder by multiple evaluators. He has substantial speech delays and significant developmental irregularities. A psychological evaluation within the past year found, *inter alia*, difficulty relating to others, low levels of adaptability, unpredictability, and poor responses to new things; his poor fluid reasoning (*i.e.*, the capacity to problem-solve) and functional skills (*i.e.*, the ability to care for oneself in daily life) are ranked with the lowest 1% of his peers – the lowest possible score. B.A.S. has a Special Education Itinerant Teacher and receives multiple weekly therapeutic services from New York

---

[1] The Court would also need to take evidence concerning the issues described *supra*, including the lack of effectiveness of protective orders in cases of domestic violence.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

City. He speaks no Italian. Children with autism are at increased risk for trauma exposure and development of post-traumatic stress disorder.[2] It would be incredibly disruptive, harmful, and risky to the safety of B.A.S. to remove him from the stable environment he requires. Any relocation without a careful evaluation of the proper supports to be put in place before a change in routine would leave B.A.S. at risk of significant developmental regression. Ms. Golan, his only parent and protector, also would be severely traumatized by a return to Italy, where she has almost no support network. The opinions of child development professionals must be considered if this Court wants to assess whether specific measures will ameliorate (or exacerbate) risk.

Current circumstances surrounding Mr. Saada are also relevant to assessing whether his interest in the child will deter abusive behavior. Over the last two years, Mr. Saada has shown little regard for B.A.S.'s life and well-being. He has had no contact with B.A.S. for nearly two years, blocked incoming calls and messages (as he has done in the past), has refused to provide financial support to B.A.S., and has refused to grant Ms. Golan a Jewish divorce[3] unless Ms. Golan gives up custody of B.A.S. Mr. Saada's continued efforts to exert coercive control over Ms. Golan and his dangerous indifference to the well-being of his child cast strong doubt that his violent personality has changed.

This Court cannot, consistent with the Supreme Court's decision and the Hague Convention, conclude that ameliorative measures ensure B.A.S.'s safety without taking evidence on the current circumstances of the parties.

### IV. This Court Should Deny The Petition Now

The grave risk in this case is sourced to Mr. Saada's pattern of severe domestic abuse, often in front of the child. It involves complex physical and psychological issues exacerbated by numerous cultural, financial, and personal factors. And layered on top of that are B.A.S.'s special needs. An attempt in this expedited proceeding to untangle (let alone solve) these issues would create more undue delay and risk the safety of the child, and therefore would be improper under the Hague Convention and the Supreme Court's decision. The only resolution that is safe and expeditious is to deny the petition to allow B.A.S. to stay in a safe environment while custody proceedings move forward.

Respectfully submitted,

/s/ Karen R. King

cc: All counsel of record, via ECF.

---

[2] *See, e.g.*, Haruvi-Lamdan, N., et al., "Autism Spectrum Disorder and [PTSD]: An unexplored co-occurrence of conditions," Autism (2022); Kerns, C.M., et al., "Exploring Potential Sources of Childhood Trauma: A Qualitative Study with Autistic Adults and Caregivers," Autism (2022); Rumball, F., et al., "Heightened Risk of [PTSD] in Adults with Autism Spectrum Disorder: The Role of Cumulative Trauma and Memory Deficits," Res. Dev. Disabilities (2021); Rumball, F., "A Systematic Review of the Assessment and Treatment of [PTSD] in Individuals with Autism Spectrum Disorders," Rev. J. Autism & Dev. Disorders (2019).

[3] Refusing to grant a Jewish divorce (a *Get*) is a recognized form of coercive control and domestic abuse. *See*, *e.g.*, Starr, K., "Scars of the Soul: Get Refusal and Spiritual Abuse in Orthodox Jewish Communities," Nashim 37–60 (2017); Jennifer Medina, "Unwilling to Allow His Wife a Divorce, He Marries Another," N.Y. Times (Mar. 21, 2014). Without a *Get*, Ms. Golan is beholden to Mr. Saada and her social interactions are restricted as a matter of Jewish law. Making a *Get* conditional upon Ms. Golan relinquishing her parental rights reflects the continued control and abuse by Mr. Saada over Ms. Golan from a distance, with no regard for the impact on their son.

5