

www.clcny.org

**BOARD OF DIRECTORS**

**PRESIDENT**
Laurie J. McPherson, Esq.

**EXECUTIVE DIRECTOR**
Karen P. Simmons, Esq.

*A Child's Voice Matters.*

November 3, 2022

Hon. Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: <u>Golan v. Saada,</u> 18 CV 05292-AMD-RML

    I am writing to advise this Court that the Kings County Family Court has assigned The Children's Law Center ("CLC") to represent B.A.S. in connection with custody and family offense proceedings that were initiated in that court last week.  A copy of the Family Court's order of assignment is attached to this letter as Exhibit A.  As B.A.S.'s court-appointed attorney, I respectfully seek to be included in any conference that this Court may conduct with respect to this matter, in the event that it is remanded to this Court from the Second Circuit Court of Appeals.  If this Court requires me to file a formal notice or motion for that purpose, I am prepared to do so promptly.

    As this Court undoubtedly is aware, B.A.S.'s mother, Narkis Golan ("the mother"), passed away on October 18, 2022.  The precise cause of her death currently is unknown, pending an investigation by the Medical Examiner.

    Immediately thereafter, on October 20, 2022, in order to ensure that B.A.S. was not left without a legal guardian, and to be in a position to meet his significant special educational needs and avoid disruption of his ongoing medical and psychological care, B.A.S.'s maternal aunt, Morin Golan ("the aunt"), filed a petition in the Kings County Family Court, seeking an order granting her custody of B.A.S. (Docket No. V-20979-22).  In addition, because counsel for Mr. Saada ("the father") had indicated that the father then was traveling to the United States in order to retrieve B.A.S. and take him to Italy— an act that would have violated the orders of the Italian court, prohibiting the father from having unsupervised contact with B.A.S.—the aunt also filed a petition seeking an order of protection against the father on B.A.S.'s behalf (Docket No. O-20978-22).

44 Court Street, 11th Fl.
Brooklyn, NY 11201
TEL  718 • 522 • 3333
FAX 718 • 522 • 7376

820 Concourse Village West, 5th Fl.
Bronx, NY 10451
TEL  718 • 741 • 3400
FAX 718 • 741 • 9658

118-21 Queens Blvd., Suite 417
Forest Hills, NY 11375
TEL  718 • 544 • 3499
FAX 718 • 544 • 4450

36 Richmond Terrace, Suite 304
Staten Island, NY 10301
TEL  718 • 447 • 8384
FAX 718 • 447 • 3893

*Our mission is to give a child a strong and effective voice in a legal proceeding that has a critical impact on his or her life.*

1

On October 20, 2022, the Family Court entered orders directing that B.A.S. remain temporarily in the care of the aunt until further court order, that the child's passport was to be held by the aunt, and that neither party was to remove B.A.S. from the jurisdiction of the court.  In addition, the court entered a temporary order of protection, directing the father to "stay away" from B.A.S. and the aunt, "[s]ubject to the order of supervised visitation of the Tribunal of Milan." Those orders are attached to this letter as Exhibits B and C, respectively.

The proceedings in the Family Court are next scheduled to be heard on November 15, 2022.  Notices of that appearance are attached to this letter as Exhibit D.

At this time, it cannot be disputed that there has been a substantial change of circumstances since August 31, 2022, when this Court issued its most recent order directing that six-year-old B.A.S. be returned to Italy.  Due to these changes, it is our position that the immediate return of B.A.S. to Italy would raise new child safety concerns that this Court should address prior to repatriation.  Thus, we ask that this Court consider current evidence regarding the new circumstances relevant to B.A.S.'s condition and safety under these new circumstances.

This Court's order clearly contemplated that the mother would return to Italy with B.A.S. and reside there with him in order to permit the father to visit with him, under the supervision of the Social Services of the Municipality of Milan, or such other municipality in which the mother chose to reside.  It also was ordered that, apart from such supervised contact, the father was not to "go near" the mother or B.A.S.  Clearly, that arrangement now is impossible, given that the mother has died and there is no one with whom B.A.S. has a relationship who is in a position to travel to Italy with B.A.S. and with whom he could reside in that country.

In addition, it is not clear whether the ameliorative measures ordered by this Court can or will be implemented if the Italian custody case has abated, and the protective orders of that Court have expired as well.  Indeed, there are many previously unanticipated questions that remain unanswered, which directly affect B.A.S.'s well-being and safety, including: (a) whether the previously ordered protective orders survive the mother's death; (b) if they do survive, who would ensure that those orders were enforced; (c) whether there are new or different ameliorative measures that should be ordered; (d) who would be the proper party to seek such ameliorative orders, and in what proceeding; and (e) how arrangements would be made for B.A.S.'s care—presumably by placing him in the foster care system in Italy, given that the father is permitted only to see him in a supervised visitation setting, as scheduled by Italian Social Services.  In addition, the Family Court has directed that B.A.S. is to remain in the aunt's care, pending further court order, and that neither the father nor the aunt is to remove B.A.S. from the jurisdiction of that court.  For all of these reasons, B.A.S.'s passports should not be released to the father at this time.

Moreover, even if there were someone who was in a position to leave the jurisdiction with B.A.S., and with whom B.A.S. could travel to Italy, it appears, as stated

above, that B.A.S. would have to be placed in the foster care system in Italy, with individuals who are complete strangers to him, and with whom he would be unable to communicate, given that he does not speak Italian.  Such a scenario presents a new and previously unanticipated grave risk of harm to the child.  It cannot be disputed that B.A.S. has been traumatized by the sudden death of the mother—the only parent of whom he has any conscious memory—and that immediate repatriation would separate him, likely permanently, from the only relatives whom he knows and trusts, and who are in a position to help him through this period of mourning for the mother.

It also is essential to recognize that, at this juncture, B.A.S. does not know the father, due to the father's own choice not to avail himself of virtual and in-person supervised visitation that was available to him over the past two years.  In addition, because, over the past two years, the father has not sought to involve his relatives with B.A.S., those relatives also are strangers to B.A.S., who has no memory of living in Italy, does not speak Italian, and knows only a life in the United States.

