

www.clcny.org

**BOARD OF DIRECTORS**

**PRESIDENT**
Stephen Rinehart, Esq.

**EXECUTIVE DIRECTOR**
Karen P. Simmons, Esq.

*A Child's Voice Matters.*

December 23, 2022

Hon. Ann M. Donnelly, United States District Judge
Hon. Robert M. Levy, United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: <u>Golan v. Saada</u>, 18 CV 05292-AMD-RML

Dear Judges Donnelly and Levy:

    Because The Children's Law Center's pending motion, seeking permission to intervene in this case on behalf of B.A.S., or, in the alternative, to serve as Guardian ad Litem for B.A.S., has not yet been decided, I do not seek, at this time, to respond fully to the motion filed by B.A.S.'s father, Isacco Jacky Saada ("the father"), seeking orders: (1) replacing or adding Morin Golan ("the aunt") as the respondent in this case; (2) vacating the orders of the Kings County Family Court relating to this family; and (3) immediately transferring B.A.S. into the father's care. However, given that the father seeks substantive relief from this Court that would drastically affect B.A.S., prior to the determination of the motion to intervene on B.A.S.'s behalf, I wish to inform the Court that, in the event that intervention was granted, I would take no position with respect to the manner in which the aunt is added to this case. However, I would strongly object to the father's request for orders: (1) vacating the temporary order of custody and temporary order of protection, issued by the Kings County Family Court with respect to B.A.S., and (2) directing that B.A.S. be placed in the father's care in New York during the pendency of this litigation. Thus, if permitted to intervene, I would request the opportunity to file a response to those portions of the father's motion. In addition, I believe that it is important to point out the most egregious of the father's many misstatements and erroneous conclusions on which his motion is based.

A.    <u>The Father's Application for Immediate Repatriation and/or Custody of B.A.S.</u>

First, it is apparent that, rather than recognizing that the mother's returning to Italy with B.A.S. and caring for him there was a necessary element of this Court's previous repatriation order, which now has become impossible to effect, and which, consequently, has been vacated by the Second Circuit, the father apparently views the mother as an inconvenience that now has been removed, and that B.A.S. should be repatriated immediately, without any constraints on the father's contact with him (Memorandum in Support of Petitioner's Motion ("MOL"), p. 4).

Indeed, the father has filed a motion in the Italian court, seeking to vacate all of the orders that imposed the ameliorative measures upon which this Court relied when it directed that B.A.S. be returned to Italy, despite its finding that, absent such measures, return would place B.A.S. at grave risk of harm (MOL, p. 6). Because the father contends that this matter has been "simplified" by the mother's death, and there no longer is a risk that B.A.S. will be exposed to the father's violence because the victim of that violence has died, he asserts that any measures to protect B.A.S. have become unnecessary. However, it is apparent that the Italian court believed that the risk to B.A.S., as a result of the father's violent temper, extended well beyond B.A.S.'s witnessing the father's physical and verbal abuse of the mother. Were that not the case, the Italian court simply could have entered protective orders directing that the father have no contact with the mother, made provision for visitation exchanges that ensured that the mother and the father had no contact with one another, and granted the father unsupervised visitation with B.A.S. Nonetheless, the Italian court specifically ordered measures intended to protect B.A.S.—as opposed to the mother—including that any contact between the father and B.A.S. was to be supervised by Social Services personnel for one year after B.A.S.'s return to Italy. This would indicate that the Italian court had grave doubts about B.A.S.'s safety and well-being in the father's unsupervised care. Clearly, the mother's death does nothing to obviate this concern, given the father's proven propensity for violent abuse when upset or frustrated.

