**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Isacco Jacky Saada,

*Petitioner*,

v.

Narkis Aliza Golan,

*Respondent*.

18-CV-5292 (AMD) (RML)

**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S**
**MOTION TO REPLACE OR ADD PARTY AND OTHER MATTERS**

Elizabeth A. Hellmann
One Manhattan West
New York, N.Y. 10001-8602
Telephone: (212) 735-2590
Facsimile: (917) 777-2590

*Attorney for Morin Golan*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

I.    INTRODUCTION ..................................................................... 1

II.   THE NEED FOR FACT-FINDING IN THIS CASE IS CLEAR ................................... 4

      A.    The Second Circuit Directed This Court to Take Into Account the
            Dramatically Changed Circumstances .................................................. 4

      B.    Petitioner's Motion Confirms the Need for Fresh Fact-Finding ........................... 5

            1.    The Motion Reveals Ample Grounds for a Defense of Grave Risk
                  and Intolerable Circumstances ................................................. 5

            2.    The Evidence in the Record From Before Narkis Golan's Death Is
                  Not Sufficient for the Changed Circumstances ......................................... 6

      C.    The Hague Convention Does Not Override Due Process Requirements ............... 9

III.  MR. SAADA'S REQUEST TO SUBSTITUTE SHOULD BE DENIED;
      SHOULD HE SEEK AN ORDER AGAINST MS. MORIN GOLAN, HE
      SHOULD BRING A CLAIM AGAINST HER ............................................. 12

      A.    Ms. Golan's Motion to Intervene Should Be Granted Formally ....................... 13

      B.    If Mr. Saada Seeks an Order Against Ms. Golan, He Should Bring a Claim
            Against Her ................................................................. 13

            1.    Substitution Would Be Improper ............................................. 13

            2.    If Ms. Morin Golan Were Added as an Additional Party, Mr. Saada
                  Would Need to Bring a Claim Against Her, and She Would Have
                  All Procedural Rights ...................................................... 15

IV.   B.A.S.'s CARE SHOULD BE MAINTAINED AS-IS DURING THE
      PENDENCY OF THESE PROCEEDINGS ............................................... 16

      A.    There Is no Rational Basis to Vacate the Family Court Orders ....................... 16

      B.    Mr. Saada's Request for Custody of B.A.S. During the Pendency of These
            Proceedings Should Be Denied ................................................. 18

            1.    Ms. Morin Golan Is the Closest Person in B.A.S.'s Life ......................... 18

            2.    Mr. Saada Has No Relationship With B.A.S. ................................... 19

3.      Mr. Saada Provides no Evidence That He Is Residing in New York........20

V.     CONCLUSION ...........................................................................................................22

# TABLE OF AUTHORITIES

Page

## CASES

Acosta v. Acosta,
No. 12-342 ADM/SER, 2012 WL 2178982 (D. Minn. June 14, 2012), *aff'd,
appeal dismissed*, 725 F.3d 868 (8th Cir. 2013) ........................................................9, 15

Axford v. Axford,
No. 09–2914, 2009 WL 2256634 (E.D. Penn. July 28, 2009).........................................19

Baran v. Beaty,
526 F.3d 1340 (11th Cir. 2008).................................................................................6, 9

CFS 12 Funding LLC v. Wiesen,
No. 21-cv-9711 (PKC), 2022 WL 17581703 (S.D.N.Y. Dec. 12, 2022) .........................14

Colchester v. Lazaro,
16 F.4th 712 (9th Cir. 2021) ...............................................................................10, 11

Cunningham v. Cunningham,
237 F. Supp. 3d 1246 (M.D. Fla.), *aff'd*, 697 F. App'x 635 (11th Cir. 2017).................15

Ermini v. Vittori,
758 F.3d 153 (2d Cir. 2014)....................................................................................6, 7

Foster v. Foster,
654 F. Supp. 2d 348 (2009)........................................................................................1

Franco v. Ideal Mortgage Bankers, Ltd.,
No. CV 07–3956(JS)(AKT), 2009 WL 3150320 (E.D.N.Y. Sept. 28, 2009)..................16

Garcia v. City of New York,
No. CV 08–2152(RRM)(MDG), 2009 WL 261365 (E.D.N.Y. Feb. 4, 2009).................14

Golan v. Saada,
142 S. Ct. 1880 (2022).........................................................................................2, 12

Graham v. Henderson,
224 F.R.D. 59 (N.D.N.Y. 2004) .................................................................................14

Gronowicz v. Leonard,
109 F.R.D. 624 (S.D.N.Y. 1986).................................................................................15

Guerrero v. Oliveros,
119 F. Supp. 3d 894 (N.D. Ill. 2015)...........................................................................15

*Hardy v. Kaszycki & Sons Contractors, Inc.*,
    842 F. Supp. 713 (S.D.N.Y. 1993) ...............................................................................15

*Kernisant v. City of New York*,
    225 F.R.D. 422 .............................................................................................................14

*Khan v. Fatima*,
    680 F.3d 781 (7th Cir. 2012)........................................................................................10

*Kim H. v. Commissioner of Social Security*,
    No. 1:20-CV-1165 (CJS), 2022 WL 3580125 (W.D.N.Y. Aug. 17, 2022).....................14

*Lukic v. Elezovic*,
    No. 20-CV-3110 (ARR) (LB), 2021 WL 466029 (E.D.N.Y. Feb. 9, 2021)....................12

*March v. Levine*,
    249 F.3d 462 (6th Cir. 2001)........................................................................................11

*Matute-Castro v. Jimenez-Ortiz*,
    No. 15-CV-04568 (DLI)(JO), 2016 WL 8711076 (E.D.N.Y. Aug. 26, 2016) ................12

*McSurely v. McClellan*,
    753 F.2d 88 (D.C. Cir. 1985) ........................................................................................15

*Monasky v. Taglieri*,
    140 S. Ct. 719 (2020).....................................................................................................12

*Mozes v. Mozes*,
    239 F.3d 1067 (9th Cir. 2001), *abrogated by Monasky v. Taglieri*, 140 S. Ct. 719
    (2020)............................................................................................................................17

*Neumann v. Neumann*,
    684 F. App'x 471 (6th Cir. 2017).............................................................................4, 6, 8

*Neves v. Neves*,
    637 F. Supp. 2d 322 (W.D.N.C. 2009) ..........................................................................15

