**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- X
                                                                :
**ISACCO JACKY SAADA,**                                        :
                                                                :
                              Petitioner,                       :
                                                                :   **MEMORANDUM DECISION AND**
                                                                :   **ORDER**
               – against –                                      :
                                                                :   18-CV-5292 (AMD) (RML)
                                                                :
**MORIN GOLAN,**                                               :
                                                                :
                              Respondent.                       :
                                                                :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

For the fourth time, the Court must decide whether to grant the petitioner's application

pursuant to the Hague Convention on the Civil Aspects of International Child Abduction to

return B.A.S., who is now seven years old, to Italy, his country of habitual residence. As

explained in detail below, given the changed circumstances of this sad and difficult case, the

Court concludes that returning B.A.S. to Italy would subject him to a grave risk of psychological

harm and place him in an intolerable situation within the meaning of Article 13(b) of the Hague

Convention.

When the Court ordered that B.A.S. be returned to Italy in August 2022, the evidence

established that B.A.S. would not face a grave risk of harm if he were returned. First, at the time

of the order, it was contemplated that he would return to Italy with his mother, his sole caretaker

for about five years. Second, the grave risk that the Court identified—domestic violence

between the parents—was reduced since the petitioner and Narkis Golan, B.A.S.'s mother,

would no longer be living together. Third, the Italian courts had adopted robust measures,

including orders of protection and supervision by Italian social service agencies, to ensure

B.A.S.'s continued well-being. Fourth, the petitioner was obligated by this Court's order to give

Narkis Golan $150,000 to ease her transition back into life in Italy.  Given these protections, the

Court was satisfied that B.A.S. would not be exposed to a grave risk of harm.  Narkis Golan

appealed that order to the U.S. Court of Appeals for the Second Circuit.

In October 2022, while the appeal was pending, Narkis Golan died suddenly.  As

explained below, her tragic and untimely death has radically altered the case and the Court's

analysis.  There is undisputed evidence that B.A.S. suffers from Post-Traumatic Stress Disorder

("PTSD") and that removing him from his current environment would risk multiple harms.

Moreover, the legal landscape in Italy is now far from clear.  There has been no determination

about where B.A.S. would live or with whom, and the timeline for making those determinations

is uncertain.  In addition, there is a possibility that he would be placed in an institutional setting

while the Italian court decides the issue of custody.

This combination of circumstances would subject B.A.S. to a risk of real and lasting

harm.  Accordingly, the petition is denied.

## BACKGROUND

### I.    Procedural History

The record in this case is voluminous and includes the transcript from a nine-day trial,

multiple decisions from this Court and the Second Circuit, and a Supreme Court decision.  The

Court recounts the events that led to the August 2022 decision only to the extent necessary to

provide context for what has transpired since that order.[1]

In 2018, Narkis Golan took B.A.S. from Italy and brought him to New York without the

petitioner's consent.  On September 20, 2018, the petitioner brought a petition in this Court

---

[1] The Court's August 31, 2022 order includes the factual and procedural history of this case before
September 2022.  *Saada v. Golan*, No. 18-cv-5292, 2022 WL 4115032, at *2–4 (E.D.N.Y. Aug. 31,
2022).

pursuant to the Hague Convention and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001, *et seq*.  In early 2019, after the trial, the Court concluded that B.A.S. was a habitual resident of Italy, and that while he would be subject to a grave risk of harm upon repatriation arising from domestic violence between his parents, there were sufficient measures that would ameliorate the risk.  *Saada v. Golan*, No. 18-CV-5292, 2019 WL 1317868, at *20 (E.D.N.Y. Mar. 22, 2019) ("*Saada I*").  This decision went through multiple rounds of appellate review, culminating in the Supreme Court's June 2022 decision holding that the Second Circuit could not require district courts to consider ameliorative measures after a grave risk finding, but that district courts could do so as a matter of discretion.  *Golan v. Saada*, 596 U.S. 666, 681–82 (2022).  The Court remanded the case for this Court to clarify whether it would have considered ameliorative measures as a matter of discretion, and to "determine whether the measures considered are adequate to order return in light of the District Court's factual findings concerning the risk to B.A.S."  *Id.* at 668.

On August 31, 2022, the Court granted the petition for a third time and ordered that B.A.S. be returned to Italy.  *Saada v. Golan*, No. 18-CV-5292, 2022 WL 4115032, at *1 (E.D.N.Y. Aug. 31, 2022).  Then-respondent Narkis Golan appealed that order to the Second Circuit.  (ECF No. 163.)  However, while the appeal was pending, Narkis Golan died unexpectedly.[2]  Two days later, on October 20, 2022, while the petitioner was in Italy, Narkis Golan's sister Morin Golan—now the respondent—filed an *ex parte* petition in King's County Family Court in which she sought "full custody of [B.A.S.];" she "fil[ed] for emergency custody of the child, to allow more time to figure out the future and allow the child to process the recent

---

[2] The parties have not provided the Court with the cause of Narkis Golan's death.  The petitioner was in Italy when she died.

traumatic events[.]"  (ECF No. 174-2 at 6–7.)  The Honorable Judith Waksberg authorized the respondent to make educational and medical decisions for B.A.S., issued a protective order against the petitioner, and appointed the Children's Law Center to represent B.A.S. in connection with the Family Court proceedings.  (ECF Nos. 168 at 8-9, 190-3, 190-6.).[3]

On November 10, 2022, the Second Circuit dismissed the respondent's appeal as moot, vacated the Court's August 2022 return order, and remanded the petition "with confidence" that that the Court could "expeditiously address the Hague Convention petition in light of the changed circumstances."  *In re B.A.S.*, No. 22-1966, 2022 WL 16936205, at *1 (2d Cir. Nov. 10, 2022).  The Second Circuit also directed the Court to "entertain any motions for intervention or substitution of parties."  *Id.*

On November 16, 2022, the respondent moved to intervene in this matter pursuant to Federal Rule of Civil Procedure 24.  (ECF No. 172.)  The Children's Law Center followed suit on November 30, 2022, seeking in the alternative to be appointed as B.A.S.'s guardian *ad litem*.  (ECF Nos. 173, 174.)  On December 8, 2022, the petitioner moved to substitute Morin Golan as a respondent pursuant to Rule 25, or to amend the petition and add her as a respondent under Rule 15(a)(2).  (ECF No. 178.)  The petitioner opposed the motions to intervene.  (ECF No. 179.)  In a separate submission, the petitioner moved to vacate the Family Court orders and to transfer B.A.S. to his care in New York during these proceedings.  (ECF No. 178.)