In this context, it also is particularly concerning that B.A.S. has been diagnosed with autism spectrum disorder, which is proving to be more serious as he grows older and is required to take on greater challenges and expectations in his daily life.  In his most recent psychological evaluation report, dated August 4, 2021, which is attached to this letter as Exhibit E, it was noted that B.A.S. "struggle[d] with daily life skills and the maintenance of his social behavior."  Specifically, B.A.S.'s "functional skills—that is, his abilities to care for himself and function in the world, also rank with the lowest 1% of his peers."  Further, he had "difficulty regulating his emotions, regulating his gaze and facial expressions, and effectively communicating his needs."  He also was "easily distracted," and had difficulty with attention and communication, "limited conversational skills, social challenges, and adaptive delays."  Thus, it was "very hard for [B.A.S.] to change routines and [he] has low adaptability."  He also is "a bit clumsy and drops things often."  Accordingly, it was recommended that B.A.S. receive services—which the mother subsequently arranged—including speech therapy, counseling, family support, and Applied Behavioral Analysis therapy.  In addition, B.A.S. has an Individualized Educational Program, which includes a dedicated special education teacher who works with him individually while he is in school.  Notably, B.A.S. has speech delays in English, and is likely to have great difficulty learning to communicate in Italian.

B.A.S.'s documented disabilities would make his ability to adjust successfully to a foster care placement in Italy far more difficult, even than for a child without developmental delays and special needs. It is well documented that children with such special needs are more likely than others to suffer trauma in connection with changes in their circumstances and routines, and to become victims of child abuse at the hands of caretakers who lack the patience and frustration-tolerance necessary to understand and address those needs. Thus, even apart from the threat of physical abuse by the father, whose tendency to become violent when dealing with frustration and disappointment are documented in this Court's prior decision, immediate return to Italy under the current circumstances may very well expose B.A.S. to a new grave risk of harm, and place him in an "intolerable situation" that previously was not anticipated.  Specifically, he would be removed suddenly from the

only relatives and life that he remembers, and deposited into a situation which is entirely foreign and unknown to him, to reside with complete strangers, with whom he is unable to communicate, while grieving the death of his only known parent.  Such a situation—which is completely different from that anticipated by the Court when it ordered that B.A.S. be returned to Italy, subject to ameliorative measures—would be traumatizing for any child, let alone a child with B.A.S.'s special needs, who lacks the inner resources to accommodate to such radical changes in his life, and undoubtedly would be unable to comprehend and process what was happening to him.

In turn, there is a real possibility that the father, who admittedly has problems containing his anger and violence when upset, would be unable to deal effectively with B.A.S.'s challenging behavior without becoming abusive.  This is extremely concerning, given this Court's findings, as well as the father's own testimony at the trial in this Court. Specifically, this Court found that the father "admitted that he tried to restrain Ms. Golan, got "violent," was "impulsive," "los[t] control" when he got "angry," and hit Ms. Golan "to shut her up."  See Saada v. Golan, 2019 WL 1317868, *4 (E.D.N.Y. 2019) (citations omitted).  At trial, the father stated:

> I get violent, I say things that I shouldn't say, maybe sometime
> I, in a stupid way, I took advantage—not advantage, but not—
> I felt comfortable doing certain things because she didn't know
> to, maybe to protect herself. I mean, I did a lot of bad things
> to Narkis.

Id., 2019 WL 1317868, at *4.

Further, the Court found that, apart from other incidents which were disputed, the father had admitted to situations in which he had engaged in abusive behavior due to lack of self-control.  For example, while the mother was pregnant with B.A.S., he admittedly attacked her as they left the hospital after she was examined.  He stated: "When we go out of hospital [I] was d[i]stressing and [I] pull her hair ... and then [I] pull her from her jacket ... I[']m not say[i]ng was [right] to pull her hair but [it] was an accumulation of stress that she keep put[t]ing me [through]." Id., 2019 WL 1317868, at *6.

Quite clearly, B.A.S. would have no more idea than the mother did, as to how to "protect" himself from the father's anger, and would not know how to avoid frustrating and stressing him.  Indeed, if B.A.S. is removed suddenly from his familiar surroundings and sent to Italy, and reacts poorly, as would be expected, at least initially, it would be extremely challenging for even the most patient person to deal with B.A.S.'s disabilities and behaviors.  Moreover, the father has had no exposure to or experience dealing with those disabilities and behaviors, given that he has absented himself from B.A.S.'s life for the past two years.

While it may be true that, from the perspective of the Court, any trauma that B.A.S. was to experience upon being returned to Italy is due to the mother's having wrongfully removed him from Italy four years ago, that perspective does not lessen the negative

impact on B.A.S., who will be placed in an intolerable situation that he had no responsibility for creating.  Indeed, B.A.S. is entirely innocent, yet is the person who will suffer, as his world, as he always has known it, is changed irrevocably.

Critically, the Hague Convention recognizes the possibility of harm from repatriation despite an initially wrongful removal or retention, and specifically authorizes the Court to consider such harms before ordering return, as this Court has previously. However, at this juncture, we believe that B.A.S.'s circumstances have changed, and that the previously ordered ameliorative measures—to the extent that they survive—may not adequately protect B.A.S., given that the mother is not available to return to Italy with him, his special needs present a greater challenge to his ability to adapt to this changed reality, and he has no recollection of the father, with whom he has not had contact in at least two years.  Thus, we believe that this Court should consider these new circumstances before enforcing its prior return order.

Even where such a radical event has not occurred in a child's life, children's needs constantly change and evolve as they grow and the dynamics in their families change. Consequently, New York State custody decisions reflect the child's circumstances at the time that they are made, and appellate courts often reverse decisions regarding custody and visitation when circumstances have changed significantly while an order is on appeal. Accordingly, we respectfully submit that this Court should review B.A.S.'s current condition and circumstances before enforcing its recent return order.  Moreover, we believe that, at a minimum, a period of transitional or reunification therapy with the father would appear necessary in order to prepare B.A.S. for life in a new country, where he will be required to communicate in a new language, without the support of the mother or any other familiar person.

Under these particular unique circumstances, to insist that B.A.S. be returned immediately to Italy, despite the severe emotional and psychological harm that is likely to result, would be to reduce him to the status of chattel, in which the father has a possessory interest, without regard for the child's well-being and best interests.  To do so runs counter to the letter and spirit of the Hague Convention, which provides that "the interests of children are of paramount importance."  Indeed, in its decision in this case, the Supreme Court noted that "the Convention sets as a primary goal the safety of the child," including his psychological and emotional safety and well-being.

Finally, I respectfully submit that, even if this Court declines to reconsider its return order in light of the radical change of circumstances that now has occurred, it should not release B.A.S.'s passports to the father, who cannot legally take custody of B.A.S. Instead, the Court should convey those passports to the Clerk of the Kings County Family Court so that, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, that court can communicate with the Italian court in order to determine which court ultimately will decide custody and visitation issues with respect to B.A.S., and where B.A.S. should reside while those proceedings are ongoing.