Moreover, it is erroneous to conclude, as the father does (MOL, p.5), that simply because the mother left B.A.S. alone with him for brief periods while she ran errands or went out with friends, when B.A.S. was less than two years old and had not yet manifested any developmental delays, that B.A.S. would not be at grave risk of harm if returned to Italy under the current circumstances, and placed in the father's permanent care without any supervision to ensure that he was not traumatized or abused. Similarly, the fact that the father may have engaged in "[o]ver a hundred hours of supervised visitation" without complaints about his care of B.A.S. (MOL, p.17) over a two-and-a-half month period when B.A.S. was two years old, does not mean that the father would be capable of controlling his temper when required to handle, independently and unsupervised, the significant needs and difficult behaviors of now-6-year-old B.A.S. on a daily basis. Indeed, it is extremely doubtful that he would be able to do, given this Court's findings regarding the father's violent tendencies and inability to change. In fact, in its decision in <u>Golan v.</u>

2

Saada, 142 S. Ct. 1880, 1890 (2022), the Supreme Court noted that it had been determined by the Italian authorities that the father's behavior "entail[ed] a 'developmental danger' for B.A.S.," and that this Court had found that the father "had demonstrated 'no capacity to change his behavior,'" and "minimized or tried to excuse his violent conduct." Id.  The Supreme Court also noted that this Court had stated that, according to the mother, even prior to the date when she left Italy with B.A.S., "'there were isolated incidents of possible abuse' of B.A.S.," although he was not yet two years old, which the father disputed. Golan, 142 S. Ct. at 1890, n.3.

      The father's motion to vacate the orders directing the ameliorative measures on which this Court relied when ordering repatriation currently is scheduled to be heard in the Italian court on January 12, 2023.  If that motion is granted, it will create yet another fundamental change of circumstances, and this Court will have no assurances that any efforts will be made by any court or public authority to ensure B.A.S.'s safety after he is returned to Italy.[1]

      Thus, the unavailability of the mother to care for B.A.S. in Italy and provide him some sense of continuity and stability, as well as to ensure that the father obeyed the orders that limited his contact with B.A.S., constitutes a radical change in the circumstances in which B.A.S. would live if he were to be returned to Italy at this time. Moreover, these changed circumstances, when coupled with the trauma that B.A.S. has experienced as a result of the mother's death, and the serious adjustment difficulties and other challenges that stem from his autism and inability to speak Italian, creates a grave risk of serious harm to B.A.S. Thus, this Court should not simply send B.A.S. to Italy without considering evidence of the real risk that B.A.S. will suffer from both psychological and emotional trauma, and serious regression in his developmental progress, due to the withdrawal of the services that he currently is receiving and the loss of the structure and routines on which he relies.  This is particularly the case, given that B.A.S. would be expected to accommodate such massive changes in his life without the support of anyone whom he knows and trusts—a challenge that would be difficult for any young child—as he would have to be placed in foster care with strangers, or, if the ameliorative orders were vacated, presumably would be allowed to reside with the father or with paternal relatives, who happen to live in the same building as the father, and whom B.A.S. does not remember.

      Despite the father's claim that B.A.S. has a positive relationship with him, B.A.S. has made clear to me that he has no independent memory of the father, and to the extent that he knows anything about him, he is afraid of him.  How B.A.S. came to fear the father is irrelevant to the fact that he is afraid of him, and that the father's complete and

---

[1] It also should be noted that, in making the August 31 repatriation order, the Court relied, to some extent, on the fact that counsel had been appointed for B.A.S. in Italy, as additional protection for B.A.S. 2022 WL 4115032, *3 (E.D.N.Y. August 31, 2022) (see also MOL, pp. 4,5,6).  However, this Court should be advised that, in communications with me, B.A.S.'s Italian counsel, Avv. Alessandro Simeone, stated that he had made one attempt to speak with B.A.S., by videoconference, on October 6, 2022, that he had been unable to engage with him, and that this was of no concern because, under Italian law, "it is not necessary to listen to the child if the child is under 12 years old." Accordingly, it is unknown whether Mr. Simeone would seek to speak with B.A.S., or to take action if B.A.S. reported problems in the home.

unexplained lack of contact with B.A.S. has done nothing to dispel that fear. The appropriate way to address that fear would be through supervised contact and relationship building, which would assist the child in ultimately reuniting with the father. However, the father has shown no interest in making such efforts. It also must be noted that the father's purported history of phone contact with B.A.S. (MOL, pp. 14-15), relates only to a very specific, limited period (April 10 to July 6, 2022), which was while the mother still was alive, and between the date on which the Supreme Court rendered its decision (on March 22, 2022), and the first appearance in this Court after the resulting remand, which took place on July 12, 2022. Moreover, based on B.A.S.'s developmental level, extremely limited attention span, and inability to speak Italian, it simply is not believable that the father spoke by phone with B.A.S., as opposed to the mother, for periods as long as one-and-a-half hours, as he claims (MOL, pp. 14-15). It also is notable that the father does not even allege that he had contact with B.A.S. since July 6, 2022—a full four months before the mother died, or at any time after the mother's death. Nor does he explain why he apparently stopped communicating with B.A.S. and has not sought to have contact with him, or how his continued silence will assist B.A.S. in adjusting in the event that he is returned to Italy.