*Rende v. Kay*,
    415 F.2d 983 (D.C. Cir. 1969) ......................................................................................15

*Rishmawy v. Vergara*,
    No. 4:21-cv-35, 2021 WL 1760303 (S.D. Ga. May 4, 2021) .........................................15

*Saada v. Golan*,
    No. 18-CV-5292(AMD)(LB), 2019 WL 1317868 (E.D.N.Y. Mar. 22, 2019), *aff'd
    in part, vacated in part,* 930 F.3d 533 (2d Cir. 2019) ...................................................8, 9

*Silverman v. Silverman*,
     338 F.3d 886 (8th Cir. 2003)....................................................................17

*Sinito v. U.S. Department of Justice*,
     176 F.3d 512 (D.C. Cir. 1999) ................................................................15

*In re Skrodzki*,
     642 F. Supp. 2d 108 (E.D.N.Y. 2007) ...................................................12

*Tann v. Bennett*,
     807 F.3d 51 (2d Cir. 2015)......................................................................17

*Van De Sande v. Van De Sande*,
     431 F.3d 567 (7th Cir. 2005)...................................................................10

*Walker v. Walker*,
     701 F.3d 1110 (7th Cir. 2012).................................................................17

*West v. Dobrev*,
     735 F.3d 921 (10th Cir. 2013).............................................................10, 11

## **STATUTES**

N.Y. Dom.  Rel.  Law § 76-c(1) (McKinney) ........................................................17

Intervenor Ms. Morin Golan[1] respectfully submits this Memorandum of Law in Opposition to Petitioner Mr. Jacky Saada's ("Petitioner" or "Mr. Saada") motion (Dkt. No. 178-1) to replace or add party and other matters ("Motion" or "Mot.").

## ARGUMENT

### I.    INTRODUCTION

Mr. Saada's kitchen sink Motion makes a number of unsupported allegations and seeks a variety of relief, all of which should be denied.  Essentially, he tries to engineer two extraordinary outcomes: (1) preclude any new fact-finding, notwithstanding the direction from the United States Court of Appeals for the Second Circuit ("Second Circuit") that this Court to take into account the substantially changed circumstances in this case, and (2) take immediate custody of B.A.S., with no regard for the safety and well-being of the child, who has no memory of Mr. Saada.  (Dkt. No. 174 (Affirmation of J. Kelly).)  Neither outcome is supported by either the facts or the law.

Regarding the first point, Mr. Saada appears desperate to avoid fact-finding because it would show, among other things, that if returned to Italy now, B.A.S. would face a grave risk of harm and intolerable circumstances because the child will be placed into an institutional home by Italian social services (*see* Dkt. No. 174, Ex. J (A. Baggioli & C. Roberti Ltr. dated Nov. 6, 2022)); the child would be without a mother, the only parent the child has known; the child has

---

[1]    Mr. Saada repeatedly uses the term "abduction" in reference to both Narkis and Morin Golan.  But Mr. Saada already admitted to being a serial abuser and the Court found a grave risk of harm under the Hague Convention, and thus the removal of B.A.S. from Italy was justified.  *See Foster v. Foster*, 654 F. Supp. 2d 348, 350 (2009) ("Once this standard has been satisfied, the burden shifts to the respondent to demonstrate that the wrongful removal was justified by proving one of the affirmative defenses set forth in Article 13 of the Hague Convention.").  His use of the term "abduction" is therefore improper.  He also attempts to prejudice the Court against Ms. Morin Golan by suggesting, falsely, that she has sought to publicize B.A.S.'s identity.  (Mot. at 4.)  Notably, it is Mr. Saada who released B.A.S.'s identity, date of birth, and other personal details in Dkt. No. 172, Ex. D (Pet'r's Mot. in Second Circuit to Dismiss Appeal and Direct Judgment) at Ex. A, and in fact repeatedly references B.A.S.'s gender in this Motion.  (*See, e.g.,* Mot. at 1, 4.)

severe autism, has an enhanced need for consistency, and faces a risk of regression if disrupted; and the child lacks any meaningful relationship with Mr. Saada, who has chosen not to avail himself of supervised visitation for a period of more than two years. All of these conditions pose a danger to the child in light of Mr. Saada's volatile and abusive temperament, and this Court has made no determinations as to what would happen to B.A.S. if B.A.S. were returned to Italy without a mother.

While Mr. Saada **consented** to Ms. Morin Golan's intervention, he later purported to "partial[ly]" oppose it on the basis that he opposes any evidentiary hearing in this matter. In this Motion, he now seems to view the substitution of Ms. Morin Golan as a silver bullet that will short-circuit any such fact-finding, and allow him to obtain a return order against Ms. Morin Golan without ever having to bring a claim against her and without this Court considering the risks and circumstances of ordering B.A.S. to Italy without B.A.S.'s mother. Indeed, Mr. Saada's rationale for substitution is that it purportedly would be the most "expeditious" way to proceed. But speed is no justification for ignoring (i) the Supreme Court's admonition in this very case that "the Convention sets as a **primary goal the safety of the child**," *Golan v. Saada*, 142 S. Ct. 1880, 1896 (2022) (emphasis added); (ii) the Second Circuit's direction that this Court on remand "address the Hague Convention petition **in light of the changed circumstances**" of this case (Dkt. No. 170 (Second Circuit Remand Order), at 1 (emphasis added)); and (iii) fundamental principles of fairness and due process. In any event, Mr. Saada provides no competent legal basis for substitution.

The way forward is not as complicated as Mr. Saada has made it. As explained above, the circumstances of this case have changed dramatically since this Court's return order due to the unexpected death of the sole named respondent, Ms. Narkis Golan, and thus, regardless of

Mr. Saada's procedural machinations, fact-finding into the circumstances currently faced by B.A.S. would be necessary before any return order could be contemplated.

As for Ms. Morin Golan's role in this case, her motion to intervene formally should be granted. Then, as Mr. Saada previously acknowledged to the Second Circuit,[2] should Mr. Saada wish to seek a judgment against Ms. Morin Golan, he will need to bring a claim against her. At that point, additional investigation must be made to assess the grave risk of harm and intolerable circumstances facing B.A.S. at this time.