On December 4 and 20, 2022, the Court referred the motions to Magistrate Judge Robert M. Levy.  In a thoughtful and well-reasoned Report and Recommendation, Judge Levy recommended that the Court vacate the Family Court's order for temporary custody, grant the

---

[3] On April 26, 2023, Judge Waksberg clarified that her order was not a permanent grant of custody.  (ECF No. 218-2 at 9.)

petitioner's request to amend the petition to substitute Morin Golan as the respondent, deny the motions for substitution and intervention, and refer to the Italian courts the petitioner's request to have B.A.S. returned to his care.  (ECF No. 187 at 1.)  Morin Golan and the Children's Law Center objected.  (ECF Nos. 188, 189-11, 191.)

On February 13, 2023, the Court adopted Judge Levy's Report and Recommendation in part, granting the request to amend the petition and denying the motions for substitution and intervention.  (ECF No. 193.)  The Court deferred judgment on the vacatur and temporary custody issues.  Shortly thereafter, on February 15, 2023, the Court denied the petitioner's request for temporary custody of B.A.S. because the petitioner did not make the requisite showing under 22 U.S.C. § 9004(b), which prohibits courts entertaining Hague petitions from ordering that a child "be removed from a person having physical control of the child unless the applicable requirements of State law are satisfied."  The Court determined, however, that visitation was appropriate to protect B.A.S.'s "well-being" pursuant to 22 U.S.C. § 9004(a).  The Court consulted Judge Waksberg, who subsequently issued a modified order of protection permitting court-ordered, supervised visitation, followed by unsupervised visitation.[4]

## II.     Psychological Evaluation of B.A.S.

It was especially important that the Court have a complete and accurate description of B.A.S.'s current psychological condition to determine whether an order returning him to Italy would subject him to a grave risk of harm.  Narkis Golan and then the respondent maintained that B.A.S. had autism, but the record on that question was inconsistent and unreliable.  The Court determined that it could not resolve the question on the existing record, and on February 21, 2023, directed the parties to submit the names of three independent mental health

---

[4] The Court referred the parties to mediation on June 29, 2023, but they were unable to reach an agreement.

professionals with expertise in childhood autism.  (*ECF Order dated Feb. 21, 2023*.)  The parties

complied, and on March 28, 2023, the Court assigned Dr. Karen M. Surowiec, PsyD, to evaluate

B.A.S.

Over the next seven months, Dr. Surowiec conducted a thorough examination consisting

of "collateral interviews and questionnaires, evidence-based measures, record review, and

clinical observation," as well as "tests and measures that assessed [B.A.S's] current level of

functioning in several areas relevant to an ASD diagnosis including intellectual and adaptive

functioning, developmental history, sensory processing, social communication, social

interactions, and repetitive behaviors."  (ECF No. 237 at 22–23.)  For example, she met with and

tested B.A.S., reviewed the records of his treatment and diagnoses, spoke to one of his teachers,

and interviewed the petitioner and the respondent.  She also interviewed B.A.S.'s doctor and

reviewed certain court records.  (*See id*.)

The respondent and the petitioner completed questionnaires about B.A.S.'s early

development, adaptive functioning, behavior, and sensory processing, but their answers "differed

considerably."  (*Id*. at 23.)  For example, Ms. Golan represented that B.A.S. had "sensory

processing difficulties" and "suggested that [B.A.S.] is experiencing significant difficulties . . .

and that his overall adaptive behavior is in the 2nd percentile."  (*Id*.)  In contrast, the petitioner

said that B.A.S. has no sensory processing difficulties, and that his "overall adaptive

functioning" was "average."  (*Id.*)

The parties also disagreed about B.A.S.'s early development.  The respondent described

"significant abnormalities in the areas of reciprocal social interaction, communication, repetitive

behavior, and [] developmental abnormalities before the age of 36 months," while the petitioner

reported "no difficulties with social interaction, minimal difficulties with communication" and

no developmental concerns. (*Id.*) The petitioner "reported minimal concerns about B.A.S.'s early development and current functioning. He denied any clinically significant emotional or behavior difficulties and endorsed that B.A.S.'s receptive communications skills were in the 22+ year age range, and his coping skills were similar to a 20-year-old individual." (ECF No. 238 at 27.)[5]

Dr. Surowiec concluded that B.A.S. had been "exposed to multiple traumatic events, including the death of his mother," and witnessing "Intimate Partner Violence between his biological parents" during the first two years of his life.[6] She also concluded that B.A.S. "exhibited a low number of symptoms and does not meet [the] full criteria for a diagnosis of [ASD] at this time. (*Id.* at 25.) More specifically, B.A.S. "exhibited a number of characteristics that are not present in children with ASD."[7] Instead, Dr. Surowiec found that the symptoms that she observed, including those his caregivers and teachers observed, "align more closely" with the

---

[5] Dr. Surowiec recommended that the petitioner "receive parenting support and psychoeducation on appropriate expectations for a child [B.A.S.'s] age." (*Id.*) Since the petitioner's native language is Italian, Dr. Surowiec also recommended that "his understanding of the questions that were asked of him in English" be confirmed. (*Id.*) Finally, she recommended "dyadic therapy" for the petitioner and B.A.S. "to address the petitioner's expectations of B.A.S.'s receptive communication, coping skills, and understanding of his diagnosis of PTSD." (*Id.*)

[6] Dr. Surowiec tried "to obtain records related to B.A.S.'s mother's death from collateral parties," but "no documents were provided." Moreover, she was given no information about the "circumstances surrounding B.A.S.'s mother's death" or his whereabouts during and immediately after her death." Nor was she given "any information regarding B.A.S.'s response to learning of his mother's passing or any details of his experiences in the subsequent days, weeks, or months after her death." (*Id.* at 7.)