Thank you for your consideration.

Respectfully,

_S/ JoAnna Kelly_____
JoAnna Kelly
Janet Neustaetter
The Children's Law Center
44 Court Street, 11th Floor
Brooklyn, NY 11201
(718) 522-3333, ext. 146
jkelly@clcny.org

Cc:
Robert D. Arenstein, Esq.
Richard Min, Esq.
Claudia Hammerman, Esq.
Karen King, Esq.

# EXHIBIT A

File#: 309699 (V-20979-22)      FC-101 (09/2020)      Page 1 of 2

At a term of the Family Court of the State
of New York, held in and for the County
of Kings at 330 Jay Street, Brooklyn, NY
11201, on October 20, 2022

**PRESENT**: Hon. Judith D. Waksberg

In the Matter of **an Article 6 Custody/Visitation** Proceeding

**Morin Golan** (Petitioner)            **(347) 678-9536**
                            **Email: mgolan51@gmail.com**
**Narkis A. Golan** (Deceased) (Respondent)
**Jacky I. Saada** (Respondent)

S.A.B.        (DOB:            )

**File #:**       309699
**Docket #:**   V-20979-22

**ORDER APPOINTING ATTORNEY**
**FOR CHILD**
**(VIRTUAL)**

It is hereby **ORDERED** that:

> The Children's Law Center
> 44 Court Street
> Brooklyn, NY 11201
> (718) 522-3333 ext.

be appointed Attorney for the Child to represent the following child(ren) in the above proceeding:

| Name of Child | | Attorney Name |
|---|---|---|
| S.A.B. | (DOB:            ) | The Children's Law Center |

It is further:

**ORDERED** that The Children's Law Center, shall contact and provide initial services to the child at the earliest practical opportunity.

**ORDERED** that the child shall be made available to meet with their attorney The Children's Law Center

**ORDERED**, that during the pendency of this matter, The Children's Law Center, is hereby appointed as Attorney for the Child as to new petitions related to their assigned child that are filed within this Court.

**ORDERED** that The Children's Law Center, shall be served with all pleadings, notices, requests for adjournment and other documents filed with the Court by another party to the proceeding.

**ORDERED** that the appointment of The Children's Law Center, shall continue through any appeal of an order or judgment of the Court, unless relieved by the Appellate Division.

You are hereby notified to appear **VIRTUALLY** on:

File#: 309699 (V-20979-22)                              FC-101 (09/2020)              Page 2 of 2

Date/Time/Part:     **November 15, 2022** at **12:00 PM in Part 19**
Purpose:            **Return of Process**
Presiding:          **Hon. Judith D. Waksberg**

### FOR VIDEO, CLICK ON THE FOLLOWING LINK:
https://notify.nycourts.gov/meet/0kw0d0

### FOR PHONE, CALL THE TOLL-FREE NUMBER AND ENTER THE MEETING ID:
**Phone: 347-378-4143    Meeting ID: 951559408**

Dated: **October 20, 2022**

**Hon. Judith D. Waksberg**

# EXHIBIT B

File#: 309699 (V-20979-22)



FC-102 (09/2020)          Page 1 of 1

At a term of the Family Court of the State
of New York, held in and for the County
of Kings at 330 Jay Street, Brooklyn, NY
11201, on October 20, 2022

**PRESENT**: Hon. Judith D. Waksberg

In the Matter of **an Article 6 Custody/Visitation** Proceeding

**Morin Golan** (Petitioner)

**Narkis A. Golan** (Deceased) (Respondent)
**Jacky I. Saada** (Respondent)

S.A.B. ▮ (DOB: ▮

| | |
|---|---|
| **File #:** | 309699 |
| **Docket #:** | V-20979-22 |

**ORDER - GENERAL**

On October 20, 2022, Morin Golan filed a petition for Custody.

Jacky I. Saada did not appear.

Morin Golan appeared with counsel.

It is hereby:

    **ORDERED** that the subject child, ▮S.A.B.▮ (DOB: ▮ is to remain in the care of Morin Golan and not to be removed from the care of Morin Golan until further court order. Child's passport is to be maintained by Morin Golan. Neither party is to remove the child, ▮S.A.B.▮ (DOB: ▮) from the jurisdiction of the court.

This matter is adjourned to November 15, 2022 in Part 19.

Dated: **October 20, 2022**

Hon. Judith D. Waksberg

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER
MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35
DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT,
OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE
APPELLANT, WHICHEVER IS EARLIEST.

# EXHIBIT C

F.C.A §§ 430, 550, 655, 828, 1029                                                      GF5 12/2020

**ORI No:** NY023023J
**Order No:** 2022-020761
**NYSID No:** _____

At a term of the Family Court of the State of New York,
held in and for the County of Kings, at 330 Jay Street, Brooklyn, NY
11201, on October 20, 2022

**PRESENT: Honorable Judith D. Waksberg**

**In the Matter of a FAMILY OFFENSE Proceeding**

Morin Golan (DOB: 12/31/1994),
      **Petitioner**

   - against -

Jacky Isacco Saada,
      **Respondent**

**File #**    309699

**Docket #**  O-20978-22

**Temporary Order of Protection**

**Ex Parte**

**NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.**

**THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.**

A petition under Article 8 of the Family Court Act, having been filed on October 20, 2022 in this Court and good cause having been shown, and Jacky Isacco Saada having been not present in Court.

   **NOW, THEREFORE, IT IS HEREBY ORDERED** that Jacky Isacco Saada observe the following conditions of behavior:

[01] Stay away from:

[A]  S.A.B.  (DOB:    ) and Morin Golan (DOB: 12/31/1994) Subject to the order of supervised visitation of the Tribunal of Milan.;

[B]  the home of  S.A.B.  (DOB:   ) and Morin Golan (DOB: 12/31/1994) Subject to the order of supervised visitation of the Tribunal of Milan.;

[C]  the school of  S.A.B.  (DOB:   ) and Morin Golan (DOB: 12/31/1994) Subject to the order of supervised visitation of the Tribunal of Milan.;

[D]  the business of Morin Golan (DOB: 12/31/1994) Subject to the order of supervised visitation of the Tribunal of Milan.;

[E]  the place of employment of Morin Golan (DOB: 12/31/1994) Subject to the order of supervised visitation of the Tribunal of Milan.;

[14] Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other electronic or any other means with  S.A.B.  (DOB:   ) and Morin Golan (DOB: 12/31/1994) Subject to the order of supervised visitation of the Tribunal of Milan.;

[02] Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against  S.A.B.  (DOB:   ) and Morin Golan (DOB: 12/31/1994);

GF-5 Page 2
O-20978-22
2022-020761

**It is further ordered** that this temporary order of protection shall remain in force until and including November 15, 2022, but if you fail to appear in court on this date, the order may be extended and continue in effect until a new date set by the Court.