Thus, it is necessary for this Court to conduct a hearing at which it receives evidence regarding the new risk of harm that B.A.S. would face under the radically changed circumstances of his life, if returned precipitously to Italy and placed either in foster care or with the father or paternal family members.

While the father's attorneys accuse both the aunt and CLC of taking the position that a hearing is necessary solely in order to delay this proceeding and have this Court reconsider facts that it considered multiple times previously, the father's claims that there is nothing new for this Court to consider clearly indicate that he does not comprehend B.A.S.'s needs, and is unprepared to ensure that the proposed repatriation does not cause B.A.S. grave psychological and emotional harm. To the contrary, generally, the father has trivialized those concerns. See, e.g., Memorandum in Opposition to CLC's Motion to Intervene and In Partial Opposition to Morin Golan's Motion to Intervene, Doc. No.179, p.3 (implying that B.A.S.'s special needs amount to nothing more than being "easily distracted" and "a bit clumsy"). This lack of provision for B.A.S.'s special needs clearly is a form of grave risk of harm that is contemplated as a defense to return pursuant to the Hague Convention. See Ermini v. Vittori, 758 F.3d 153, 166 (2d Cir. 2014) ("Article 13(b) explicitly lists 'psychological' harm and 'physical' harm as appropriate harms for triggering the Convention's affirmative defenses, both of which are implicated by a developmental disorder such as autism").

Further, although the father's counsel has stated repeatedly that the father is prepared to come to New York to spend time becoming reacquainted with B.A.S., and involving himself with B.A.S.'s educational and therapeutic providers (MOL, p.17), there is no indication that the father actually has made arrangements to do so, or that he has sought to speak with any of those providers in order to learn more about B.A.S.'s specific special needs, to ensure that those needs are met while this case is ongoing, or to

4

understand the sorts of special educational services and therapeutic supports that B.A.S. would need to have in place immediately in the event that he was returned to Italy. Of course, this failure may reflect the father's stated position that B.A.S. actually is not autistic and that returning him to Italy will resolve any problems that he developed while in the United States.

In addition, the father's attorneys accuse CLC and the aunt of seeking to have this Court conduct "what amounts to a child custody best interest analysis" (MOL, p. 3), while, at the same time, seeking an order of this Court, placing B.A.S. in his care, without any ameliorative measures in place (MOL, p. 4). This, in itself, constitutes a request that this Court determine that the father should have custody of B.A.S., at least on a temporary, if not a permanent basis. In any event, it is true that, since the mother no longer is available to travel to Italy with B.A.S. and reside with him there, this or some other court must direct where B.A.S. is to live if he is returned to Italy before the Italian court conducts a hearing, and makes a final determination as to custody. Clearly, B.A.S. is not property that can simply be left in storage somewhere while the court decides his fate.

While it is clear that this Court may not make a custody determination, based on the child's best interests, it always must keep in mind that the Hague Convention dictates that the safety and interests of children are of paramount importance. Indeed, in its decision in this case, the Supreme Court noted that "the Convention sets as a primary goal the safety of the child," including his psychological and emotional safety and well-being. Golan, 142 S. Ct. at 1893 ("The Convention explicitly recognizes that the child's interest in avoiding physical or psychological harm, in addition to other interests, 'may overcome the return remedy'"); see also Id., 142 S. Ct. at 1896 ("[T]he Convention sets as a primary goal the safety of the child").