Regarding Mr. Saada's second goal, immediate custody, B.A.S. is challenged by autism and is grieving the loss of Ms. Narkis Golan, B.A.S.'s mother and primary caretaker. Ms. Morin Golan has continued B.A.S.'s schooling, counseling, and services in Brooklyn and socialization with the only family he has known: Ms. Morin Golan and B.A.S.'s maternal grandmother, great-grandmother, aunt, uncle, and cousins. Mr. Saada, an admitted abuser who never has been allowed to have unsupervised visits during this case, does not live in Brooklyn and for years has not been involved in B.A.S.'s life in any meaningful way. It is dangerous, therefore, to seek to vacate Family Court Orders that have ensured the stability in B.A.S.'s life and custody of B.A.S. even before this Court has ruled, and Mr. Saada has offered no compelling legal basis for doing so.[3]

---

[2]   *See* Dkt. No. 172, Ex. D (Pet'r's Mot. in Second Circuit to Dismiss Appeal and Direct Judgment) at ¶ 29.

[3]   This does not mean that, if he wished, Mr. Saada could not set up supervised visits and other contact with B.A.S. The obligation to do so is on him. Yet he has not contacted Ms. Morin Golan or her counsel with such a request. Nor has he done the same with B.A.S.'s counsel.

## II.     THE NEED FOR FRESH FACT-FINDING IN THIS CASE IS CLEAR[4]

### A.     The Second Circuit Directed This Court to Take Into Account the Dramatically Changed Circumstances

On November 4, 2022, counsel who formerly represented Ms. Narkis Golan filed a letter with the Second Circuit[5] and argued that due to Ms. Narkis Golan's death, her appeal should be dismissed as moot, and the judgment of this Court vacated and the petition dismissed.  (*See* Ex. A.)  The letter further asked the Second Circuit, in the alternative, "to remand to give the district court an opportunity to pass on the changed circumstances" and cited (among others) *Neumann v. Neumann*, 684 F. App'x 471, 483 (6th Cir. 2017), a Hague Convention case in which, as in this case, "material facts underlying the district court's judgment . . . changed during the appeal." *Id.*

The Second Circuit dismissed the appeal as moot, vacated this Court's order, and remanded to this Court.  (Dkt. Entry No. 152 (*Saada v. Golan*, No. 22-1966, Remand Order) at 1.)  Notably, in doing so, the Second Circuit adopted the language of the letter and directed this Court to "address the Hague Convention petition *in light of the changed circumstances*" of this case.  *Id.* (emphasis added).  As previously explained (Dkt. No. 177 (Hellmann Ltr. dated Dec. 6, 2022), at 5-6), *Neumann* demonstrates that "[t]h[e] primary interest in protecting the child from danger or an intolerable situation can only be served if courts consider the dangers that the child will actually face upon return, as opposed to some counterfactual dangers that the child would have faced if he had been returned beforehand."  684 F. App'x at 483.  Here, as in *Neumann*, this

---

[4]   While Mr. Saada states that he objects to a "hearing" in this matter, it appears that he has a blanket objection to any further fact-finding or briefing on the merits whatsoever.  (*See, e.g.,* Mot. at 11 (claiming that the Court "has all of the information it needs" and that all "evidence . . . belongs in Italy . . . alone")).

[5]   A copy of the Response to Order to Show Cause filed by Attorneys for Ms. Narkis Golan before the Second Circuit is attached hereto as **Exhibit A**.

Court's mandate is to determine whether "evidence shows that returning the children *now* presents a 'grave risk' of 'physical or psychological harm' or 'an intolerable situation.'" *Id.* at 484 (emphasis added).

> B.       Petitioner's Motion Confirms the Need for Fresh Fact-Finding
>
>    1.       The Motion Reveals Ample Grounds for a Defense of Grave Risk and
>             Intolerable Situation

The reason Petitioner argues so vociferously in his Motion against a hearing is that he does not want any new evidence in this matter.  But the admissions in his own Motion reveal that there are ample grounds for Ms. Morin Golan to assert a defense of grave risk of harm and intolerable situation (in the event that Mr. Saada brings a claim against her): (1) he admits that the deepened severity of B.A.S.'s autism never has been considered by this Court (Mot. at 5 ("This Court did not grant Ms. Narkis Golan a new hearing on this evidence")), let alone B.A.S.'s current diagnosis and limitations (both of which may have been impacted by his mother's death), and the risks those create for any return of B.A.S. at this time; (2) he attempts to dismiss the specter of B.A.S. being sent to a group home in Italy as "speculation" (Mot. at 6), but effectively admits he is trying to maneuver around that reality by seeking to vacate the orders put in place in Italy at this Court's request (*id.*) – which reversal he notably sought without seeking the permission of this Court and by misrepresenting to the Italian court that this Court already had ruled in his favor (*see* Dkt. No. 177 (Hellmann Ltr. dated Dec. 6, 2022) at 1); and (3) as discussed below, he demonstrates the paucity of his contact with B.A.S. and lack of any meaningful relationship.  (Mot. at 14-15.)  Mr. Saada attempts to dismiss all of these potential concerns as only relevant to a "custody" determination and thus suggests that they are beyond the purview of this Court.  But nothing could be further from the truth.  Courts considering Hague Convention petitions routinely consider similar matters when assessing whether there

exists a grave risk of harm or intolerable situation.  For example, the court in *Ermini v. Vittori* looked at whether repatriation would stunt the child's development of critical living skills given the lack of similar therapy programs in the home country.  *See* 758 F.3d 153, 165-67 (2d Cir. 2014).  In *Baran v. Beaty*, the court considered an abusive parent's involvement in raising a child, the parent's emotional stability, violence directed towards the spouse in the child's presence, and whether the child was ever physically endangered in the abusive parent's presence. *See* 526 F.3d 1340, 1345-46 (11th Cir. 2008).  Still other courts have looked at logistical issues facing a child upon return, including "who would greet [them] at the airport . . . and who would take care of them pending a resolution . . . of temporary custody and then custody." *Neumann*, 684 F. App'x at 478.  Some of these considerations may be relevant to deciding the suitability of a parent in a custody matter; they can be equally pertinent, however, to determining whether there is a grave risk of harm to a child or an intolerable situation if returned.  Courts could never fully evaluate Article 13 exceptions under the Hague Convention if they were barred from inquiring into any factor that might also be relevant to custody proceedings.