[7] For example, B.A.S. "exhibited a number of facial expressions and emotions on his face when engaged in back-and-forth conversation with the clinician. Also, [B.A.S.] followed up on the clinician's bids for conversation and showed interest by asking questions. Additionally, [B.A.S.], exhibited shared enjoyment in a teasing game regarding his stinky feet and giggled loudly at the clinician's surprised face while making eye contact. Furthermore, when [B.A.S.] provided verbal responses, there were subtle changes in his facial muscles that created different expressions related to his response. He exhibited the looks of surprise, frustration, irritation, and smiled when he laughed. These afore mentioned behaviors are significant in that they are contrary to a diagnosis of ASD. Social exchanges such as tickling, joking, understanding another's sense of humor, and making comments about the self, such as, 'I am strong,' and 'I am skinny,' indicate that B.A.S. has the social and cognitive ability to not only think these things, but articulate them as well, which is not the case for children with ASD." (*Id.* at 24.)

criteria for PTSD.  (*Id*.)  Those symptoms include "nightmares, night terrors, avoidance, increased irritability, behavioral regression, sleep disturbances, hypervigilance, fears, and emotional numbing."  (*Id*.)  In addition, the death of B.A.S.'s mother "represents a deeply distressing experience, especially considering his age and the close emotional bond a child shares with his mother."  His "grief and mourning process combined with his existing vulnerabilities including difficulties with externalizing behaviors, avoidance, attention problems, and school challenges make him particularly susceptible to the development of PTSD."  (*Id*. at 26.)[8]

On October 30, 2023, the Court asked Dr. Surowiec to provide her opinion on the following question: the effect on B.A.S. of removing him from his current residential and educational setting and returning him to Italy.  (*ECF Order dated Oct. 31, 2023*.)  Dr. Surowiec submitted her response on November 1, 2023.  She consulted "the body of literature exploring the correlation between a child's resilience and the prevalence of risk and protective factors in their life," and concluded that "[c]hildren who experience an abundance of risk factors, coupled with a relative lack of protective factors, are at the highest risk for future mental and physical health disorders, such as chronic illness, weakened immune system, relationship problems, substance abuse, and sleep disturbance, for example."  (*Id.* at 37–38.)  She identified significant risk factors in this case, including "early adverse experiences, developmental delays, a history of externalizing behavior, loss of a parent, and multiple diagnoses, including PTSD."  (*Id*.)  B.A.S. currently has a "nurturing home environment, a stable education setting, weekly therapeutic sessions . . . [and] consistent interactions with peers," as well as "access to medical professionals and treatments aimed at enhancing coping skills," "behavioral modification," and "active

---

[8] Dr. Surowiec also concluded that B.A.S. was "at risk for developing Oppositional Defiant Disorder (ODD)," the symptoms of which "include a frequent and persistent pattern of: irritable and angry mood, argumentative and defiant behavior, and spiteful or vindictive behaviors."  (*Id.* at 27.)

community engagement." (*Id*. at 38.)  Dr. Surowiec opined that "any life changes that have the potential to decrease his protective factors or increase his risk factors would constitute a notable risk," and that "disruptions in [B.A.S.'s] care and daily routines" could exacerbate his "symptoms, developmental regression, and heightened vulnerability to the onset of additional psychiatric diagnoses." (*Id*.)

## III.    Italian Legal Proceedings

As discussed more fully in the Court's August 2022 opinion, in December 2019, the Ninth Civil Section of the Milan Ordinary Court ("Milan Court") issued a series of orders in connection with B.A.S's return to Italy in Narkis Golan's custody, including orders of protection against the petitioner, an order granting temporary custody to Narkis Golan, supervised visitation between the petitioner and B.A.S., and an order directing Milan Social Services to oversee a comprehensive program of intervention in B.A.S.'s domestic life.  (ECF No. 96-1 at 11–13.) Among other things, the Milan Court directed social services to do an "accurate psycho-social investigation into the family" and to arrange for "psycho-diagnostic evaluations" of B.A.S., and psychological evaluations and parenting classes for the petitioner and Narkis Golan.  (*Id*.)

On November 28, 2022, after Narkis Golan died, the petitioner moved to vacate the Milan Court's protective order and grant the petitioner provisional custody upon B.A.S.'s return to Italy.  (ECF No. 174-12 at 1, 10.)  In the event that the Milan Court did not grant the petitioner's application, he requested that B.A.S. be allowed to stay with the petitioner's family. (*Id.* at 10.)  The petitioner argued that the protective order was no longer necessary because it was designed to prevent violence between the petitioner and Narkis Golan, and because there are no findings that the petitioner was violent toward B.A.S.  (*Id.* at 3.)

On January 25, 2023, the Milan Court revoked the protective elements of its December 2019 Order and declared "the cessation of the matter under dispute due to the death of Narkis

Aliza Golan;" the court "otherwise, insofar as it is still relevant," affirmed the remainder of the order.  (ECF No. 188-1 at 4.)  The court did not grant the petitioner's request for custody of B.A.S., or award custody to the petitioner's family; instead, it deemed that "the substantial interest of [B.A.S.], through the Special Guardian, can be protected before the Juvenile court." (*Id*. at 3.)  Accordingly, the Milan Court ordered "the sending of the records of the Public Prosecutor's Office at the Juvenile Court of Milan to the extent of its competence."  (*Id*. at 5) (hereinafter "Juvenile Court").

The parties dispute what would happen to B.A.S. if the Court ordered his return to Italy and submitted opinions on the legal implications of the Milan Court's order.  The petitioner's expert, Cinzia Calabrese, is a Milan attorney with experience in family law.  (ECF No. 188-2 at 1.)[9]  According to her, the Milan Court's order "entails that the Social Services of the Municipality of Milan are in charge of the decisions regarding the care and education of the child . . .  This decision does not imply that the child would be placed in foster care or an orphanage . . . .  In this case, there is no explicit provision placing the child with any other subject different than the father."  (*Id.*)

The respondent submitted the opinions of her lawyers in the Italian proceeding, Cinzia Roberti and Anna Paola Baggioli, who practice family and labor law in Rome and Milan, respectively.[10]  They agreed that the Milan Court's January 2023 decision vacated the order of protection prohibiting the petitioner from interacting with B.A.S.  (ECF No. 190-13.)  They stressed, however, that the petitioner's "parental authority is compressed and conditional" because the Milan Court "confer[red] all the powers for the management of [B.A.S.] to the

---

[9] Ms. Calabrese testified as an expert during trial in 2019.  *Saada I*, 2019 WL 1317868, at *13.

[10] Ms. Baggioli also represented Narkis Golan and testified at the 2019 trial.