**Dated:**   October 20, 2022                                    ENTER

Honorable Judith D. Waksberg

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**The Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

**Federal law requires** that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

**It is a federal crime to:**
• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**Check Applicable Box(es):**

[ ]  Party against whom order was issued was advised in Court of issuance and contents of Order

[ ]  Order personally served in Court upon party against whom order was issued

[x]  Service directed by other means: Petitioner to Arrange

[ ]  [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ]  Warrant issued for party against whom order was issued[specify date]: _____

[ ]  ADDITIONAL SERVICE INFORMATION [specify]: _____

# EXHIBIT D

File#: 309699 (O-20978-22, V-20979-22)      FC-100 (09/2020)          Page **1** of **1**

## FAMILY COURT OF THE STATE OF NEW YORK
## COUNTY OF KINGS

| | | |
|---|---|---|
| In the Matter of **an Article 8 Family Offense and an Article 6 Custody/Visitation** Proceeding | **File #:** **Docket #:** | 309699 O-20978-22 V-20979-22 |

**Morin Golan** (Petitioner)

**Narkis A. Golan** (Deceased) (Respondent)
**Jacky I. Saada** (Respondent)

**NOTICE TO APPEAR
(IN PERSON)**

To:      Morin Golan                                    Nicole L. Fidler Esq.
         1628 East 12th Street                          30 Wall St FL 8
         Brooklyn, NY 11229                             New York, NY 10005-2205

You are hereby notified to appear **IN PERSON** on:

|  |  |
|---|---|
| Date/Time/Part: | **November 15, 2022** at **12:00 PM** in **Part 19** |
| Purpose: | **Return of Process** |
| Presiding: | **Hon. Judith D. Waksberg** |
| Location: | **330 Jay Street, Brooklyn, NY 11201** |
| Floor: | **8** |
| Room: | **8027** |

If you have documents that you would like to send to the Court, at least 5 days prior to the Court date please submit through our Electronic Document Delivery System (EDDS) https://iappscontent.courts.state.ny.us/NYSCEF/live/edds.htm or e-mail to: KingsFamilyCourt@nycourts.gov

*Ryan L. Darshan*

**Dated:** October 20, 2022                        Ryan L. Darshan, Clerk of Court

File#: 309699 (V-20979-22)                    GF-2 (08/2002)          Page 1 of 2

## FAMILY COURT OF THE STATE OF NEW YORK
## COUNTY OF KINGS

In the Matter of **an Article 6 Custody/Visitation** Proceeding

**Morin Golan** (Petitioner)

**Narkis A. Golan** (Deceased) (Respondent)
**Jacky I. Saada** (Respondent)

**File #:**          309699
**Docket #:**     V-20979-22

**SUMMONS - GENERAL**
**(IN PERSON)**

S.A.B.          (DOB:          )

To:      Jacky I. Saada
          Address is Unknown

A petition under Article 6 of the Family Court Act has been filed with this Court.

**YOU ARE HEREBY SUMMONED** to appear **IN PERSON** before this Court on:

| | |
|---|---|
| Date/Time/Part: | **November 15, 2022** at **12:00 PM** in Part **19** |
| Purpose: | **Return of Process** |
| Presiding: | **Hon. Judith D. Waksberg** |
| Location: | **330 Jay Street, Brooklyn, NY 11201** |
| Floor: | **8** |
| Room: | **8027** |

to answer the attached petition and to be dealt with in accordance with the Family Court Act.

If you have documents that you would like to send to the Court, at least 5 days prior to the Court date please submit through our Electronic Document Delivery System (EDDS) https://iappscontent.courts.state.ny.us/NYSCEF/live/edds.htm or e-mail to: KingsFamilyCourt@nycourts.gov

**If you fail to appear as directed, a warrant may be issued for your arrest.**

*Ryan L. Darshan*

**Dated:** October 20, 2022                    Ryan L. Darshan, Clerk of Court

**NOTICE:** FAMILY COURT ACT §154(C) PROVIDES THAT PETITIONS BROUGHT PURSUANT TO ARTICLES 4, 5, 6, 8 AND 10 OF THE FAMILY COURT ACT, IN WHICH AN ORDER OF PROTECTION IS SOUGHT OR IN WHICH A VIOLATION OF AN ORDER OF PROTECTION IS ALLEGED, MAY BE SERVED OUTSIDE THE STATE OF NEW YORK UPON A RESPONDENT WHO IS NOT A RESIDENT OR DOMICILIARY OF THE STATE OF NEW YORK. IF NO OTHER GROUNDS FOR OBTAINING PERSONAL JURISDICTION OVER THE RESPONDENT EXIST ASIDE FROM THE APPLICATION OF THIS PROVISION, THE EXERCISE OF PERSONAL JURISDICTION OVER THE RESPONDENT IS LIMITED TO THE ISSUE OF THE REQUEST FOR, OR ALLEGED VIOLATION OF, THE ORDER OF PROTECTION. WHERE THE RESPONDENT HAS BEEN SERVED WITH THIS SUMMONS AND PETITION AND DOES NOT APPEAR, THE FAMILY COURT MAY PROCEED TO A HEARING WITH RESPECT TO ISSUANCE OR

File#: 309699 (V-20979-22)  GF-2 (08/2002)

**ENFORCEMENT OF THE ORDER OF PROTECTION.**

File#: 309699 (O-20978-22)  GF-2 (08/2002)          Page **1** of **1**

**FAMILY COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

In the Matter of **an Article 8 Family Offense** Proceeding

**Morin Golan** (Petitioner)

**Jacky I. Saada** (Respondent)

File #:          309699
Docket #:      O-20978-22

**SUMMONS - GENERAL**
**(IN PERSON)**

To:      Jacky I. Saada
         Address is Unknown

A petition under Article 8 of the Family Court Act has been filed with this Court.