Thus, if, at this juncture, this Court were to determine that B.A.S. must be returned to Italy because it does not believe that return would place him at grave risk of harm, and it believes that the Italian court has jurisdiction over custody issues related to B.A.S., I would contend that, although it is the norm to immediately return a child to his or her country of habitual residence before the court of that country determines custody, that scenario is neither necessary nor appropriate in this unique case, as there is no absconding parent who can be ordered to return with the child, and, at least currently, the other parent is permitted only supervised access to the child. Accordingly, if this Court ordered that B.A.S. was to be repatriated to Italy prior to a custody determination, it appears that it also would have to make a temporary custody decision and choose one of the available alternatives—placement in foster care, placement with the father, or placement with paternal family members, who reside in the same building as the father, and who have had no contact with B.A.S. since he was two years old. Since all of these options are likely to be highly traumatic to B.A.S., this Court presumably would have to determine which alternative was least problematic.

Accordingly, it is my position that, prior to actually ordering return—if that is its ultimate order—this Court should stay the proceeding in this Court while the Italian court

hears the custody proceeding, and at a minimum, determines where B.A.S. should reside pending the custody determination of that court. See Golan, 142 S. Ct. at 1888 ("[R]eturn is merely a 'provisional' remedy that fixes the forum for custody proceedings").

Since it is my understanding that the aunt intends to appear in the Italian proceeding once an official death certificate can be obtained, at that juncture, the Italian court could temporarily place B.A.S. in the father's care, either in New York or in Italy, or could place B.A.S. with relatives, or in foster care in Italy.[2]  Alternatively, that court could allow B.A.S. to remain in New York in the aunt's temporary care, where he is comfortable and has the ability to continue his established routines, while it decided custody.[3]  Given the ability to conduct such a proceeding virtually, or in a hybrid fashion, and the fact that B.A.S. surely will not be appearing in the Italian court, there is no apparent reason why the Italian court might not direct such an arrangement while the proceeding was pending.

In that scenario, if the father did, in fact, come to New York to spend time with B.A.S., he could avail himself of the opportunity to establish a relationship with B.A.S. while that case was pending, and ensure that, if the Italian court ultimately granted the father custody, B.A.S. would be far better able to tolerate relocating to Italy to reside with him.  On the other hand, if the Italian court ultimately granted custody to the aunt, B.A.S. would not have had his entire life disrupted for a temporary period, by living in unknown, temporary circumstances in Italy for a number of months, before being sent back to New York.

Further, any ultimate order of the Italian court would be readily enforceable in New York, upon registration of that order pursuant to the UCCJEA. See New York Domestic Relations Law §§77-d through 77-j.  Thus, an order that simply directed B.A.S.'s immediate return to Italy, without prior proceedings to assess what temporary custody arrangements would be in his best interests, not only would place B.A.S. at risk of harm, but is unnecessary to accomplish what presumably is the father's stated objective of having the Italian court determine what custody arrangement would be in B.A.S.'s best interests under the current circumstances, including the fact that the mother no longer is alive and is unavailable to care for B.A.S. in Italy.

B.   The Father's Application to Vacate the Temporary Orders of the Kings County Family Court

Although it is true that the Kings County Family Court cannot enter any final orders as to custody or visitation while this case is pending, it also clearly has an obligation, as

---

[2] It is my understanding that the Medical Examiner's office has not issued a death certificate as yet, because all necessary testing with respect to the cause of the mother's death has not been completed.

[3] The Italian court also could confer with the Kings County Family Court to determine whether it should relinquish its jurisdiction, based on B.A.S.'s lengthy residence in New York and the fact that virtually all the evidence regarding his care, protection and training is located in New York.  See Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Domestic Relations Law §§76-b (1), 76-f.  However, pursuant to the UCCJEA, the decision regarding that issue would remain with the Italian court.

6

this Court has recognized, to ensure that B.A.S. receives appropriate care and protection while he remains within the jurisdiction of that court.  Indeed, when that court entered the temporary orders that the father seeks to vacate, no other provisions were in place to ensure that B.A.S. received necessary care and protection while he is present in New York, and those orders did not conflict with any orders of any other court.  At that time, the August 31, 2022 order of this Court, directing B.A.S.'s return, with extensive conditions, had been stayed by the Second Circuit.  Subsequently, due to the mother's death, it had become impossible to comply with the conditions set forth in that order, and, ultimately, on November 10, 2022, the Second Circuit vacated that order, and remanded the case to this Court for further consideration in light of the changed circumstances.  Meanwhile, the order of the Italian court, which contained the ameliorative measures upon which this Court relied when entering the August 31 order, was effective only upon B.A.S.'s return to Italy.  Moreover, in entering its temporary orders, the Family Court recognized the priority of the Italian court's orders in that it explicitly provided that its temporary orders of protection were subject to the orders of that court, and specifically permitted the father to exercise supervised visits, as directed by the Italian court.