> 2.  <u>The Evidence in the Record From Before Narkis Golan's Death Is Not Sufficient for the Present Changed Circumstances</u>

According to Petitioner's repeated assertions, Ms. Narkis Golan's death "simplifies" this case and this court "has all of the information it needs necessary to issue a ruling on the narrow, jurisdictional question at issue" of determining whether B.A.S. can return Italy safely.  (Mot. at 11.)  This is not true.  Ms. Narkis Golan's death presents a profound change in circumstances that impacts this Court's prior findings in ways that cannot be determined without further fact finding and argument, and there is ***nothing in the record about the current circumstances facing B.A.S.***

The inquiry before this court will be whether it is possible to return B.A.S. to Italy safely at a time when the child grieves the sudden death of his mother, does not speak Italian, and ranks at the lowest 1% of his peers in terms of functional skills with an overall level of adaptive functioning well below the normative mean.  (Dkt. No. 168, Ex. E (Psychological Evaluation), at 26.)  The evidence that Ms. Morin Golan will be offering in this litigation will focus on B.A.S.'s heightened clinical need for consistency and reliability that contributes to a grave risk of harm presented by a drastic change in environment, including country, language, and caretaker.  The grave risk of harm posed by return is unique to this particular juncture in time, presented by the reality of abruptly uprooting an already vulnerable child with heightened clinical needs during a time of great fragility, risking significant and irreversible regression.[6]  *See Ermini*, 758 F.3d at 166-67 (denying return due to grave risk that autistic child would face significant regression upon return).

This court does not have "all of the information it needs necessary to issue a ruling" on the possibility of safe return, because it has never examined the grave risk that Mr. Saada poses to B.A.S. in a context where B.A.S.'s autism is presenting in ways that it was not when this court last heard evidence on Mr. Saada's interactions with B.A.S.  To be clear: Intervenor is not attempting to relitigate a settled issue; she hopes to raise for the Court's consideration a grave risk under current circumstances for which, by definition, there is no evidence in the record.  Any prior assessment on this point thus is not dispositive: "Th[e] primary interest in protecting the child from danger or an intolerable situation can only be served if courts consider the dangers

---

[6]   Contrary to Mr. Saada's assertion, this evidence does not "rightfully belong[] in Italy and in Italy alone."  (Mot. at 11.)  Among other things, if B.A.S. were ordered to Italy, the harm posed by a sudden, drastic change in B.A.S.'s life, schooling, counseling and therapy during a time of tremendous grief already will have been inflicted by the time of any custody proceedings in Italy.

that the child will actually face upon return, as opposed to some counterfactual dangers that the child would have faced if he had been returned beforehand." *Neumann*, 684 F. App'x at 483-84 (directing the district court to determine "whether or not clear and convincing evidence shows that returning the children *now* presents a 'grave risk' of 'physical or psychological harm' or 'an intolerable situation'" (emphasis added)).

Petitioner repeatedly asserts that "[t]his Court is well aware that Mr. Saada poses no threat to B.A.S." (Mot. at 17.)  But this Court could not possibly know whether that is true at this time, as it has yet to hear evidence and argument about whether B.A.S. could be safely returned to Mr. Saada in Italy now in the absence of B.A.S.'s mother.  There is no evidence in the current record about the threat that Mr. Saada poses to B.A.S., who is now verbal and mobile and whose autism is presenting in significantly more profound ways.  Mr. Saada's own expert's testimony at trial suggests there are serious reasons for concern.  Dr. Alberto Yohananoff testified that "there is a ***significant risk that Mr. Saada would engage in harmful behavior towards B.A.S.***" (Dkt. No. 62 (Tr. for Bench Trial on Jan. 15, 2019) at 1221:7-1222:5 (emphasis added).)  He agreed that "[i]t is not inconceivable that ***if his patience is truly tested under stressful conditions, he may engage in behavior that may be harmful to the subject child***[.]"  *Id.* at 1221:3-6 (emphasis added).  Moreover, Dr. Yohananoff testified that he "cannot rule out that" Mr. Saada might hit B.A.S., because there were "too many personality risk factors there that suggest that this is a possibility"[7] *Id.* at 1221:23-1222:1, adding that his "primary concern was the psychological [force], but the physical [force] is definitely there."  *Id.* at 1222:2-5.

---

[7]   Those personality risk factors include "impulsive behavior, emotional reactivity, poor tolerance frustration, difficulties thinking through the consequences of his behavior, questionable judgment and a potential for explosive anger when confronted with stressful situations."  *Saada v. Golan*, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *12 (E.D.N.Y. Mar. 22, 2019), *aff'd in part, vacated in part,* 930 F.3d 533 (2d Cir. 2019).  Moreover, Dr. Yohanoff stated at trial that he did not know whether the ameliorative measures he recommended would be "effective or not[.]"  (Dkt. No. 62 (Tr. for Bench Trial on Jan. 15, 2019) at 1249:4-8.)

In these circumstances, it is no answer that "Ms. Narkis Golan left B.A.S. alone with Mr. Saada regularly."  (Mot. at 5.)  Nor is it preclusive that there was "no significant evidence that Mr. Saada was intentionally violent to B.A.S." at the time of trial.  *Saada v. Golan*, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *4 (E.D.N.Y. Mar. 22, 2019), *aff'd in part, vacated in part,* 930 F.3d 533 (2d Cir. 2019).  A district court is "not required to find [the child] had previously been physically or psychologically harmed."  *Baran*, 526 F.3d at 1346 (finding petitioner posed grave risk of harm to child when there was no evidence to suggest petitioner "intentionally harmed" child, but there was evidence that petitioner had placed child "in harm's way" by "abusing [respondent] while she was pregnant, verbally berating [her] for hours on end while she held [child] in her arms, and handling newborn [child] irresponsibly while drunk").  "[W]here spousal abuse evinces a propensity towards violence and is ***accompanied by other risk factors specific to the child***, a grave risk of harm to a child may be found."  *Acosta v. Acosta*, No. 12-342 ADM/SER, 2012 WL 2178982, at *7 (D. Minn. June 14, 2012) (emphasis added), *aff'd, appeal dismissed*, 725 F.3d 868 (8th Cir. 2013).  The absence of significant evidence of intentional violence in the past does not bar a determination of grave risk now, and it certainly does not preclude new fact-finding.  Mr. Saada's "propensity toward violence" needs to be considered in conjunction with the "other risk factors specific to" B.A.S.  *Acosta*, 2012 WL 2178982, at *7.