Social Services," rather than giving custody to the petitioner or his family.  (*Id*. at 3.)  This, they argue, creates a potential "jurisdictional vacuum;" B.A.S. is not in Italy, and the lawyers opined that the Juvenile Court would not exercise jurisdiction until he arrived in Milan.  (*Id*.)  Ms. Roberti and Ms. Baggioli also predicted that the Juvenile Court would require the petitioner and his family members to "undergo an evaluation process with the social services" before he would be entrusted with B.A.S.  (*Id*.)  They concluded that "if [B.A.S.] were to return to Italy, he would now be placed in a family home together with other boys waiting for the Minor Court to conclude the trial or deem someone suitable to take [B.A.S.]," (*id*. at 4), and that B.A.S. might be forced to live in a group home while Social Services determined whether the petitioner was fit to take custody of him, (*id*. at 5).

Given the parties' dispute, and pursuant to the Hague Conference Protocol on Direct Judicial Communications,[11] the Court consulted the Honorable Mary W. Sheffield of the Missouri Court of Appeals, who currently serves as a U.S. Network Judge to the International Hague Network of Judges.  In a March 24, 2023 letter, Judge Sheffield asked Judge Daniela Bacchetta of the Ministry of Justice Department for Juvenile Justice and Judge Gabriella Tomai, the International Hague Network Judge for Italy, to explain the nature of any proceedings in the Juvenile Court of Milan, how the Milan Court's January 25, 2023 order would affect custody of B.A.S.—including whether the petitioner or his family members could have custody of B.A.S. if

---

[11] See generally Hague Conference on Private International Law, Direct Judicial Communications: Emerging Guidance Regarding the Development of the International Hague Network of Judges and General Principles for Judicial Communications, Including Commonly Accepted Safeguards for Direct Judicial Communications in Specific Cases, Within the Context of the International Hague Network of Judges (2013), https://assets.hcch.net/docs/62d073ca-eda0-494e-af66-2ddd368b7379.pdf.

B.A.S. returned to Italy, and whether there was a risk B.A.S. would be placed in institutional care.  (ECF No. 209 at 2.)[12]

On May 11, 2023, Judge Bacchetta responded that the Milan Court's jurisdiction was largely limited to cases concerning spousal separation and divorce, and that it had entrusted B.A.S. to local social services in response to the heightened conflict between his parents.  (ECF No. 217 at 1.)  The Milan Court effectively dismissed the case when Narkis Golan died, as there was no longer any conflict between her and the petitioner.  (*Id.*)  Judge Bacchetta also explained that upon the death of one parent, the surviving parent would normally assume sole custody of the child under Italian law; in this case, however, further proceedings would be necessary because the Milan Court had "entrusted" B.A.S. "to the local social service," which "represents a more or less strong limitation of" the petitioner's custody rights.  (*Id.* at 1.)  The Milan court sent the case to the Public Prosecutor's Office of the Juvenile Court, which "must decide how to proceed."  (*Id.* at 2.)[13]  Judge Bacchetta also explained that social, psychological, health and family services would be involved.  (*Id.*)

Judge Bacchetta opined that the fact that B.A.S. would be entrusted to social services upon his return to Italy did not mean that the petitioner or his family members would necessarily be prohibited from exercising custody over B.A.S.; rather, the Juvenile Court would be empowered to make this determination once B.A.S. returned to Italy.  (*Id.*)  In Judge Bacchetta's view, "[f]oster care or shelter homes would be the last resource, only if no family option is

---

[12] The Court advised the parties of all communications with the Italian Network judges as it has done throughout these proceedings.

[13] At the time of the communications with the Italian judges, the respondent had not yet made an appearance in the Italian proceedings.  The Court learned of her participation on November 1, 2023, when the petitioner filed a letter informing the Court that "Ms. Golan [requested] exclusive custody of B.A.S. in New York" on July 13, 2023.  (ECF No. 239 at 1.)

available," and that the Juvenile Law court could appoint various services to support the petitioner and B.A.S.  (*Id.* at 3.)

On May 17, 2023, the respondent filed a Notice of Foreign Law Issue pursuant to Rule 44.1 and attached a letter from Laura Serra, another Italian lawyer with expertise in family law. (ECF No. 220 at 1.)  Ms. Serra claimed that B.A.S. would "almost certainly" be placed in an institutional home upon his return to Italy (ECF No. 220-1 at 2–3), because the Milan Court, which could have revoked the 2019 decree in its entirety and granted the petitioner's request for custody, instead placed a "strong limitation" on the petitioner's custody rights by entrusting B.A.S. to Italian social services.  (*Id.* at 1.)  The Juvenile Court proceeding would be an "intra-family placement" requiring a thorough evaluation of any potential parent or guardian, including an evaluation of the petitioner's fitness as a parent, before he could exercise custody over B.A.S. (*Id.* at 2.)

Ms. Serra agreed with Judge Bacchetta "that, in principle '[f]oster care or shelter homes would be the last resource, only if no family option is available,'" but opined that there was a high likelihood B.A.S. would be placed in an institutional home given the "exceptional" circumstances of the case.  (*Id.* at 2–3.)  In her view, the Public Prosecutor would discharge its duty "very prudently and not risk placing the child with the father's family . . . pending a final placement decision" but also believed the Public Prosecutor would consider the traumatic impact that Narkis Golan's death had on B.A.S., his "autism diagnosis," and his inability to speak Italian.  (*Id.* at 3.)  According to Ms. Serra, the evaluation process could take years.  (*Id.* at 4.)

Ms. Serra further opined that B.A.S. would probably not receive appropriate psychological care, and that he would be emotionally and developmentally affected because the institutional homes in question have inadequate resources.  (*Id.* at 3–4.)  Ms. Serra emphasized

13

that it would be difficult for B.A.S. to receive any treatment without an Italian certification of his condition, which would further impede his receipt of adequate care.  (*Id.* at 4.)

On May 25, 2023, the petitioner submitted an opinion from his lawyers in Italy, Zanetti Vitali and Romauldo Richichi, who rejected Ms. Serra's opinion that B.A.S. would "almost certainly" be placed in foster care upon his return to Italy.  (ECF No. 222-1 at 2.)  Ms. Vitali and Mr. Richichi predicted that the Italian courts would place B.A.S. in an institutional home only as a last resort, adding that such placements occurred in limited circumstances where there is "clear evidence of an actual very grave danger for the child, as it happens in really degraded familial and social contests of habitual violence, drug abuse, deep poverty, crime and serious health of mental illness."  (*Id.*)  Ms. Vitali and Mr. Richichi expressed confidence that Italian social services and the Public Prosecutor would be able to protect B.A.S. from any risk posed by the petitioner without taking the drastic step of placing him in foster care.  (*Id.* at 3–4.)