**YOU ARE HEREBY SUMMONED** to appear **IN PERSON** before this Court on:

| | |
|---|---|
| Date/Time/Part: | **November 15, 2022** at **12:00 PM in Part 19** |
| Purpose: | **Return of Process** |
| Presiding: | **Hon. Judith D. Waksberg** |
| Location: | **330 Jay Street, Brooklyn, NY 11201** |
| Floor: | **8** |
| Room: | **8027** |

to answer the attached petition and to be dealt with in accordance with the Family Court Act.

If you have documents that you would like to send to the Court, at least 5 days prior to the Court date please submit through our Electronic Document Delivery System (EDDS) https://iappscontent.courts.state.ny.us/NYSCEF/live/edds.htm or e-mail
 to: KingsFamilyCourt@nycourts.gov

**If you fail to appear as directed, a warrant may be issued for your arrest.**

*Ryan L. Darshan*

**Dated:** October 20, 2022                    Ryan L. Darshan, Clerk of Court

**NOTICE: FAMILY COURT ACT §154(C) PROVIDES THAT PETITIONS BROUGHT PURSUANT TO ARTICLES 4, 5, 6, 8 AND 10 OF THE FAMILY COURT ACT, IN WHICH AN ORDER OF PROTECTION IS SOUGHT OR IN WHICH A VIOLATION OF AN ORDER OF PROTECTION IS ALLEGED, MAY BE SERVED OUTSIDE THE STATE OF NEW YORK UPON A RESPONDENT WHO IS NOT A RESIDENT OR DOMICILIARY OF THE STATE OF NEW YORK.  IF NO OTHER GROUNDS FOR OBTAINING PERSONAL JURISDICTION OVER THE RESPONDENT EXIST ASIDE FROM THE APPLICATION OF THIS PROVISION, THE EXERCISE OF PERSONAL JURISDICTION OVER THE RESPONDENT IS LIMITED TO THE ISSUE OF THE REQUEST FOR, OR ALLEGED VIOLATION OF, THE ORDER OF PROTECTION.  WHERE THE RESPONDENT HAS BEEN SERVED WITH THIS SUMMONS AND PETITION AND DOES NOT APPEAR, THE FAMILY COURT MAY PROCEED TO A HEARING WITH RESPECT TO ISSUANCE OR ENFORCEMENT OF THE ORDER OF PROTECTION.**

# EXHIBIT E

**Crown Counseling**
Associates

1398 Carroll Street Brooklyn, NY 11213      718-208-4780

office@crowncounselingassociates.com

### Elizabeth Jacobs-Pinson, Psy.D., Director

## Psychological Evaluation

**Name**: ███ S.A.B. ███

**Date of Birth**: ███

**Chronological Age**: 5 Years 1 Month

**Education Level**: Preschool

**Date of Evaluation**: 08/04/2021

**Date of Report**: 08/04/2021

**Psychology Intern**: Dr. Judah Stern, Ph.D., LP

**Supervisor**: Dr. Elka Jacobs-Pinson Psy.D.

### Purpose for Evaluation

S.A.B. was referred for a psychological assessment by his mother, Ms. Golan, who is concerned about S.A.B.'s attention, social skills and verbal skills. The purpose of this evaluation is to assess S.A.B.'s cognitive, behavioral, learning, and social skills and to determine his eligibility for OPWDD services.

### Background Information

All information was reported by S.A.B.'s mother, Narkis Golan. S.A.B. is the only child of Narkis. The mother is a high school graduate. The parents are divorced, and the mother has legal custody.

Narkis was 25 at the time of the pregnancy and gave birth to S.A.B. at full-term via regular delivery. During her pregnancy, she experienced blackouts, falls and emotional stress. Additionally, the pregnancy was complicated by gestational diabetes, presence of a benign tumor on the left side of the mother's uterus, red degeneration (hemorrhagic necrosis of a rapidly enlarging fibroid), which made movement very difficult. The labor and delivery were unusually long and required emergency surgery due to significant blood loss. She did not smoke, use drugs, or drink alcoholic beverages and was not exposed to x-rays, chemicals, or infectious diseases during her pregnancy. S.A.B. weighed 8lb 0oz and received neonatal care for three days. He did not take antibiotics, have seizures, or need oxygen at any time. S.A.B. was reported to have been late in achieving the milestones of sitting up without help, eating finger food and toilet training. Additionally, he was also late in saying 2–3-word sentences and using 3 words.

As an infant, S.A.B. was reported to have been colicky and difficult to comfort. He also had difficulty nursing, had fascination with certain objects and did not respond to his name or the sound of caregivers. The parent reported that this was mainly due to complicated living

situations. S.A.B. displayed extremely high levels of activity and distractibility as a child, as well as generally happy disposition. He had low levels of adaptability as well as extreme tantrums, unpredictability and poor responses to new things. S.A.B. had more difficulty than other children regarding tying shoelaces, dressing himself, holding crayons or pencils and buttoning and zipping things. He also had more difficulty waiting for a turn to play, knowing left from right, acting without thinking and sitting during mealtime. S.A.B. also struggled with knocking things over and dropping things accidentally. Recently, S.A.B. has been having difficulty completing tasks, following instructions, and making decisions. He's been sleeping too much, cries easily, has excessive temper tantrums and has rapid mood swings. S.A.B. fidgets excessively, talks excessively, and engages in impulsive behavior. He was described as often being angry and resentful. S.A.B. often complains of somatic symptoms, has a poor appetite and often needs reassurance. He engages in dangerous activities, displays aggression to others, is immature, and loses things easily compared to his peers. S.A.B. frequently has problems eating at the dinner table, sitting down for homework, and being told to do something he doesn't want to.

Educationally, S.A.B. is indifferent about school and very motivated to do well in his studies. He currently attends mainstream school, Mosdoth Bereshith, where he is in preschool. He currently receives an IEP from 2021 for a SIET and speech therapy.

S.A.B. has previously been diagnosed with autism spectrum disorder at three years old. He has previously received psychological evaluations between August and October 2019 by New York Behavior Analysis and Psychological Services, PLLC. The evaluations were conducted by J. Helen Yoo, Ph.D. S.A.B. has asthma for which he takes Flovent, PRN. He has also experienced frequent nightmares as a child. A family history of speech or language problems and school failure was reported.

### Tests Administered

Oral and written interview with PARENT

Behavioral observation and interview with S.A.B.

Stanford-Binet Intelligence Scale, Fifth Edition (SB-5)

Vineland Adaptive Behavior Scales, Third Edition (Vineland-3)Autism Spectrum Rating Scales (6-18 Years)- Parent Ratings

Autism Diagnostic Observation Schedule (ADOS-2) Module

### COVID-19 Regulatory Personal Protective Equipment

This evaluation was conducted during New York re-opening plans following the COVID-19 quarantine. IQ tests and behavioral observation were completed face-to-face. PPE included social distancing and face shields/masks. All attendees washed their hands prior and all materials and surfaces were cleaned with disinfectants before and after use.