Accordingly, the Family Court's actions were entirely consistent with its obligations as *parens patriae* for any child who comes within its jurisdiction.  See Edwin E.R. v. Monique A.-O., 188 A.D.3d at 410, 413 (N.Y. App. Div. 2020) ("The court has a 'parens patriae responsibility to do what is in the best interests of the child'" (internal citation omitted)); Nessia v. Nessia, 121 Misc. 2d 479, 481 (N.Y. Sup. Ct. 1983) ("In addition to its statutory duty to find the child's best interests, the court has long been vested with *parens patriae* power and responsibility for the child's welfare").  The entry of those orders also was consistent with the court's authority to exercise temporary emergency jurisdiction pursuant to the UCCJEA, New York Domestic Relations Law §76-c.  By the terms of that statute, any temporary orders entered by the Family Court are to remain in effect only until "a court of a state having jurisdiction…has taken steps to assure the protection of the child."  In any event, the orders entered by the Family Court with respect to B.A.S. currently expire on January 9, 2023, unless renewed at the next appearance in that court on that date.  Further, as stated, the temporary orders entered by the Family Court are not inconsistent with the currently existing orders of the Italian court, which do not permit the father to take custody of B.A.S., and grant him only visitation supervised by Social Services personnel.

Indeed, it is extremely concerning that the father, who is not present in the U.S., and has not availed himself of the opportunity to have contact with B.A.S. at any time since the mother's death, has taken the position that no temporary orders should be entered to ensure that B.A.S. is cared for while this Court considers the various motions that are pending in this case, and, ultimately, whether it will order that B.A.S. be returned to Italy, with or without ameliorative measures.  Thus, the father apparently is not concerned that B.A.S. potentially would be left unable to access immediate medical care if he was in an accident or became gravely ill during this period.  Moreover, it was only after the aunt was granted temporary educational and medical decision-making authority

7

for B.A.S., that she was able to obtain insurance coverage for B.A.S., which had terminated with the mother's death, and was necessary to ensure that B.A.S.'s services and therapy continued.

In addition, despite his claims that he wishes to have access to B.A.S. while this proceeding is pending (MOL, pp. 14-15, 17), his attorney has rejected my repeated offers to assist in arranging phone or video contact with B.A.S. or supervised in-person visits with B.A.S. in New York.  Indeed, despite counsel's claim to the contrary, the temporary orders of protection always have been subject to visitation consistent with the Italian order.  Moreover, rather than asking the Family Court to order temporary visitation, including phone or video contact, as it could, see Domestic Relations Law §77-c, the father simply has contested both service of the aunt's petitions and the jurisdiction of the Family Court.

Further, although the father argues that this Court could grant him an access order while this proceeding is pending (MOL, p. 16), since the mother's death he never has asked this Court to grant him access to B.A.S., in order to spend time with and get to know him, as opposed to seeking orders placing B.A.S. immediately in his care—i.e., granting him custody—without considering the emotional effect such a life-altering change would have on B.A.S.  The fact is that any child—even one who had not experienced the trauma of recently losing a parent, and who had no developmental disabilities—would have great difficulty if suddenly sent to live with a virtual stranger, with whom he could not even communicate effectively in the only language that he knows.

Accordingly, the father's motion for orders vacating the temporary orders of the Kings County Family Court, and immediately placing B.A.S. in the father's care while this proceeding is pending, should be denied.  If CLC's motion to intervene on B.A.S.'s behalf, or to be assigned as Guardian ad Litem for B.A.S. in this proceeding is granted, I respectfully would seek to formally respond to the father's motion with respect to those issues.

Respectfully,

JoAnna Kelly
The Children's Law Center
44 Court Street, 11th Floor
Brooklyn, New York 11202
(718) 522-3333, ext. 146
jkelly@clcny.org

cc:

Richard Min, Esq.
Michael Banuchis, Esq.
Elizabeth Hellmann, Esq.