C.      The Hague Convention Does Not Override Due Process Requirements

Mr. Saada asserts that "[t]he most expeditious way to resolve this case is to replace Narkis Golan with Morin Golan and order B.A.S. to be returned home."  (Mot. at 4.)  That may well be true, but neither Hague Convention jurisprudence nor basic principles of fairness and due

process call for sacrificing justice in the name of speed.  In fact, doing so may well elongate this matter in appeals.

As Petitioner himself recognizes (Mot. at 11), in a Hague Convention case, due process requires "a meaningful opportunity to be heard."  *West v. Dobrev*, 735 F.3d 921, 932 (10th Cir. 2013) (evidentiary hearing contemplated but appellant failed to identify competent evidence that would be offered).  Where, as here, a respondent has presented sufficient evidence of a grave risk of harm to the child and cast sufficient doubt on the adequacy of conditions that would protect the child upon return, an evidentiary hearing is "necessitate[d]."  *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005) (reversing district court's decision denying hearing on the ground that respondent presented sufficient evidence at the summary judgment stage to necessitate a hearing).

When a district court prevents a respondent from developing the evidence that "courts generally require respondents to present" for an Article 13(b) defense to be accepted, and the court's rulings block expert evidence and other testimony and make it "practically impossible for [the respondent] to make out her case," such rulings render the proceeding "fundamentally unfair," and the appellate court may vacate the return order that resulted from such a proceeding. *Colchester v. Lazaro*, 16 F.4th 712, 727, 729 (9th Cir. 2021) (vacating return order and ordering new trial because district court's errors rendered the trial below fundamentally unfair); *see also Khan v. Fatima*, 680 F.3d 781, 788 (7th Cir. 2012) (failure to allow psychological evidence of the child was reversible error where the Respondent submitted credible evidence of grave risk of harm).

Petitioner's cases are not to the contrary.  While Mr. Saada cites *March v. Levine*, 249

F.3d 462, 474 (6th Cir. 2001) for the proposition that a "full hearing" is not necessarily required

(Mot. at 11), that decision

> ***does not suggest an evidentiary record is unnecessary in Hague proceedings***:
> Rather, the Sixth Circuit held that the district court had not abused its discretion in
> granting summary judgment before discovery substantially because the district
> court had ***'allowed a voluminous amount of evidence into the record in
> conjunction with the parties' briefs***, and the court had independently sought
> information under the terms of the treaty' before granting summary judgment.

*Colchester*, 16 F.4th at 725 (emphases added) (citation omitted) (reviewing whether district court

adequately allowed respondent to develop an evidentiary record necessary for an Article 13(b)

defense).  Indeed, in *March*, over 1,300 pages of evidence had been entered into the record from

both parties.  *See March*, 249 F.3d at 475.  Here, ***no evidence*** has been entered yet on the defense

of grave risk of harm and intolerable situation that Ms. Morin Golan will assert in response to

any claim by Mr. Saada.  And Ms. Morin Golan has been given no opportunity to substantively

brief or be heard on any of the issues.

Similarly, Petitioner cites *West* for the proposition that "a meaningful opportunity to be

heard . . . is all due process requires in the context of a Hague Convention petition."  735 F.3d at

932.  However, the "meaningful opportunity to be heard" that was given to the respondent in that

case far exceeds what Petitioner now argues should be given to Ms. Morin Golan.  In *West*, the

respondent had (i) an opportunity to answer allegations specifically directed against him in the

pleadings, (ii) an opportunity to present evidence, including an expert report, alongside his

answer, and (iii) an opportunity to be heard in a preliminary hearing on whether an evidentiary

hearing should be held.  *See id.* at 927.  Petitioner cites no case (and we are aware of none) that

allowed a final ruling on facts even remotely resembling what he proposes here — *i.e.*, prior to

(1) any formal allegations having been lodged relating to the party in the case; (2) any discovery

or fact finding having been permitted; and (3) any substantive briefing or opportunity to be heard having been permitted.[8]

Granting Petitioner's request to deprive Ms. Morin Golan of any meaningful opportunity to be heard on her defense to a presumptive claim by Mr. Saada would be fundamentally unfair. The changed circumstances require fresh fact-finding, which would serve, not undermine, the Hague Convention's paramount concern for the safety of B.A.S. *See Golan v. Saada*, 142 S. Ct. at 1896 ("[T]he Convention sets as a primary goal the safety of the child.").

## III.   MR. SAADA'S REQUEST TO SUBSTITUTE SHOULD BE DENIED; SHOULD HE SEEK AN ORDER AGAINST MS. MORIN GOLAN, HE SHOULD BRING A CLAIM AGAINST HER

With the need for new fact-finding clear, Mr. Saada's procedural machinations become somewhat academic. Indeed, the rational and fair path forward in this case has been plain from the start: add Ms. Morin Golan as in intervenor to the case, and, should Mr. Saada seek to obtain an order against her, he should bring a claim against her, at which point she can assert her defense. Mr. Saada correctly recognized this in his first Motion before the Second Circuit after Ms. Narkis Golan's death. (*See* Dkt. No. 172 (Saada Motion before the Second Circuit), Ex. D at ¶ 29 (citing need to bring a petition against Ms. Morin Golan unless Second Circuit directs judgment).)

---

[8]   The other cases cited by Petitioner likewise do not support his position. (Mot. at 11.) *See Monasky v. Taglieri*, 140 S. Ct. 719, 724 (2020) (four-day bench trial before district court granted petition); *Lukic v. Elezovic*, No. 20-CV-3110 (ARR) (LB), 2021 WL 466029 (E.D.N.Y. Feb. 9, 2021) (discovery, including deposition, before court granted petition). In *Matute-Castro v. Jimenez-Ortiz*, No. 15-CV-04568 (DLI)(JO), 2016 WL 8711076 (E.D.N.Y. Aug. 26, 2016), the court denied the petition after five months of discovery that included deposition and expert evaluation of the child. *Id.* at *4, *13. In *In re Skrodzki*, 642 F. Supp. 2d 108 (E.D.N.Y. 2007), the court granted the petition only after respondent answered responding to allegations directed specifically at her, submitted affidavits, and made oral submissions to court on motion for summary judgment. *Id.* at 110.