a)  *Pending Proceeding in the Milan Juvenile Court*

On November 1, 2023, the petitioner informed the Court that on May 25, 2023, the Italian Public Prosecutor initiated a proceeding involving B.A.S in the Juvenile Court.[14]  (ECF No. 239.)  According to the filings attached to the petitioner's letter, the respondent requested on July 13, 2023 that the court "[g]rant sole custody of the minor [B.A.S.] to his maternal aunt, Morin Golan, by establishing the child's residence in New York;" the respondent also sought a protective order, supervision for all future visits with the petitioner, and the equivalent of child support from the petitioner.  (*Id.*)[15]

---

[14] On June 16, 2023, Judge Bacchetta wrote to Judge Sheffield that a case pertaining to B.A.S. had been opened before Judge Elly Marino in the Juvenile Court of Milan.  Judge Sheffield in turn relayed this information to the Court.  (*ECF Order dated June 16, 2023.*)

[15] On July 25, 2023, Judge Bacchetta sent the following email to Judge Sheffield: "I have been informed that in the case opened before the Juvenile Court of Milan, a report on Mr. Saada has been sent to the judge by the competent social service."  Judge Sheffield relayed this information to this Court.  (*ECF*

On September 22, 2023, the Italian judge issued an order: (a) setting a preliminary hearing on February 28, 2024; (b) directing the respondent to submit a statement at least 45 days before the hearing; (c) directing the petitioner to submit a statement at least 30 days before the hearing; and (d) appointing Mr. Alessandro Simeone as attorney for B.A.S. (*Id.* at 1.) According to the petitioner, "the Italian courts have continued to oversee B.A.S. and are actively evaluating Mr. Saada and exploring whether protective measures are appropriate," and "Ms. Golan is . . . actively litigating custody in Italy . . . ." (*Id.* at 2.)

On November 16, 2023, the respondent's counsel filed a declaration from Ms. Baggioli, disputing the status of the Italian court proceedings (ECF No. 244); according to Ms. Baggioli, "the Italian proceedings are currently in their infancy, and no active steps have been taken at this point to evaluate whether it would be safe for B.A.S. to be left in Mr. Saada's care." (ECF No. 244-1 ¶ 3.) Ms. Baggioli reiterated that "the odds that the Italian court will place B.A.S. in institutional care pending resolution of a judicial ruling in Italy on these allegations are, in [her] opinion, extremely high." (*Id.* ¶ 4.) She also stated that there "has been no 'oversight' by the Milan Juvenile Court," "[t]he court has not made directions or rulings of any kind," and Ms. Golan appeared in the matter only to ensure she could fight for custody "in the event that the New York federal court precipitously ordered B.A.S. to Italy."[16] (*Id.* ¶ 7.)

IV.    **Investigation and Report by the Administration for Children's Services**

On June 16, 2023, the respondent filed a letter alleging that the petitioner made sexual comments about women in front of B.A.S., showed B.A.S. "sexually explicit images," and

---

*Order dated July 25, 2023*.) Judge Bacchetta did not suggest that she had the report, and the Court has never received a copy of the report.

[16] Contrary to the claim in Ms. Bagnotti's declaration, this Court did not cause the Juvenile Court to initiate a proceeding simply by making an inquiry through the Hague network.

disparaged B.A.S.'s mother and the respondent's family.  (ECF No. 223 at 1–2.)  Attorney Joanna Kelly from the Children's Law Center—who represents B.A.S. in the Family Court proceedings—interviewed B.A.S about what happened during "recent visits" with the petitioner. (ECF No. 223 at 1.)  Shortly thereafter, the respondent filed another letter alleging that after an unsupervised visit on the weekend of June 16, 2023, the petitioner screamed at B.A.S. for reporting the images, pulled B.A.S.'s ear, and slapped him in the face.  According to the letter, B.A.S. said that the petitioner "berated" him the next day, and insulted B.A.S. and the respondent's family in Italian.  (ECF No. 225 at 1.)  B.A.S. also reported that the petitioner told B.A.S. that he would "get [the petitioner] in trouble" if he continued to speak to Ms. Kelly.  (*Id*.)

According to the respondent, B.A.S. "was unable to sleep" and said that he "does not ever want to see [the petitioner] ever again."  (*Id*. at 2.)  The respondent requested that the Court "lift its order for visitation" and revisit the Children's Law Center's request to represent B.A.S. in this case.  (*Id*.)  The respondent also requested further discovery on the issues identified in the June 16 and June 19, 2023 letters, including depositions and interrogatories, third-party subpoenas, and an evidentiary hearing.  (*Id*. at 5–6.)

The petitioner denied "the allegations related to showing sexual images, speaking about sexual acts to B.A.S., or hitting B.A.S."  (ECF No. 226 at 1.)  The petitioner said that "the most likely explanation" was that B.A.S. was "playing" on the petitioner's phone, and "seeking photographs and messages on Mr. Saada's WhatsApp between him and his girlfriend."  (*Id*. at 2.) The petitioner alleged that the respondent's family was influencing B.A.S. and turning him against the petitioner.  The petitioner argued that "[t]hese issues are ultimately custody related," and that the Court should deny the respondent's request for discovery.  (*Id*. at 2–3.)

On June 21, 2023, Ms. Kelly filed an affidavit in Family Court detailing these allegations; that same day, Judge Waksberg scheduled an order to show cause hearing for June 26, 2023.  (ECF No. 227-1.)  During the hearing, Judge Waksberg issued an Order for Investigation/Report, which directed the New York Administration for Children's Services, Division of Child Protection ("Child Protective Services" or "CPS") to investigate the "allegations described in [the] order to show cause," as well as the issue of whether B.A.S. was "being coached," and to issue its report by July 25, 2023.  (ECF Nos. 228, 228-1.)  CPS provided its initial report on July 25, 2023, (ECF No. 233-2), and filed an updated version on August 18, 2023, (ECF No. 233-1).

A CPS employee interviewed B.A.S., who said that "his biological father is not nice he hits people and he hit him as well," and that "his father is the grossest person ever."  (ECF No. 233-1 at 7.)  Safe Horizon Social Worker Katheryn Torres interviewed B.A.S. on June 23, 2023. B.A.S. reiterated what he told CPS and said that "his father likes girls and vaginas and began to point towards the private area sticking out his tongue stating it was gross."  (*Id*. at 8.)  B.A.S. also said "that his father slapped him and pulled him," and "that it was the first time he was ever hit by his father."  (*Id*.)

C.P.S. was "unable to make a determination" about whether B.A.S. had been coached. (ECF No. 233-1 at 8.)