Parental/Guardian interviews and other information was collected through telehealth and face-to-face evaluation time was restricted as much as possible. Social history was completed by phone call and written questionnaires.

### Assessment Validity

[S.A.B.] s primary language is English. In order to thoroughly evaluate [S.A.B.]'s cognitive skills, two IQ tests were performed. The Leiter is a non-verbal test administered as a primary assessment. Additionally, the Stanford-Binet, used for supplemental information, was administered in English with Yiddish translation, a non-standardized technique. However, it is believed that these findings all accurately reflect the child's capacity.

## Behavioral Observations

[S.A.B.] was assessed over the course of a testing sessions. [S.A.B.] was dressed appropriately, presented as shy, and appeared his stated age. Additionally, [S.A.B.] s hygiene can be described as good. His height appeared average, weight appeared average, and build was considered to be smaller than average in frame. When picked up for testing, [S.A.B.] readily accompanied the examiner. Once in the testing room, he required an excessive amount of encouragement to engage with tasks and required redirection often. Furthermore, [S.A.B.] presented slight anxiety. Rapport with [S.A.B.] was difficult to establish; he appeared to become apprehensive of the examiner. His eye contact was considered mildly concerning. More specifically, he appropriately established eye contact, but had difficulty maintaining it throughout testing. [S.A.B.] was mildly inattentive when asked to complete various tasks. Additionally, he got out of his seat often. Frequent breaks were offered to [S.A.B.] to increase his alertness for various task demands. His frustration tolerance was considered adequate. More specifically, in consideration of all the observed factors, the results of this evaluation are considered to be a valid representation of [S.A.B.]'s current functioning at this time.

## Cognitive Results

**Stanford-Binet Intelligence Scale, Fifth Edition (SB-5)**

## IQ and Factor Index Score Results

| | | | 90% Confidence Interval | | |
|---|---|---|---|---|---|
| | Standard Score | Percentile | Score Range | Percentile | Descriptive Classification |
| IQ Scores | | | | | |
| Full Scale IQ (FSIQ) | 92 | 30 | 89–95 | 23–37 | Average |
| Nonverbal IQ (NVIQ) | 95 | 37 | 90–100 | 25–50 | Average |
| Verbal IQ (VIQ) | 90 | 25 | 85–95 | 16–37 | Average |
| Abbreviated IQ (ABIQ) | 91 | 27 | 85–99 | 16–47 | Average |
| Factor Index Scores | | | | | |
| Fluid Reasoning (FR) | 73 | 4 | 69–83 | 2–13 | Borderline impaired or delayed |
| Knowledge (KN) | 91 | 27 | 86–98 | 18–45 | Average |

| | | | | | |
|---|---|---|---|---|---|
| Quantitative Reasoning (QR) | 100 | 50 | 94–106 | 35–65 | Average |
| Visual Spatial (VS) | 103 | 58 | 97–109 | 42–73 | Average |
| Working Memory (WM) | 97 | 42 | 90–104 | 25–61 | Average |

The SB-5 assesses intelligence via five factors of cognitive ability. These five factors include Fluid-Reasoning, Knowledge, Quantitative-Reasoning, Visual-Spatial Processing, and Working-Memory. Each of the five factors is given a weight and the combined score is reduced to a ratio known commonly as the intelligence quotient, or IQ.

S.A.B. s performance on the SB-5 resulted in an overall Full-Scale score of 92, which places him in the 30th percentile overall intellectual functioning relative to age peers (Average). Similarly, S.A.B. scored 95 as a NVIQ and 90 as a VIQ both also falling in the Average category.

Fluid Reasoning represents the poorest area of performance for S.A.B. Fluid Reasoning is the ability to solve verbal and nonverbal problems using inductive or deductive reasoning. S.A.B. will likely find tasks that measure this ability to be more challenging. Compared to other individuals this score would be described as Borderline impaired or delayed.

Knowledge assesses the ability to discriminate, visualize, recognize and supply general information, and recall words and previous knowledge.

Quantitative Reasoning indicates S.A.B. s ability to produce conventional answers for quantitative reasoning and mathematics.

Visual-Spatial Processing was identified as the highest in S.A.B. 's profile. Visual-Spatial Processing represents an individual's ability to see patterns, relationships, spatial orientations, or the "Gestalt" whole among diverse pieces of a visual display. This score represents an area of relative strength for S.A.B. He may find tasks requiring this ability easier and may suggest a preferred learning style. Compared to other individuals this score would be described as Average.

Working-Memory assesses abilities with distractibility, patience, and short-term memory, including visual memory, memory span, and perceptual integration.

No significant differences between the Nonverbal Subtests and the average of all 10 SB5 scaled scores were found to be infrequent in the normative sample, indicating a balanced nonverbal ability profile for S.A.B. Verbal Fluid Reasoning was found to be significantly and practically lower than the average of the 10 SB5 subtests. This may show that S.A.B. s relatively less proficient with identifying and describing relationships between illustrated objects or printed words and sentences.

### Leiter International Performance Scale, Third Edition (Leiter-3)

LEITER-3 was administered to test non-verbal IQ due to S.A.B. 's weak English language skills. Results are consistent with Stanford-Binet Intelligence Test findings.

| Cognitive Subtests | | | |
|---|---|---|---|
| Subtest | Raw Score | Scaled Score | Percentile |
| Figure Ground (FG) | 15 | 11 | 63 |
| Form Completion (FC) | 20 | 11 | 63 |
| Classification/Analogies (CA) | 10 | 9 | 37 |
| Sequential Order (SO) | 08 | 7 | 16 |
| Visual Patterns (VP) | -- | -- | -- |

| Cognitive Composite | | | |
|---|---|---|---|
| Sum of 4 Scaled Scores | Nonverbal IQ | Percentile | Confidence Interval (95%) |
| 38 | 96 | 39 | 90-102 |

S.A.B. s non-verbal IQ was 96, which falls in the 39th percentile.

Subtest scores and percentiles as follows:

**Figure Ground** – 11 – 63

Performance on this task is associated cognitive flexibility – in regard to shifting attention between elements of a task, visual scanning, search strategy, and short-term visual memory.

**Form Completion** – 11 – 63

Performance on this task is associated with cognitive flexibility, organization, and deduction.