A.    Ms. Golan's Motion to Intervene Should Be Granted Formally

Mr. Saada consented to Ms. Morin Golan's motion to intervene, which she filed on November 16, 2022.  (Dkt. No. 172.)  Mr. Saada did not oppose that motion within the time limit permitted under the rules[9], presumably because he *already had consented*.  Later, he filed a "partial opposition" to the motion (Dkt. No. 179) that doesn't actually oppose the intervention but instead objects to this Court holding an evidentiary hearing — which is a different matter that, as noted above, should not be an open issue given the direction from the Second Circuit for this Court to assess the changed circumstances.  Accordingly, Ms. Golan's (unopposed) motion to intervene should be granted formally at this time.

B.    If Mr. Saada Seeks an Order Against Ms. Golan, He Should Bring a Claim Against Her

As things stand, any order Mr. Saada obtained would be against the sole named respondent, Ms. Narkis Golan, who is dead.  If Mr. Saada wishes to obtain an order against Ms. Morin Golan, he will need to bring a claim directly against her.[10]

1.    Substitution Would Be Improper

Mr. Saada's suggested shortcut for bringing a claim against Ms. Morin Golan is to substitute her in as respondent.  Mr. Saada's desire for expedition, however, cannot support this request.

---

[9]    Local Civil Rule 6.1(b) (providing that Mr. Saada's last day to oppose Ms. Morin Golan's motion was November 30, 2022).

[10]    It is nonsensical, therefore, for Mr. Saada to assert that a petition against Ms. Morin Golan "would have no purpose but to cause further delay."  (Mot. at 8.)  One imagines that Mr. Saada would want an order against a living respondent.  Mr. Saada's suggestion that the Court should attach meaning to the fact that the Second Circuit remanded instead of dismissing Mr. Saada's petition upon Ms. Narkis Golan's death (*id.*) is even more nonsensical; Mr. Saada seems to forget that when remanding, the Second Circuit refused his requests to modify the *Saada VII* Return Order by vacating the $150,000 payment of Mr. Saada, vacating the Family Court order and remanding to this Court with instructions to modify the return order.  Dkt. No. 172, Ex. D (Mr. Saada's Mot. to Various Relief and Brief in Resp. to Order to Show Cause).  By his logic, we should infer that the Second Circuit signaled that the $150,000 should remain.

Rule 25 only permits the substitution of a "proper party." Fed. R. Civ. Pro. 25(a)(1). The motion for substitution must identify the proper party to be substituted for the deceased party so the court may act on the motion. *See* 6 Moore's Federal Practice - Civil § 25.12 (2022). A "representative" of the deceased party's estate or a "successor" of the deceased party is a "proper party" for substitution. *Kernisant v. City of New York*, 225 F.R.D. 422, 429 n.6 (E.D.N.Y. 2005). The party seeking substitution must show that the person to be substituted is a proper representative or successor under applicable state law. 6 Moore's Federal Practice - Civil § 25.12 (2022). In federal court sitting in New York, whether a person is a proper "successor or representative" of the decedent is determined by New York state law. *Garcia v. City of New York*, No. CV 08–2152 (RRM)(MDG), 2009 WL 261365, at *1 (E.D.N.Y. Feb. 4, 2009) (citations omitted).

Courts require a "persuasive factual showing as to why the substituting party is a proper party." *CFS 12 Funding LLC v. Wiesen*, No. 21-cv-9711 (PKC), 2022 WL 17581703, at *3 (S.D.N.Y. Dec. 12, 2022). Federal courts sitting in New York have held that a "successor" of the deceased party is a "distributee" of the decedent's estate. *See, e.g., Kernisant*, 225 F.R.D. at 429 n. 6; *Graham*, 224 F.R.D. at 64-65. Failure to establish that the non-representative party sought to be substituted is a distributee of the estate has resulted in denial of motion to substitute. *See CFS 12 Funding*, 2022 WL 17581703, at *3 (denying motion to substitute where movant failed to show that substituting party was either representative or distributee); *Garcia*, 2009 WL 261365, at *1 (same); *Graham*, 224 F.R.D. at 65 (same); *Kim H. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1165 (CJS), 2022 WL 3580125, at *2 (W.D.N.Y. Aug. 17, 2022) (same).

Mr. Saada admits that "Ms. M Golan may not be Ms. N. Golan's legal representative" (Mot. at 7), but nonetheless conclusorily asserts that she "is certainly an appropriate individual to

14

replace Ms. N. Golan given the circumstances."[11]  (Mot. at 8.)  However, he fails to cite a single

case to support either that Ms. Morin Golan can be considered a "successor" or "representative"

under New York law; the only cases he cites that apply New York law hold that a distributee is a

successor, but do not involve findings that someone in Ms. Morin Golan's position may be a

successor.[12]  Because Mr. Saada does not claim that Ms. Morin Golan is a distributee or specify

any other basis supported by case law on which she should be substituted, his motion should be

denied.

> 2.    <u>If Ms. Morin Golan Were Added as an Additional Party, Mr. Saada Would Need to Bring a Claim Against Her, and She Would Have All Procedural Rights</u>

In the alternative to substitution, Mr. Saada suggests adding Ms. Morin Golan as a party

under Federal Rule of Civil Procedure 15.  While counsel for Mr. Saada did not seek to confer on

this matter, Ms. Morin Golan does not necessarily oppose granting him leave to amend the

Petition to add her as respondent.  However, importantly, Mr. Saada will need to formally bring a

claim against her as a new respondent, and she will be entitled to answer the petition, *see, e.g.,*

---

[11]   None of the cases Mr. Saada cites with non-parent respondents involves substitution.  (Mot. at 6-7.)  All of those cases involved petitions that named those non-parent respondents from the start, and while they show that non-parents are sometimes named as respondents, they do nothing to show that Ms. Morin Golan is a proper party to substitute for Ms. Narkis Golan in the present action.  *See Neves v. Neves*, 637 F. Supp. 2d 322 (W.D.N.C. 2009) (petition named alleged abducting parent and non-parents as respondents at same time; respondent parent did not die when litigation was pending); *Cunningham v. Cunningham*, 237 F. Supp. 3d 1246 (M.D. Fla.) (petition named alleged abducting parent and non-parent as respondents at same time; respondent parent did not die when litigation was pending), *aff'd*, 697 F. App'x 635 (11th Cir. 2017); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894 (N.D. Ill. 2015) (same); *Rishmawy v. Vergara*, No. 4:21-cv-35, 2021 WL 1760303 (S.D. Ga. May 4, 2021) (same); *Acosta v. Acosta*, No. 12-342 ADM/SER, 2012 WL 2178982, at *1 (D. Minn. June 14, 2012) (dismissing non-parents as respondents because "no evidence supported a legal claim" against them), *aff'd, appeal dismissed*, 725 F.3d 868 (8th Cir. 2013).