*a)      The Petitioner's "Indicated" Report*

CPS filed an "Indicated" Report on July 20, 2023, (*id*. at 6), which means that "CPS found enough evidence to support the claim that a child has been abused or neglected."  *See* NYC Admin. for Children's Services, *A Parent's Guide to Child Abuse Investigation* https://www.nyc.gov/site/acs/child-welfare/parents-guide-child-abuse-investigation.page.  CPS's

notes in connection with the Indicated Report reflect the following from an interview with

B.A.S:

> [O]n [June 16 and 17, 2023, the petitioner] was rude to [B.A.S.] CPS asked how and [B.A.S.] stated that his dad pulled his ear and slap him. [B.A.S.] asked if he could use the word his dad use, and the CPS respond yes. According to [B.A.S.], his dad said to him "what the Fuck are you, what Fuck, you stupid, keep yelling at me because I talk to Johanna [Kelly]." CPS asked who Johanna and [B.A.S.] stated that she is a lawyer. CPS inquired about what he told Johanna and [B.A.S.] respond, I don't want to talk about it.
>
> CPS inquired about his dad pulling on his ear and slapping him and how it made him feel. According to [B.A.S.] he felt horrible, and he cried because his dad pulled both ears and slapped him on his face. [B.A.S.] reported that 'taxi guy said what are you doing because he was rude.' CPS asked who was rude and the child respond my dad. [B.A.S.] reported that he is afraid of his dad because his dad slapped him whole day Saturday and Sunday and yelled at him. [B.A.S.] reported that he felt sad and annoyed. [B.A.S.] reported that 'dad is rude, don't like seeing him, he always says bad things about Morin and family.' [B.A.S.] reported that he is afraid of his dad because he yells. . . .
>
> CPS inquired about how many time his dad slap him. [B.A.S.] stated that this weekend was the first time his dad slapped him and pulled his ears. . . . The CPS probe about the picture and videos and that made [B.A.S.] uncomfortable, and [B.A.S.] made no disclosure. [B.A.S.] said I know why you writing, I know what you doing, you going tell it to the Judge."

(ECF No. 235-1 at 15.)

In a separate interview, Morin Golan reported that B.A.S. said that the petitioner showed him sexually explicit images, and that "his dad told him he likes girls with dick and his favorite place to lick is the place where pee comes from." (*Id*. at 13.) She further reported that "when she picked [B.A.S.] up" after his birthday weekend, he "seemed distant." (*Id*.) "She stated that the child reported that his father grabbed him by the ear, slapped him on the face and called him stupid because he told Johanna [sic] what happened." (*Id*.)

On September 8, 2023, the respondent moved for an evidentiary hearing on CPS's findings and requested that the Court reevaluate whether "any visitation should continue to be unsupervised," (ECF Nos. 233, 236); the Court denied motion for an evidentiary hearing as unnecessary.  (*ECF Order dated Nov. 8, 2023*.)

## LEGAL STANDARD

The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*., permits a parent (or other individual or institution) seeking relief under the Hague Convention to file a petition for return of a child in state or federal court, *id.* § 9003(a)-(b), and directs courts to "decide the[se] case[s] in accordance with the Convention," *id.* § 9003(d).  ICARA "empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."  *Id.* § 9001(b)(4); *see* Art. 19, Treaty Doc., at 11 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue").

The Convention's "core premise" is that "'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'"  *Monasky* v. *Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting Convention Preamble, Treaty Doc., at 7).  Accordingly, the Convention generally requires the "prompt return" of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country.  Art. 1(a), Treaty Doc., at 7; *see also* Art. 12, *id.*, at 9. This requirement "ensure[s] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Art. 1(b), *id*. at 7.

Return of the child is, however, a general rule—there are exceptions.  As relevant here, the Convention provides that return is not required if "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable

situation." Art. 13(b), *id*. at 10.  "[A] grave risk of harm" from repatriating the child to the country of habitual residence arises "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (internal quotations omitted).  According to the Second Circuit, "[t]he potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." *Id.* (internal quotations omitted).  The grave risk determination includes both "the magnitude of the potential harm" and "the probability that the harm will materialize." *Id.*  A respondent arguing that return would expose the child to a grave risk of harm must establish that this exception applies by "clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).  Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be "promptly returned" to the child's country of habitual residence.  *Id.* § 9001(a)(4).

The Convention "is designed to protect the interests of children and their parents," *Lozano v. Montoya Alvarez*, 572 U.S. 1, 19 (2014) (Alito, J., concurring), and children's interests may point against return in some circumstances.  The Convention explicitly recognizes that the child's interest in avoiding physical or psychological harm, in addition to other interests, "may overcome the return remedy." *Id.* at 16 (majority opinion) (cataloging interests).  Courts must remain conscious of this purpose, "bearing in mind that the Convention sets as a primary goal the safety of the child." *Golan v. Saada*, 596 U.S. 666, 668 (2022).

## DISCUSSION

The record before the Court establishes by clear and convincing evidence that under the current circumstances, granting the petition and returning B.A.S. to Italy would subject him to a grave risk of harm—psychological and otherwise—and place him in "an intolerable situation."

## I.   Dr. Surowiec

There is an undisputed expert opinion that returning B.A.S to Italy under the current circumstances would risk serious psychological damage.  After a meticulous examination over the course of seven months, Dr. Karen Surowiec diagnosed B.A.S. with PTSD.  To answer the Court's question—the effect on B.A.S. of removing him from his current residential and education setting and returning him to Italy—Dr. Surowiec consulted "the body of literature exploring the correlation between a child's resilience and the prevalence of risk and protective factors in their life."  (ECF No. 238 at 37.)  Risk factors include "early adverse experiences, developmental delays, academic stressors, challenging peer relationships, family conflict, family history of mental health disorders, and psychiatric diagnoses to name a few."  (*Id.*)  On the other hand, protective factors include "compassionate family support, positive parenting, insulation from stressors, social support, effective coping mechanisms, favorable peer relationships, community involvement, and access to suitable mental health services and appropriate therapeutic treatments."  (*Id.*)  Dr. Surowiec explained that "[c]hildren who experience an abundance of risk factors, coupled with a relative lack of protective factors, are at the highest risk for future mental and physical health disorders."  (*Id.*)

According to Dr. Surowiec, seven-year-old B.A.S. has multiple risk factors: early adverse experiences— including domestic violence between his parents—developmental delays, a history of externalizing behavior, and the recent loss of his mother, who was his sole caretaker for most of his life.  Dr. Surowiec determined that these experiences make B.A.S. "particularly

21

susceptible" to PTSD.  (ECF No. 238 at 26.)   B.A.S.'s PTSD diagnosis increases the risk that he could develop "chronic illness, weakened immune system, relationship problems, substance abuse, and sleep disturbance."  (*Id.* at 37).  B.A.S.'s current symptoms include "nightmares, night terrors, avoidance, increased irritability, behavioral regression, sleep disturbances, hypervigilance, fears, and emotional numbing."  (*Id.* at 26.)