**Classification/Analogies** - 9 – 37

Performance on this task is associated with conceptualization/hypothesizing (classification, matching) and reasoning. Tasks include grouping objects and pattern completion. Impulse control is necessary to prevent responses before scanning and analyzing all response blocks.

**Sequential Order** – 7 – 16

Performance on this task is associated with focus, sequential thought, reasoning, and recognizing relationships between elements.

**Adaptive Functioning Results**

Adaptive behavior includes the age-appropriate behaviors necessary for an individual to live independently and to function safely and appropriately in daily life. Adaptive behaviors include real life skills such as grooming, dressing, safety, safe food handling, school rules, ability to work, money management, cleaning, making friends, social skills, and personal responsibility.

**S.A.B.** s functional skills were assessed using the Vineland-3 test. **S.A.B.** 's overall level of adaptive functioning earned an Adaptive Behavior Composite (ABC) score of 54. This is well below the normative mean of 100 (standard deviation is 15). Thus, overall, his functional skills - that is, his abilities to care for himself and function in the world, also rank with the lowest 1% of peers.



**S.A.B.** s Communication score is relatively low. When **S.A.B.** is upset, he rarely verbalizes it, rather he expresses himself in gestures and facial expressions. He gets irritated and aggravated very easily. **S.A.B.** is very opinionated and has no problem expressing his emotions. He doesn't know all his letters and pronunciations yet. **S.A.B.** also struggles with attention and will rarely focus on anything for more than five minutes. He doesn't react very well to criticism and rarely apologizes for his mistakes. Often, **S.A.B.** has to be explained things multiple times before he processes things. Occasionally, he spaces out to the point where he is not conscious of his surroundings and not cognizant of who is in the room with him. This domain is a relative weakness for **S.A.B.**

**S.A.B.** s Daily Living score is relatively low. **S.A.B.** is toilet trained; however, he has accidents at night sometimes. **S.A.B.** has tense scenery issues and is extremely particular about

temperature, sounds, color and texture. He will refuse to eat, bathe, or dress if there is something he doesn't like regarding these factors. He is also very picky and usually refuses to eat healthily. ███S.A.B.███ has trouble sleeping alone and sometimes has nightmares or visions. It is very hard for him to change routines and he has low adaptability. ███S.A.B.███ is also a bit clumsy and drops things often. He has minor motor skill deficiencies. It is of the opinion of the parent that ███S.A.B.███ needs to work on his independence. This domain is a relative strength for ███S.A.B.███

███S.A.B.███ s Socialization score is relatively low. He has difficulty making friends and understanding socially appropriate behavior. It is hard for ███S.A.B.███ to understand privacy and boundaries. ███S.A.B.███ rarely says away from children that are poor influences and has trouble reading the context of a social situation. He rarely stays away from dangerous situations or potentially harmful people. When playing games, he finds it hard to wait for his turn and he likes to do things his own way. When things don't go his way, he cries and throws temper tantrums. He's highly sensitive and emotional about things. ███S.A.B.███ s eye contact isn't fully integrated, and he gets easily distracted. His distractibility prevents him from accomplishing tasks and following directions. It is difficult for him to transition between activities.

**Autism Spectrum Rating Scales Results (ASRS)**

ASRS is an informant measure designed to identify symptoms, behaviors, and associated features of autism spectrum disorder (ASD) in children and adolescents aged 2 to 18 years. ASRS is a norm-referenced assessment based on a nationally representative sample, designed to identify symptoms, behaviors, and associated features of the full range of autism spectrum disorders.

Subscales



The Autism Spectrum Rating Scales (2-15 Years) Parent Ratings form is used to quantify observations of a youth that are associated with autism spectrum disorder. When used in combination with other information, results from the ASRS (2-5 Years) Parent form can help determine the likelihood that a youth has symptoms associated with autism spectrum disorder; this information can then be used to determine treatment targets.

S.A.B. received an overall score of 78 which is in the Very Elevated category. This indicates that he has many behavioral characteristics similar to youth diagnosed with autism spectrum disorder. His score on the DSM-5 subscale indicates that he has symptoms directly related to the DSM-5 diagnostic criteria for autism spectrum disorder. Based on responses to the ASRS (2-5 Years) Parent form, S.A.B. has difficulty using appropriate verbal and non-verbal communication for social contact, engages in unusual behaviors and has difficulty relating to children. Additionally, S.A.B. has difficulty relating to adults and also has difficulty providing appropriate emotional responses to people in social situations. S.A.B. uses language in an atypical manner, engages in stereotypical behaviors and has difficulty tolerating changes in routine. He overreacts to sensory stimulation and has problems with inattention and/or motor and impulse control.

These findings are in line with clinical observations and parent interviews.

**Autism Evaluation (ADOS) Test**

The Autism Diagnostic Observation Schedule-Second Edition (ADOS-2) is a standardized, semi-structured assessment instrument designed to obtain information in the areas of communication, reciprocal social interactions, and restrictive and repetitive patterns of behaviors and interests associated with a diagnosis of autism spectrum disorder.

Module 2 of the ADOS-2 is designed for children who use phrase speech as S.A.B. does. This module of the ADOS-2 includes construction task, response to name, make-believe play, joint Interactive play, conversation, response to joint attention, demonstration task, description of a picture, telling a story from a book, free play, birthday party, snack anticipation of a routine with objects, and bubble play.

| ADOS –2 | | |
|---|---|---|
| **Module 2** | | |
| **Social Affect** | Score | Description |
| **Communication** | | |
| Pointing | 1 | S.A.B. could only produce an approximal point in order to reference objects without a coordinated gaze. |
| Descriptive, Conventional, Instrumental, or Informational Gestures | 1 | S.A.B. had some use of descriptive gestures that were limited in range and rare use of descriptive gestures. |
| **Reciprocal Social Interaction** | | |
| Unusual Eye Contact | 0 | |
| Facial Expression Directed at others | 1 | S.A.B. had only some directed expressions. |
| Shared Enjoyment in Interaction | 1 | S.A.B. only showed some inconsistent pleasure appropriate to the context during interactions with the examiner. |
| Showing | 1 | S.A.B. inconsistently showed toys and objects without clearly orienting it toward the examiner. |
| Spontaneous Initiation of Joint Attention | 1 | S.A.B. partially referenced objects that were clearly out of reach, but he did not coordinate his gaze. |
| Quality of Social Overtures | 2 | S.A.B. had inappropriate overtures that lacked integration into context and social quality, and was bringing up |