[12]   *See Hardy v. Kaszycki & Sons Contractors, Inc.*, 842 F. Supp. 713, 716 (S.D.N.Y. 1993) (holding that a distributee of the decedent litigant's estate was a successor of the decedent); *Gronowicz v. Leonard*, 109 F.R.D. 624, 626 (S.D.N.Y. 1986) (same); *Sinito v. U.S. Dep't of Justice*, 176 F.3d 512, 516 (D.C. Cir. 1999) (not applying New York law in determining successor); *McSurely v. McClellan*, 753 F.2d 88, 96 (D.C. Cir. 1985) (holding that distributee of decedent litigant's estate was successor of decedent; not applying New York law); *Rende v. Kay*, 415 F.2d 983 (D.C. Cir. 1969) (same).

Fed. R. Civ. Pro. 15 (contemplating that movant will amend its pleading), and engage in discovery; *Franco v. Ideal Mortg. Bankers, Ltd.*, No. CV 07–3956(JS)(AKT), 2009 WL 3150320, at *3-4 (E.D.N.Y. Sept. 28, 2009) (amending complaint and moving to discovery).  It is not the case that Mr. Saada could add Ms. Morin Golan as an *additional* party and then, as he appears desirous to do, pretend that nothing has changed and treat her as synonymous with her dead sister.

## IV.   B.A.S.'S CARE SHOULD BE MAINTAINED AS-IS DURING THE PENDENCY OF THESE PROCEEDINGS

Mr. Saada repeatedly argues that the custody of B.A.S. can be decided only by an Italian court.  (*See, e.g.,* Mot. at 5.)  Yet he asks this Court to take actions to do just that by (i) vacating the Family Court Orders, and (ii) ordering that "Mr. Saada should have B.A.S. during these proceedings" (Mot. at 14).  There is no rational basis for disturbing the arrangements presently in place for B.A.S., particularly considering how disruptive it would be for B.A.S. during this delicate time.

### A.   There Is no Rational Basis to Vacate the Family Court Orders[13]

The only reason Mr. Saada offers for seeking to vacate the orders putting B.A.S. in the care of Ms. Morin Golan and authorizing her to make medical and educational decisions for B.A.S. is that they are "in direct violation of the Hague Convention."  (Mot. at 12.)  This is false and his groundless request should be denied.

---

[13]   The heading to Mr. Saada's argument asserts that "The Family Court Orders Should Be Vacated" (Mot. at 11), but the text that follows appears to address only "Ms. M. Golan's improperly obtained custody order" (*id.* at 12).  Thus, we do not understand Mr. Saada to be seeking action with respect to the order of protection in favor of B.A.S. and Ms. Morin Golan, but rather only the order that puts B.A.S. in the care of Ms. Morin Golan and authorizes her to make medical and educational decisions for B.A.S.  (*See* Dkt. No. 178, Ex. B.)

New York courts, including its Family Courts, have "temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child, a sibling or parent of the child." N.Y. Dom. Rel. Law § 76-c(1) (McKinney). In the days following her sister's sudden death, Ms. Morin Golan turned to the Family Court, not to bypass the Hague Convention, but because it could act with the necessary speed to provide protection for B.A.S. She was fully transparent with the Family Court and advised it of the proceedings before this Court (then, before the Second Circuit) and the Italian courts. (*See* Dkt. No. 174, Ex. B (Custody Petition).) Indeed, in its Temporary Order of Protection, the Family Court expressly listed its conditions subject to "the order of supervised visitation of the Tribunal of Milan." (Dkt. No. 172, Ex. B (Kings County Family Court Temporary Order of Protection).) And its order that B.A.S. "remain in the care of" Ms. Morin Golan does not purport to grant her permanent custody.[14] (Dkt. No. 172, Ex. A (Kings County Family Court Short Order).)

Far from violating the Hague Convention or the Supremacy Clause of the Constitution (Mot. at 14), the Family Court has played a critical gap-filling role that has ensured the safety and well-being of B.A.S. in the aftermath of the child's mother's death. Only someone residing in Brooklyn like Ms. Morin Golan is in a position to make the everyday educational and medical decisions that B.A.S., a child with autism spectrum disorder, requires. It is thus dangerous for

---

[14]  For all of these reasons, the cases Mr. Saada cites on this point are inapt. (Mot. at 12-13.) Unlike here, in those cases, both parents were alive and one raced to obtain a custody order in order to circumvent the Hague Convention. *See Walker v. Walker*, 701 F.3d 1110 (7th Cir. 2012) (Hague Convention case where both parents are alive, and neither party sought a custody order in the United States); *Tann v. Bennett*, 807 F.3d 51 (2d Cir. 2015) (Hague Convention case where both parents are alive, and father obtained a custody order in New York while mother's Hague Convention case was on appeal); *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001) (Hague Convention case where both parents are alive, later abrogated by *Monasky v. Taglieri*, 140 S. Ct. 719 (2020)); *Silverman v. Silverman*, 338 F.3d 886 (8th Cir. 2003) (Hague Convention case where both parents are alive, and mother obtained custody order in Minnesota during the pendency of the Hague Convention proceeding). The *Rooker-Feldman* doctrine thus does not come into play.

Mr. Saada, who does not reside in Brooklyn and who has not even seen B.A.S. in person for over two years, to seek to vacate the orders giving Ms. Morin Golan this authority.

    B.    <u>Mr. Saada's Request for Custody of B.A.S. During the Pendency of These Proceedings Should Be Denied</u>

As already noted above, Ms. Morin Golan has been providing stable, day-to-day care for B.A.S. since the child's mother's death.  Mr. Saada seeks to up-end B.A.S.'s stability based on a vague suggestion by his counsel (with no evidence) that he "is ready to leave his home and job." (Mot. at 17.)  This request should be denied and confirms Mr. Saada's lack of relationship with B.A.S. and corresponding lack of appreciation for B.A.S.'s need for continuity in his care.