B.A.S.'s existing "protective factors" include a nurturing home environment in the respondent's custody, a stable educational setting, weekly therapeutic sessions guided by a counselor who can facilitate his grieving process, consistent interactions with peers, access to medical professionals and treatments aimed at enhancing coping skills and behavioral modification, as well as active community engagement.  (ECF No. 238 at 38.)  Dr. Surowiec concludes:

> Given [B.A.S.'s] developmental history, early exposure to adverse experiences, and his present diagnostic profile, any life changes that have the potential to decrease his protective factors or increase his risk factors would constitute a notable risk.  Furthermore, disruptions in [B.A.S.'s] care and daily routines could potentially result in the exacerbation of his symptoms, developmental regression, and heightened vulnerability to the onset of additional psychiatric diagnoses."

(*Id.*)

The petitioner does not dispute Dr. Surowiec's conclusion that B.A.S. has PTSD.[17]  Nor does he dispute Dr. Surowiec's finding that returning B.A.S to Italy could cause him lasting and significant damage.  Instead, characterizing the return as a "temporary disruption until [B.A.S.] becomes accustomed to his new routine," he argues that Dr. Surowiec's opinion does not establish grave risk by clear and convincing evidence, because she did not opine that "that he

---

[17] While the respondent does not directly contest Dr. Surowiec's conclusion, she describes the diagnosis as "surprising," and presses the point that B.A.S. has been diagnosed with autism.  (ECF No. 240 at 2.)  Dr. Surowiec, whom the respondent agreed was an appropriate neutral expert, found otherwise.

*will* suffer any harm."  (ECF No. 245 at 3 (emphasis in original).)  But the Court's task in determining "grave risk" is not to determine whether psychological harm is a *certainty*; rather, it is to determine whether there is a *risk* of harm.  *See Souratgar*, 720 F.3d at 103 (grave risk determination includes both "the magnitude of the potential harm" and "the probability that the harm will materialize"); *Blondin v. Dubois*, 238 F.3d 153, 160 (2d Cir. 2001) (accepting "uncontroverted" report from psychiatrist recommending that "if the children were returned to France with or without their mother and even if they could avoid being in the same domicile as their father [ ] they would almost certainly suffer a recurrence of their traumatic stress disorder (i.e. post-traumatic stress disorder) that would impair their physical, emotional, intellectual and social development"), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022); *Reyes Olguin v. Cruz Santana*, No. 03-CV-6299, 2005 WL 67094, at *7 (E.D.N.Y. Jan. 13, 2005) ("Here, there is uncontroverted expert testimony that the children are at great risk of severe psychological damage if they are returned to Mexico."); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005) (finding grave risk of harm with respect to sibling the petitioner did not abuse, given the petitioner's history of physical and psychological abuse of one child).

In short, Dr. Surowiec's uncontradicted opinion more than satisfies the clear and convincing standard of proof and is sufficient on its own to deny the petition.  There are, however, additional factors supporting that conclusion, as detailed below.

## II.     The Uncertainty of the Situation in Italy

In *Application of Blondin v. DuBois*, then-District Judge Denny Chin observed that a court determining whether a child will face a grave risk of harm upon repatriation "must engage in 'some evaluation of the people and circumstances awaiting [the] child in the country of . . . habitual residence.'"  78. F. Supp. 2d 283 (S.D.N.Y. 2000) (quoting *Nunez-Escudero v. Tice-*

*Menley*, 58 F.3d 374, 376 (8th Cir.1995)); *see also Tahan v. Duquette*, 613 A.2d 486, 489 (1992) (petitioned court "must be empowered to evaluate the surroundings to which the child is to be sent and the basic personal qualities of those located there").  Judge Chin also cited the "signatories to the Convention," who "were of the view that:"

> the interest of the child in not being removed from [his or her] habitual residence without sufficient guarantees of [his or her] stability in the new environment [] *gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.*

Elisa Perez-Vera, Explanatory Report to the Convention, ¶ 29 (emphasis added).[18]

Guided by that reasoning, the Court considers the record on the current situation in the Italian courts.  When Narkis Golan died, the Milan Court revoked its December 2019 protective order, but did not grant the petitioner's request for custody of B.A.S.  (ECF No. 188-1.)  Rather, the court referred the issue of custody to the Public Prosecutor's Office at the Milan Juvenile Court.  The respondent's legal experts predict there is a "high likelihood" that B.A.S. would be placed in institutional care for an uncertain period while the petitioner and his family "undergo an evaluation process with the social services."  (*Id*.)  The petitioner responds that the risk of institutionalization is low, and that children in B.A.S.'s situation are placed in foster care only if there is "clear evidence of an actual very grave danger for the child," typically in "degraded familial and social contests of habitual violence, drug abuse, deep poverty, crime and serious health of mental illness."  (ECF No. 222-1 at 2.)

---

[18] Perez-Vera was the official Hague Conference reporter for the Convention, and the U.S. State Department explains that "[h]er explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention."  51 Fed. Reg. 10,494, 10,503 (1986) (U.S. Dep't of State Text and Legal Analysis of the Convention).

Judge Bacchetta, the most neutral expert on this question, described B.A.S.'s "entrustment to the social services" as "more or less" a "strong limitation" of the petitioner's custody rights, (ECF No. 217 at 1, 2), and opined that the Juvenile Court would order B.A.S. into institutional care as a "last resource, only if no family option is available." (*Id.* at 3.) If B.A.S. were returned to Italy, "the Public Prosecutor must decide how to proceed and what kind of request to propose to the Juvenile Court." (*Id.* at 1.) Judge Bacchetta "[could not] say more" about what might happen. (*Id*. at 2.)