| | | |
|---|---|---|
| | | preoccupations with little attempt to involve the examiner. |
| Amount of Reciprocal Social Communication | 1 | S.A.B. had some reciprocal communication limited in frequency and amount. |
| Overall Quality of Rapport | 2 | Overall, S.A.B. had one-sided or unusual interaction resulting in a consistently and was mildly uncomfortable session. |
| | **SA TOTAL** | **11** |
| **Restricted and Repetitive Behaviors** | | |
| Stereotyped/Idiosyncratic Use of Words or Phrases | 1 | S.A.B.'s use of words or phrases tended to be repetitive and occasionally stereotyped or odd. |
| Unusual Sensory Interest in Play/Person | 3 | S.A.B. has definite unusual sensory-seeking behaviors, such as holding blocks and toys to his nose and touching the evaluator's wrist. |
| Hand and Finger and other Complex Mannerisms | 0 | |
| Unusually Repetitive Interests or Stereotyped Behaviors | 2 | S.A.B. had clearly repetitive or stereotyped interests, such as being preoccupied with dirt on the floor. |
| | **RRB TOTAL** | **5** |
| | | **OVERALL TOTAL: 16** |
| **Classification/Diagnosis** | **Autism** | |
| **Symptoms associated with Comparison Score** | **7** | **Moderate** |
| | | |

S.A.B.'s score on the ADOS-2 is consistent with an ADOS-2 classification of Autism. His overall score of 16 exceeds the cutoff score and his ADOS-2 comparison score of 7 fell within the Moderate range of level of Autism-related symptoms. During the ADOS-2 administration, S.A.B. had some excess stereotyped use of language and repetitive word choice, compared to other people on his language level. He had definite sensory seeking interests that came up consistently during the evaluation and had repetitive and stereotyped interests. S.A.B. didn't seem to have any interest involving the examiner in his interests and the overall quality of the exchange would have been stilted if the examiner did not make a conscious effort to be interactive and to modify the context of the exchange. S.A.B. had an inconsistent gaze that

was mildly concerning and displayed finger and hand mannerisms or any other complex mannerisms. His facial expressions usually varied between extremes and he was able to show some of his toys without a pointed gaze or obvious gesture toward the examiner. S.A.B. showed definite pleasure during some points of the evaluation and seemed to generally enjoy the exchange. S.A.B. displayed some reciprocal social communication, but they were reduced in frequency or amount, or in the number of contexts in which his behaviors occurred. He was able to point and gestures, but often this was limited or exaggerated. Additionally, S.A.B. displayed a lot of inappropriate overtures and many of these lacked integration into context and social quality.

## Summary, Diagnosis, and Recommendations

S.A.B. is a five-year-old boy who lives in Brooklyn, New York with his mother. S.A.B. struggles with daily life skills and the maintenance of his social behavior. He also has difficulty regulating his emotions, regulating his gaze and facial expressions, and effectively communicating his needs. S.A.B. has previously been diagnosed with autism spectrum disorder at three years old. He has previously received psychological evaluations between August and October 2019 by New York Behavior Analysis and Psychological Services, PLLC. The evaluations were conducted by J. Helen Yoo, Ph.D. S.A.B. has asthma for which he takes Flovent, PRN. He currently receives an IEP from 2021 in a SIET and speech therapy.

S.A.B. 's cognitive functioning was assessed using the Stanford Binet Intelligence Scale, Fifth Edition. S.A.B. 's performance on the SB-5 resulted in an overall Full-Scale score of 92, which places him in the 30th percentile overall intellectual functioning relative to age peers (Average). Similarly, S.A.B. scored 95 as a NVIQ and 90 as a VIQ both also falling in the Average category. Visual-Spatial Processing was identified as the highest in S.A.B. 's profile while Fluid Reasoning represents the poorest area of performance for Mark. He was also assessed using the Leiter International Performance Scale, Third Edition (Leiter- 3) due to English being his second language. S.A.B. s non-verbal IQ was 96, which falls in the 39th percentile which is commensurate with his SB-5 results.

S.A.B. 's adaptive functioning was assessed using the Vineland Adaptive Behavior Scales, Third Edition (Vineland-3). S.A.B. 's functional skills were assessed using the Vineland-3 test. S.A.B. s overall level of adaptive functioning earned an Adaptive Behavior Composite (ABC) score of 54. This is well below the normative mean of 100 (standard deviation is 15). Thus, overall, his functional skills - that is, his abilities to care for himself and function in the world, also rank with the lowest 1% of peers. His Communication standard score is 44 which corresponds to a percentile rank of 1%. This domain is a relative weakness for S.A.B. . His standard score for Daily Living Skills is 63, which corresponds to a percentile rank of 1%. This domain is a relative strength for S.A.B. . His Socialization standard score is 52. The percentile rank is 1%.

S.A.B. was also assessed using the Autism Spectrum Rating Scale (ASRS Parent Form). S.A.B. received an overall score of 78 which is in the Very Elevated category. This indicates that he has many behavioral characteristics similar to youth diagnosed with autism spectrum disorder. His score of 78 on the DSM-5 subscale indicates that he has symptoms directly related to the DSM-5 diagnostic criteria for autism spectrum disorder. He scored within the Elevated range on the Social/ Communication, Social/Emotional Reciprocity and Attention/Self Regulation subscales. Finally, he scored within the Very Elevated range on the Sensory Sensitivity, Behavioral Rigidity, DSM-5 Scale, Atypical Language, Stereotypical Behaviors, and Unusual Behaviors subscales. Additionally S.A.B. s score on the ADOS-2 is consistent with an

ADOS-2 classification of Autism. His overall score of 16 exceeds the cutoff score and his ADOS-2 comparison score of 7 fell within the Moderate range of Autism-related symptoms.

S.A.B. s scores imply difficulty with attention and communication. Furthermore, his scores on the ASRS and ADOS-2 indicate the presence of autism spectrum disorder. S.A.B. presented limited conversational skills, social challenges, and adaptive delays in previous psychological evaluations. The current evaluation indicates that S.A.B. s behaviors are best explained through an autism spectrum disorder diagnosis. It is recommended that S.A.B. receive services spanning areas including speech therapy, counseling, family support, and Applied Behavior Analysis (ABA) therapy.

F84.0 autistic spectrum disorder (ASD)


Judah Stern Ph.D.

_____

Dr. Judah Stern, Ph.D., LP


Elizabeth Jacobs-Pinson, Psy.D.
Licensed Psychologist
Supervisor