    1.    <u>Ms. Morin Golan Is the Closest Person in B.A.S.'s Life</u>

Ms. Morin Golan shares a singular bond with B.A.S.  During this difficult time in his childhood, she has been a familiar source of comfort following the death of the only parent B.A.S. knows.  Accordingly to B.A.S.'s counsel, B.A.S. clung to Ms. Morin Golan when being dropped off for a meeting with B.A.S.'s counsel.  (*See* Dkt. No. 174 at ¶ 19.)  Since the death of B.A.S.'s mother, Ms. Morin Golan has ensured that B.A.S.'s schooling, religious education, physical and speech therapy, and other activities and services for autism in Brooklyn remain uninterrupted.

Mr. Saada attempts to paint Ms. Golan as having wrongly taken B.A.S. into her care following the death of the child's mother.  This is a gross mischaracterization.  It is unreasonable to assert that Ms. Morin Golan is an "abductor" simply because, in the absence of either of B.A.S.'s parents, she assumed the role of caregiver.  Far from "abducting" B.A.S., Ms. Morin Golan went to the courts to seek the authority to care for B.A.S.  Mr. Saada was not even in the country.  It would have been profoundly irresponsible and a danger to leave a minor with significant special needs without a guardian who could make medical decisions for the child.

Furthermore, in the presence of abuse and a grave risk of harm to the child, which this Court found in its prior rulings (*see* Dkt. No. 159), any removal of the child is justified under Article 13(b) of the Hague Convention.  *See Axford v. Axford*, No. 09–2914, 2009 WL 2256634, at *8 (E.D. Penn. July 28, 2009) ("Under the Hague Convention, a wrongful removal may nonetheless be justified if respondent can produce clear and convincing evidence that 'there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" (citation omitted)).  Thus continuing to use loaded language by referring to Ms. Narkis and Ms. Morin Golan as abductors is contrary to this Court's findings.

### 2.    Mr. Saada Has No Meaningful Relationship With B.A.S.

Mr. Saada further alleges that Ms. Golan misrepresents his lack of communication with B.A.S. in the past two years.  As evidence, his lawyer purports (with no admissible evidentiary support) to cite calls Mr. Saada had with B.A.S. between April 10, 2022 and July 7, 2022.  Ms. Narkis Golan passed away October 18, 2022.  As evidenced by the chart below, even if Mr. Saada's statements about his phone calls with B.A.S. are accepted *arguendo* as true, of the 196 days between the April and October period, Mr. Saada spoke to his son a total of ***9 times***, amounting to ***less than 5 hours*** over six months.[15]  (*See* Mot. at 14-15.)

---

[15]    This is even crediting Mr. Saada's counsel's claim that two calls with B.A.S. exceeded an hour, a claim that cannot be accepted on its face.



Moreover, as explained during the status conference on July 12, 2022,[16] for the two years prior to April 2022, Mr. Saada had no communication with his son.  He reportedly blocked Ms. Narkis Golan's number, provided no financial support, and had no video calls with B.A.S.  (*See* Dkt. No. 154 (Ltr. in Resp. to the Ct.'s July 12, 2022 Order), at 5; Ex. B at A-2208 to A-2209.)

       3.    <u>Mr. Saada Provides No Evidence That He Is Residing in New York</u>

Mr. Saada's counsel suggests (without evidence) that he is willing to relocate to New York during the pendency of the case to assume responsibility for B.A.S.  Yet Mr. Saada has made no attempt to visit B.A.S. – even once COVID travel restrictions were lifted and even after B.A.S.'s mother died.  In fact, when this Court denied unsupervised visitation earlier in 2022, he cancelled his trip to the United States completely and did not see B.A.S. at all.  *See* Ex. B at A-2209.  The fact that B.A.S. currently has no relationship with his father, and does not even

---

[16]    A copy of the transcript of the July 12, 2022 status conference is attached hereto as **Exhibit B**.

recognize him, is of no fault of Ms. Narkis Golan or Ms. Morin Golan.  Mr. Saada has failed to take advantage of the numerous opportunities open to him to foster a relationship with his son.[17]

Mr. Saada also claims that the Court knows he is no danger to B.A.S.  Yet the evidentiary record does not contain any such determination.  To the contrary, the protective order in Italy suggests that he was a threat not only to the late Ms. Narkis Golan but remains a risk to B.A.S. This protective order remains in place at this time and the Court has refused his previous requests for unsupervised visitation based on this very order.  Additionally, as detailed above, there remains evidence on the record that Mr. Saada's temperament makes it impossible to rule out physical and psychological abuse of the child.  His own expert witness, Dr. Yohananoff could not definitively say he was no threat to B.A.S.  (Dkt. No. 62 (Tr. for Bench Trial on Jan. 15, 2019) at 1221:3-1222:5.)  Dr. Yohananoff's inability to rule out Mr. Saada as a threat was based in part on the fact that "the cumulative stress that builds when you're a parent 24/7 is not there." (*Id*. at 1203:12-16.)  The Court recognized one "would not expect somebody to behave badly on a supervised visit."  (Dkt. No. 61 (Tr. for Bench Trial on Jan. 14, 2019) at 1121:15-17.)

In short, Mr. Saada is not resident in Brooklyn, and has presented no competent evidence to establish that he can be unsupervised with B.A.S. (something never before permitted by this Court) or that B.A.S. would not be scarred by being sent to live with someone with whom the child has no relationship.  Mr. Saada's request for custody of B.A.S. therefore should be denied.

---

[17]  The cases referenced by Mr. Saada all point to courts granting the petitioning parent or the non-custodial parent visitation during the pendency of a Hague Convention case.  (*See* Mot. at 16.)  Under the Italian protective order, Mr. Saada is permitted supervised visitation in a neutral space.  Furthermore, as evidenced by the fact that he had phone conversations with B.A.S. following the issuance of the protective order between April 2022 and July 2022, he is permitted communication through electronic means including Skype and telephone.  So his request that he be given access to B.A.S. is superfluous.

## V.      CONCLUSION

For the foregoing reasons, Ms. Morin Golan respectfully requests that Mr. Saada's

Motion be denied in all respects.


Dated: December 23, 2022
        New York, New York


                              Respectfully submitted,


                              /s/ Elizabeth A Hellmann_____
                              Elizabeth A. Hellmann
                              One Manhattan West
                              New York, N.Y. 10001-8602
                              Telephone: (212) 735-2590
                              Facsimile: (917) 777-2590
                              E-Mail: betsy.hellmann@probonolaw.com