In short, there is agreement that institutionalization is a possibility; the dispute is whether that possibility is likely or unlikely. Dr. Surowiec determined that because of B.A.S.'s diagnostic profile, "life changes"—such as being sent to a country that is unfamiliar to him, and where he does not speak the language—"would constitute a notable risk" and "could potentially result in the exacerbation of his symptoms, developmental regression, and heightened vulnerability to the onset of additional psychiatric diagnoses." (ECF No. 238 at 38.)

In the Court's view, even the remote possibility of institutionalization is too great a risk for B.A.S., a child with PTSD, who has lost his mother, does not speak Italian, and has no memory of life in Italy. To be clear, this is not a case in which the country of habitual residence is incapable of making a custody determination. Indeed, the Italian Courts have taken an active role throughout the pendency of this case. The Court's concern in this unique case is with B.A.S.'s welfare while that determination is made. There simply is no way to predict with any confidence what would happen to B.A.S. if he were forced to return to Italy—where he would live, with whom, or under what circumstances. Nor is there any way to predict how long it would take to determine the question of custody. *See Blondin*, 78 F. Supp. 2d at 295–296 (finding that the "insecurity of returning to France and the uncertainty of the custody proceedings

25

there would exacerbate" the children's trauma).  In short, return under these circumstances would throw B.A.S. "into a maelstrom of uncertainty and insecurity," *id.* at 295, which is an additional reason to deny the petition, as it would clearly exacerbate the grave risk of harm that the Court has determined exists in this case.

## III.    Allegations of Abuse

Finally, the Court considers the relevance of CPS's July 20, 2023 "Indicated" Report in connection with allegations that the petitioner screamed at B.A.S., slapped him, pulled his ears, and exposed him to pornographic images.[19]  (*See* ECF Nos. 233, 235.)

A court deciding a Hague Convention petition "must resist the temptation to engage in a custody determination under the traditional 'best interests' test." *Elyashiv*, 353 F. Supp. at 403; *see also Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("[A] United States district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.").  A custody determination is "contrary to a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich*, 983 F.2d at 1400.  "[I]t is not relevant . . . who is the better parent in the long run, or whether the absconding parent had good reason to leave her home . . . and terminate her marriage." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (cleaned up).[20]  With these principles in mind, the Court considers the relevance and significance of the CPS "Indicated Report" to the question of grave risk.

---

[19] As detailed above, Judge Waksberg ordered an investigation on June 26, 2023, which CPS filed in the Family Court on July 25, with an amended version on August 18.  The impetus for the CPS "Indicated" Report is not confirmed, but according to the respondent, "[i]t appears that the investigation was commenced based on a report from B.A.S.'s school."  (ECF No. 235 at 2; ECF No. 235-1 at 30.)

[20] It is for these reasons that the Court has denied the respondent's multiple demands for hearings, discovery, to add lawyers, and other measures that are not appropriate in a Hague Convention case.

The respondent maintains that the CPS reports are proof positive that the petitioner poses a danger to B.A.S. and should not have custody of him.  (*See* ECF No. 235 at 4 ("[W]e believe that the CPS notes further confirm that B.A.S. would face a grave risk of both physical and psychological harm, and would be placed in an intolerable situation, if this Court ordered him to Italy.").)  The petitioner, on the other hand, denies the allegations contained in the report, urges that any such evaluation should be left to the court charged with making custody determinations, and alleges that "[t]he Court can be confident . . . that [B.A.S.] was somehow prepped for his interview by Respondent's side."  (*See* ECF No. 236.)

As an initial matter, there has been no finding that the allegations in the report are true. An "indicated report" means CPS determined that "a fair preponderance of the evidence of the alleged abuse or maltreatment exists."  N.Y. SSL § 412(7); *see Van Oss v. New York*, 783 F. Supp. 2d 681, 686 (S.D.N.Y. 2011).  This is not a determination of guilt.

Moreover, it is not unheard of in hotly contested custody cases, as this case surely is, for a party to "coach" a child into accusing the other parent of abuse.  *See e.g.*, *Nowlan v. Nowlan*, 543 F. Supp. 3d 324, 365 (W.D. Va. 2021), *aff'd*, No. 21-1965, 2022 WL 34141 (4th Cir. Jan. 4, 2022).  That is one of the subjects that Judge Waksberg directed CPS to investigate.  In this regard, the respondent's claim that the court-ordered investigation "does not find any evidence that B.A.S. was coached," (ECF No. 233 at 2), misstates the record.  In fact, the investigator "was unable to make a determination."  (ECF No. 233-1 at 8.)

Whether the allegations are true and whether someone coached B.A.S. are questions for the court determining custody, not the court determining the Hague Convention petition.  The issue for this Court is whether the mere existence of the "indicated" report is entitled to weight in the grave risk analysis.  While the report is concerning, especially because B.A.S. is a vulnerable

child, "[s]poradic or isolated incidents of physical discipline directed at the child" do not generally constitute grave risk.  *Souratgar*, 720 F.3d at 104; *see also Saavedra v. Montoya*, No. 21-CV-5418, 2023 WL 2910654, at *15 (E.D.N.Y. Apr. 12, 2023) (evidence that petitioner spanked his child and left a mark was fundamentally disciplinary in nature and did not constitute a grave risk of harm).  Further, there has been no determination about the truth of the allegations.  Accordingly, the report, standing alone, does not establish grave risk.[21]

The Court has never questioned the Italian courts' ability to make a custody decision that prioritizes B.A.S.'s well-being.  However, at this time, the mere process of uprooting this fragile seven-year-old, diagnosed with PTSD and still coming to grips with his mother's death, as well as the uncertainty about what would happen if he were returned to Italy, would expose him to a grave risk of psychological harm and put him in an intolerable situation.  For reasons "entirely beyond their control," the Italian authorities cannot at this point protect B.A.S. from that risk.  *Blondin*, 238 F.3d at 162.  The Court expresses no opinion on the ultimate question of custody.  As explained above, there is currently a case in the New York Family Court, overseen by a well-respected and fair judge with deep experience in these difficult matters who is familiar with the facts of the case.  The parties can present their evidence and arguments in that forum.

---

[21] The respondent asks the Court to consider the petitioner's alleged efforts to "cause B.A.S. to become estranged from his maternal family."  (ECF No. 240 at 8.)  The petitioner accuses the respondent of similar conduct.  This is not an appropriate reason to deny a petition.

**CONCLUSION**

For the reasons explained above, the amended petition is denied.  The Clerk of Court is respectfully directed to enter judgment in favor of the respondent and close the case.  The parties are to meet and confer regarding B.A.S.'s continued custody case in the King's County Family Court.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       January 24, 2024